# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| AMPHENOL CORPORATION,<br><br>Plaintiff,<br>V.<br><br>RICHARD PAUL,<br><br>Defendant. | CIVIL NO. 3:12-cv-543 (AVC)<br><br>MAY 7, 2012 |

**AFFIDAVIT OF RICHARD PAUL**

I, Richard Paul, do swear and depose under penalty of perjury, as follows:

1. I am over eighteen years of age and understand the obligations of an oath.

2. I have personal knowledge of the facts stated herein, which are true to the best of my knowledge and belief, and, if called to do so, would testify competently to them.

3. I submit this affidavit in support of my Memorandum in Opposition to Emergency Motion For Preliminary Injunction in the above-captioned case.

4. Until March 9, 2012, I was the Business Unit Director of the High Speed Interconnect unit at Amphenol Corporation ("Amphenol").

5. "Connectors," "interconnects," "interconnectors," and "electrical connectors" are terms used to describe a wide-range of electro-mechanical devices that use a mechanical assembly to join electrical circuits. There are many types of connectors, of varying sizes, shapes, and durability, used for various applications in a wide-range of markets. As Amphenol's Business Unit Director, I primarily worked with Amphenol's high-speed cylindrical electrical connectors for the military and commercial aerospace marketplaces.

6. I am a lifelong resident of Bainbridge, New York, a small, close-knit rural community located approximately seven (7) miles from Sidney, New York, where the an Amphenol plant I worked at is located.

7. I live with my wife in the home my grandparents lived in. We have one daughter together, a freshman in college, as well as two step-children.

8. I live across the street from my father, a widower who lives by himself. He is experiencing certain health issues, and requires near constant supervision and care.

9. Amphenol, in one way or another, employees the majority of my community, some of my closest friends, and my family. My brother is a manager at Amphenol, one of my sons is an Amphenol engineer and my other son is an Amphenol salesman.

10. In 1983, I joined Amphenol, at that time called Bendix Connector Operations, as a technical analysis engineer.

11. In 1987, I left Amphenol to work for BF Goodrich Aerospace as a project engineer.

12. In 1996, I returned to Amphenol as an engineering manager.

13. From 1996 until my departure in 2012, I advanced while at Amphenol. I held positions as an Engineering Manager, New Products Manager, Director of Marketing, and, finally, a Business Unit Director for Amphenol's High Speed Interconnect unit.

14. On March 9, 2012, I resigned from my position at Amphenol at a meeting I requested with Richard Aiken, the General Manager for Amphenol's Military Aerospace Operations, and Sheri Youngs, Amphenol's Human Resources Manager. At the meeting, I returned to Amphenol

my laptop, cell phone, employee badge, corporate American Express card, and keys to the Amphenol facility: Although I made myself available via my home phone and personal e-mail, Amphenol did not contact me to arrange an exit interview.

15. I did not leave Amphenol with any intention to harm Amphenol in any way. As I wrote to Amphenol in my resignation letter, I had every intention that my departure would be amicable and that I would leave as an employee in good standing.

16. On March 12, 2012, I signed a contract to become TE Connectivity, Inc.'s ("TE") Vice President for Product Management and Pricing for its Aerospace, Defense & Marine business unit.

17. In my new position at TE, my responsibilities are different from my responsibilities at Amphenol. At TE, I am responsible for product management and pricing for TE's relays, wire/cable, and engineered products, which are primarily cable accessories.

18. At first, I understood that the TE position would have a minor role with some TE connectors, but I understood that these TE connectors were different from the Amphenol high speed, cylindrical connectors I had been working with at Amphenol. Subsequently, however, I agreed with TE that I would have no responsibility for TE's connectors or interconnectors of any kind.

19. On March 12, 2012, I sent Mr. Aiken, Mrs. Youngs and Gary Anderson, Amphenol's Senior Vice President and Group General Manager, an e-mail stating that I was joining TE. Later that afternoon, I received a call from Mr. Aiken. We discussed my new position at TE in further detail, including the products I would be working with at TE.

20. I did not hear from Amphenol until March 21, 2012, when I received a letter from Attorney James Beausoleil, one of the lawyers for Amphenol in this case. The letter stated, among other things, that Amphenol was requesting that I not work for TE.

21. On March 28, 2012, a week later, I received an e-mail attaching a letter from Amphenol's attorney, Attorney Beausoleil requesting that I, among other things, "secure and maintain" certain "electronic storage devices," "printed material," and "a Yahoo account."

22. On March 29, 2012, the next day, I sent an e-mail to Attorney Beausoleil. In that e-mail, I wrote that I intended to give his firm and Amphenol my full cooperation:

(a) I stated that I had no intention or desire to compete with Amphenol in my new position at TE.

(b) I stated that I understood that TE had provided Amphenol with a description of my position at TE, and that this should assure Amphenol of my intentions.

(c) I wrote that I would not "violate any terms of my Amphenol employment."

(d) I also stated that I "have not, nor would ever, share sensitive data, in any form, that relates to Amphenol with TE or anyone else."

(e) I noted that "[i]f Amphenol is uncomfortable with any files I may have on my back up drive or thumb drives, I would be happy to accommodate a meeting with an Amphenol representative and have these files permanently deleted; I only ask that I am allowed to retain the numerous personal files (pictures, videos, personal passwords (i.e. banking), tax preparation records, etc) that may be on the drives."

(f) I stated that I did not have any "CD's or floppy drives, or any printed data (with the exception of a company phone list, some business cards that I have collected, and my most recent log book)." I offered to return these items to Amphenol.

23. On March 30, 2012, the next day, Attorney Beausoleil sent me an e-mail asking, among other things, that I send "any Amphenol hard copy documents" to his address and that I send "any external hard drives, thumb drives, or other storage devices, etc. that have any Amphenol documents or data on them" to his firm's consultant.

24. On April 2, 2012, I e-mailed Attorney Beausoleil stating that, among other things, that I would be returning "all printed material I have that relates to Amphenol" including "my phone directories, most recent log book, and business cards I have collected."

(a) I also stated that I was not comfortable with giving his firm's consultant my external hard drive with access to delete Amphenol's files, as I did not know how his consultant would know "what were Amphenol files, and what were mine."

(b) I again offered to have an "Amphenol IT person witness me deleting files of concern (I will be home all day today) . . . . I would delete the files, and then empty the recycle bin."

(c) I also stated that if the consultant "has a more secure method I would be willing to listen."

25. On April 4, 2012, I sent Attorney Beausoleil the requested phone directory, business cards, and a log book. I was uncomfortable sending the hard drive because it has my family's

personal information on it, including my banking documents, secure passwords, tax information, and family photographs.

26. Despite my concerns about my confidential personal information, I subsequently turned over my hard drive and external thumb drives – including my personal information –to Amphenol's lawyers. I have also since returned a laptop to Amphenol. Amphenol has not returned the hard drive, or my personal files contained on the hard drive, to me.

27. As was the practice at Amphenol, I used Amphenol computers for both business and personal purposes. As such, I had a great deal of personal information stored on my Amphenol computer and on Amphenol's network, including, but not limited to, family pictures, tax return spreadsheets, personal financial records, personal e-mails, and private account passwords.

28. To the extent that I may have copied, printed, or forwarded information from Amphenol computers or networks, my sole purpose was to protect my personal information and assist Amphenol through completing work for Amphenol.

29. Regarding my Yahoo!® e-mail account (rpaulaao@yahoo.com), this was my primary personal e-mail account for years. Amphenol did not supply this account to me. It was the practice of many Amphenol employees to use their personal e-mail accounts for work.

30. Due to difficulties accessing the Amphenol network remotely, I would occasionally forward work e-mails to this Yahoo!® e-mail account (rpaulaao@yahoo.com) so that I could more easily read my work e-mails at home.

31. I have stopped the regular use of the Yahoo!® e-mail account (rpaulaao@yahoo.com) account, except to monitor the account for personal e-mails and for purposes of this lawsuit. I understand that a copy of the account has been made for purposes of this lawsuit.

32. On April 13, 2012, I viewed my bank account, which revealed that Amphenol had been direct depositing checks corresponding to payments for 50% of my Amphenol salary into my bank account without my knowledge or consent. Amphenol made the first deposit into my account on March 30, 2012. Through my lawyers, I have requested that these direct deposits stop.

33. I had, and have, no intention of harming Amphenol, violating any obligations to Amphenol, or using any of Amphenol's confidential, proprietary or trade secret information for my own use of for the use of any other company. I have no intention of violating any agreements or obligations I have or may have with Amphenol.

34. I understand that TE has taken precautions to make sure that:

(a) I do not use any confidential or trade secret information belonging to Amphenol;

(b) I do not provide any such information to any TE employee;

(c) I am not ever pressured to do so; and

(d) I am not put in a position where I will inevitably use Amphenol's confidential information.

35. I signed an intellectual property protection agreement with TE, which states, in relevant part:

> Tyco Electronics respects the intellectual property rights of others. This includes another's confidential and proprietary information . . . You hereby agree that you have not and will not share with Tyco Electronics any confidential or proprietary information you have received from your present or former employers. Should you be asked a question that you believe might require such a disclosure, you agree to raise the issue immediately and any answer you provide shall not disclose or otherwise utilize such confidential or proprietary information. You further agree never to use for your own or for Tyco Electronic[']s benefit any former employer's confidential or proprietary information. . . .

I will abide by this agreement.

36. I understand that I will have no role in the integration of TE and Deutsch Group SAS ("Deutsch").

37. TE and I have taken precautions to make sure that my TE employment poses no harm to Amphenol's legitimate business interests. As TE has assured Amphenol in writing:

(a) I will not be required to use and will not use Amphenol's confidential information for TE's benefit;

(b) For at least one year, I will have no input into TE's prospective Deutsch business, its manufacturing facilities, engineers, product, or personnel;

(c) Deutsch's locations will be separate from TE's Aerospace, Defense & Marine locations;

(d) For a year, I will not attempt to divert Amphenol customers or suppliers, with whom I have had contact over the last year, to do business with TE instead; and

(e) For a year, I will not attempt to solicit Amphenol employees with whom I worked in the last year of his work for Amphenol.

38. At TE, I am not directly or indirectly engaging in the production, development, sale or distribution of any product produced, sold or distributed by Amphenol or which, to the best of my knowledge, was in development by Amphenol at the time I left Amphenol.

39. TE has instructed me that, while working for TE, I should not directly or indirectly engage in the production, development, sale, or distribution of any product produced, sold, or distributed by Amphenol.

40. At TE, I will not directly or indirectly engaging in the production, development, sale or distribution of any product produced, sold or distributed by Amphenol or which, to the best of my knowledge, was in development by Amphenol at the time I left Amphenol.

I affirm under penalty of perjury that the foregoing is true and correct.

[signature]
Richard Paul

Sworn and subscribed before
me this 7th day of May, 2012
[signature]
Notary Public
My commission expires 5/24/14

SAMANTHA M. SNELL
Notary Public, State of New York
Delaware County, No. 01SN6222391
My Commission Expires 5/24/14