UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| AMPHENOL CORPORATION, Plaintiff | Civil Action No. 3:12-cv-00543-AVC |
| v. | (Electronically Filed) |
| RICHARD PAUL, Defendant. | **EMERGENCY RELIEF REQUESTED** |

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR ORDER ON COURT'S AMENDED RULING AND IN SUPPORT OF PLAINTIFF'S EMERGENCY CROSS-MOTION TO EXTEND THE INJUNCTION PERIOD

**[FILED UNDER SEAL IN ACCORDANCE WITH LOCAL RULE 5(E)]**

**OF COUNSEL:**
James L. Beausoleil, Jr., Esq.
Anthony L. Gallia, Esq.
James J. Halligan, Esq.
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19106-4196
Tel: 215-979-1120/1127/1187
Fax: 215-979-1020
Email: jlbeausoleil@duanemorris.com
Email: algallia@duanemorris.com
Email: jjhalligan@duanemorris.com

Michael C. Jankovsky, Esq.
QUATRELLA & RIZIO, LLC
One Post Road
Fairfield, CT 06824
Tel: 203-255-9928, ext. 324
Fax: 203-255-6618
E-mail: mjankovsky@qrlaw.com

*Attorneys for Plaintiff*
*Amphenol Corporation*

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .......... 1

II. FACTUAL BACKGROUND .......... 3

A. Paul and TE Abused the Judicial Process in Order to Escape Injunctive Relief. .......... 3

1. TE Intentionally Withheld Evidence to Prevent Amphenol From Confirming the Accuracy of the Representations Made by Paul and TE. .......... 3

2. Paul and TE Knowingly Offered False or, at Best, Misleading Testimony at the Injunction Hearing in Order to Escape Injunctive Relief. .......... 5

3. TE's Continued Efforts to Withhold and Conceal Discoverable Evidence. .......... 6

B. Contrary to Paul and TE's Sworn Assertions, the Documents Recently Produced by TE Clearly Show that Paul *Has* Engaged in Competitive and Harmful Conduct. .......... 7

1. Paul Had Involvement and Input in the Deutsch Integration and with Deutsch Products During the Non-Compete Period. .......... 8

(1) Paul and TE misrepresented the level of integration between TE and Deutsch at the October 2012 injunction hearing. .......... 8

(2) Paul was involved in the various phases of the TE/Deutsch integration. .......... 9

(3) TE and Deutsch personnel routinely reported to Paul regarding Deutsch, Deutsch products, the Deutsch integration, and competitive opportunities resulting from the TE/Deutsch integration. .......... 12

2. Paul Had Involvement and Input Into the [redacted] Line of Connector Adapters. .......... 14

3. Paul Had Input and Involvement with a [redacted] Being Developed by TE that Directly Competes with Amphenol's [redacted] .......... 17

4. Paul Had Involvement or Input Into Other Connector-Related Products. .......... 20

III. ARGUMENT ........................................................................................................ 23

A. The Court Should Equitably Extend the Injunctive Period For Eight Months So That Amphenol May Receive the Full Year of Non-Competition It Bargained For. ........................................................................................ 23

B. The Extension of Paul's Non-Competition Beyond One Year Is Contemplated by the Parties and Is Clearly Reasonable In Light of The Actual and Threated Harm Caused By Paul. ........................................................ 27

C. The Balance of Harms Weighs Decidedly in Amphenol's Favor. ........................ 28

IV. CONCLUSION ........................................................................................................ 30

**TABLE OF AUTHORITIES**

**Federal Cases**

*Levitt Corp. v. Levitt*, 593 F.2d 463 (2d Cir. 1979) .......... 23, 27

*Loewen Group Int'l, Inc. v. Haberichter*, 1998 U.S. App. LEXIS 28514 (7th Cir. 1998) .......... 24

*Marsh USA Inc. v. Marsh & McLennan Cos.*, 2008 U.S. Dist. LEXIS 90986 (S.D.N.Y. Oct. 31, 2008) .......... 28

*Overholt Corp. Ins. Serv. Co. v. Travis*, 941 F.2d 1361 (8th Cir. 1991) .......... 24

**State Cases**

*Deloitte & Touche USA LLP v. Lamela*, 2007 Del. Ch. LEXIS 44 (2007) .......... 23

*J.H. Goldberg Co. v. Stern*, 53 A.D.2d 246 (N.Y. App. Div. 4th Dept. 1976) .......... 23, 26-27

*Leiboff v. Peleaz*, 671 N.Y.S.2d 336 (App. Div. 2d Dep't 1998) .......... 28

*N.Y. Real Estate Inst., Inc. v. Edelman*, 42 A.D.3d 321 (N.Y. App. Div. 1st Dept. 2007) .......... 23, 27

*O'Leary v. Telecom Resources Service, LLC*, 2011 Del. Super. LEXIS 36 (Jan. 14, 2011) .......... 28

*TriState Courier & Carriage, Inc. v. Berryman*, 2004 Del. Ch. LEXIS 43 (2004) .......... 28

**Other Authorities**

1-4 Business Torts § 4.07 (2012) .......... 24, 27

# I. INTRODUCTION

Upon receiving testimony and evidence at the October 17-18 injunction hearing, the Court concluded that:

> At this stage of the proceedings it does not appear that Paul is competing with his former employer. Accordingly Paul may continue in his current capacity as the global vice president for product management and pricing at TE's aerospace, defense, and marine business unit. **There are, however, certain indicia that, upon further development, may lead to the conclusion that Paul is indeed competing with Amphenol, and therefore, acting in violation of his Agreements.**

*See* ECF Doc. 101, at 6 (emphasis added). The Court made this ruling in large part based on the testimony offered by Defendant Richard Paul ("Paul") and TE Connectivity, Ltd.'s ("TE") President, Kevin Rock ("Rock"). Both Rock and Paul testified that Paul had no involvement with Deutsch, the Deutsch integration, and connectors, and that adequate precautions had been put in place to protect Amphenol's contractual and legal rights. *See* October 17-18, 2012 Hearing Trans. at 133:20-134:1, 137:5-11, 150:5-6, 182:6-8, 202:17-21, 225:14-226:1, 227:20-228:1, 252:4-6.

At the time of the hearing, however, TE had produced only 977 pages of documents in response to a subpoena *duces tecum* served four months earlier. Plaintiff Amphenol Corporation ("Amphenol") relied on these 977 pages as its primary source of evidence. Unbeknownst to Amphenol and this Court, **the 977 pages produced by TE represented less than 5% of the total responsive pages of documents contained in Paul's email account.** That is because, after two motions to compel, several court orders, and at least eight months of obfuscation and delay by TE, TE recently (and reluctantly) produced to the Court for the first time approximately 20,000 pages of responsive documents. Revealed in these documents – but previously concealed – is proof that Paul has continued to violate his covenant not to compete. Paul had involvement and input into the Deutsch integration, Deutsch products, and connectors far greater than was previously

disclosed. Paul was even assisting TE in the development of [redacted] and [redacted] products that are directly competitive with Amphenol. Paul was intimately involved with the development of these products while at Amphenol, and brought knowledge of Amphenol's proprietary information with him while working on these projects at TE. TE's most recent production (made only because the Court compelled it) shows that the testimony and arguments made by Paul and TE at the hearing were, at best, misleading and, at worst, fabricated to escape injunctive relief.

Paul and TE's campaign of obfuscation, delay, and concealment have forced Amphenol to: (1) delay taking depositions and seek several extensions of the discovery deadline; (2) take certain depositions without the benefit of TE's full production; and (3) ***most importantly***, oppose Paul's motion to modify the order, on the eve of crucial injunctive measures expiring, without having TE's complete production of documents or the use of meaningful deposition testimony. Paul and TE's abuse of the judicial process have not only undermined Amphenol from receiving the benefit of its bargain ( *i.e.*, having Paul refrain from competition for at least one year), this abuse has allowed Paul to continue to compete with Amphenol, with only superficial "precautions" put in place (which, as TE's recent production shows, were meaningless).

Amphenol's had a contractual right to a one year period of non-competition pursuant to the Intellectual Property Agreement ("IPA") and Management Stockholder's Agreements ("Stockholder's Agreements"). Paul has on numerous occasions, including while testifying at the hearing, acknowledged these agreements are binding. Under these agreements, Paul had an obligation to honor his post-employment restrictions in good faith and refrain from competitive activity harmful to Amphenol. Instead, Paul chose to willfully breach these obligations and, in conjunction with TE, flout the judicial process. Under applicable New York law, justice demands that, when a defendant engages in such inequitable conduct, the non-compete period must be

extended for the length of the defendant's breach. Accordingly, Amphenol respectfully requests that this Honorable Court exercise its broad equitable authority to extend the non-compete period for an additional eight months to provide Amphenol with the benefit of its bargain.

## II. FACTUAL BACKGROUND

### A. Paul and TE Abused the Judicial Process in Order to Escape Injunctive Relief.

#### 1. TE Intentionally Withheld Evidence to Prevent Amphenol From Confirming the Accuracy of the Representations Made by Paul and TE.

When Paul suddenly and abruptly resigned his decades-long employment from Amphenol on March 9, 2012 to join Amphenol's direct competitor, TE, Amphenol discovered, through a forensic investigation, that Paul misappropriated thousands of highly confidential documents containing proprietary and confidential information. *See* ECF Doc. 2-14, at 14-19. The misappropriated information included some of Amphenol's most sensitive and closely-guarded secrets. *See* Affidavit of Maria Morgan ("Morgan Affidavit") (Exhibit 1) ¶¶ 5-18. Amphenol was, of course, alarmed by Paul's sudden departure to a competitor, his misappropriation of thousands of proprietary documents, and the grave threat of harm posed to Amphenol if Paul – either through his intimate knowledge of Amphenol's business and/or disclosure of the documents themselves – used this information to compete against Amphenol. In light of such concerns, Amphenol filed suit against Paul on April 10, 2012.

In response, Paul, TE's President Kevin Rock, and TE's General Counsel Charles C. Post, Esq. represented, in writing and/or under oath, that Paul: (1) would not have any "role" or "input" with Deutsch; (2) would not have any "responsibility" over connector products; (3) would not "directly or indirectly engage" in the production, development, sale or distribution of products that compete with Amphenol; and (4) would not "divert" Amphenol's customers or distributors. *See* Affidavit of Richard Paul ("Paul Affidavit") (Exhibit 2) ¶¶ 18, 36-38; Affidavit of Kevin Rock

("Rock Affidavit") (Exhibit 3) ¶¶ 7, 10-12; Exhibit 4; Exhibit 5. In opposing Amphenol's Motion for a Preliminary Injunction, Paul nonchalantly dismissed Amphenol's concerns as "misguided, misapplied, and fail[ing] to take into consideration the actual scope of Mr. Paul's position at TE." *See* ECF Doc. 20, at 16.

To test the representations made by Paul and TE, Amphenol served TE with a subpoena *duces tecum* on May 31, 2012. *See* Exhibit 6. Amphenol sought, among other things, documents related to Paul's involvement with Deutsch and products that are competitive with Amphenol. Had TE produced responsive documents on or before June 18, 2012 (as commanded by the subpoena), this action might have been resolved a long time ago.

Instead, TE intentionally delayed producing its documents for several months with the clear purpose of frustrating Amphenol's prosecution of this case. Following excuse after excuse, TE finally produced its documents on September 17, 2012 – a nearly four month delay. *See* Affidavit of James J. Halligan, Esq. (ECF Doc. 66) ¶¶ 23-24, 28. During this four month period, TE offered a litany of excuses to delay producing documents, including: (1) that TE's in-house counsel, Charles Post, was out of the country or unavailable (*id.* ¶¶ 5); (2) that a confidentiality order was required before TE would produce its documents (*id.* ¶¶ 5, 7, 13, 15); (3) that, even after the confidentiality order was entered by this Court, an amendment removing in-house counsel from viewing documents under the order was necessary (*id.* ¶¶ 16-17, 21); and (4) additional time was needed to review documents (*id.* ¶¶ 5, 10-11). Even worse, TE employed impermissibly narrow search parameters to intentionally limit the scope of its production of documents. *Id.* ¶ 26 and Exhibit T. As of September 17, 2012, TE produced only 977 pages of redacted documents.

### 2. <u>Paul and TE Knowingly Offered False or, at Best, Misleading Testimony at the Injunction Hearing in Order to Escape Injunctive Relief.</u>

While limited in scope, Amphenol believed that the documents produced by TE revealed that Paul was actively competing against Amphenol and relying upon Amphenol's processes, information, and the customer goodwill in his current duties at TE. This conduct contradicted the sworn promises of Paul and TE. In light of the actual and threatened harm being caused by Paul, Amphenol filed an emergency motion for a temporary restraining order on September 25, 2012. *See* ECF Doc. 65.

On October 17-18, 2012, the Court held a hearing on both Amphenol's motion for a preliminary injunction (*see* ECF Doc. 2) and motion for a temporary restraining order (*see* ECF Doc. 65). In support of these motions and arguments, Amphenol relied upon the 977 pages of documents produced by TE, but cautioned that "a proper search of documents by TE will reveal even more instances of Paul competing against Amphenol and conduct that is otherwise unlawful." *See* ECF Doc. 65-1, at 11-12. Ignoring the fact that **TE was withholding 95% of the discoverable evidence,** Paul's counsel argued:

> [I]t's Amphenol's burden to show by clear evidence that Mr. Paul has caused irreparable harm to them, and that just doesn't exist here.
>
> ... Here Amphenol has the benefit of seeing what has happened as my client Richard Paul has worked for TE for the last seven months.

*See* Hearing Trans. at 22:17-25. Far from "ha[ving] the benefit of seeing what has happened", TE withheld almost all of its discoverable information in order to thwart Amphenol's efforts. Paul and Kevin Rock testified that: (1) Paul had and has <u>no</u> involvement with Deutsch, Deutsch products, and the Deutsch integration (*see* Hearing Trans. at 150:5-6, 182:6-8, 202:17-21, 227:20-228:1); and (2) Paul had and has <u>no</u> involvement or input with connectors of any kind (*see* Hearing Trans. at 133:20-134:1, 137:5-11, 225:14-226:1, 252:4-6). In light of the evidence

presented and testimony given, the Court chose to enjoin Paul, but permitted him to continue his employment under certain restrictions. *See* ECF Doc. 101 *generally*. The Court elected not to fully restrain Paul from employment because, at the time of the hearing, "it [did] not appear that Paul is competing with his former employer." *See id.* at 6.

**3. TE's Continued Efforts to Withhold and Conceal Discoverable Evidence.**

On October 22, 2012, Amphenol filed an emergency motion to compel seeking an order that required TE to search the email accounts of relevant custodians. *See* ECF Doc. 83. Amphenol's proposed list of search terms was focused on three categories of information: (1) Deutsch; (2) connectors; and (3) Amphenol's customer and distributors. *Id.* On November 19, 2012, the Court via a telephonic conference directed TE to search *only* Paul's email account for the search terms proposed by Amphenol (thereby greatly reducing the burden on TE) and produce responsive documents from this search. On November 20, 2012, TE agreed that it would "complete the [court-ordered] production" on or before December 3, 2012. *See* Exhibit 7.

Rather than timely produce documents as agreed (and as directed by the Court), TE delayed its production an additional several months by making a piecemeal production of a handful of emails at a time. The documents produced by TE, however, were heavily redacted and most of the emails were missing critical attachments.

Based on TE's overly broad redactions and failure to fully produce documents within the time promised, Amphenol, on January 10, 2013, was forced to file a second emergency motion to compel. *See* ECF Doc. 113. Following another telephonic conference, the Court, on January 16, 2013, granted Amphenol's motion in part and ordered TE to submit to the Court, on or before

February 4, 2013, redacted and unredacted versions of any material it has submitted to Amphenol for an *in camera* review.[1]

In its submission to the Court on February 4, 2013, TE disclosed – ***for the first time ever to either the parties or the Court*** – that it had approximately 20,000 pages of responsive documents in its possession, yet in the nine months since it first received the subpoena *duces tecum*, produced only 1,958 pages of heavily redacted documents to Amphenol (and only produced 977 pages prior to the injunction hearing). There is simply no justification for TE to have 20,000 pages of responsive documents in its possession and have produced less than 10% of these documents over a nine month period.[2]

### B. Contrary to Paul and TE's Sworn Assertions, the Documents Recently Produced by TE Clearly Show that Paul *Has* Engaged in Competitive and Harmful Conduct.[3]

The TE documents recently produced make clear that Paul, contrary to his sworn affidavits and testimony under oath, has been involved and had input with, among other things, the Deutsch integration, Deutsch products, and the development and sale of products that directly compete with Amphenol. Far worse than merely being "copied" on emails, the documents recently produced by TE show that persons involved with Deutsch and competitive products reported to him, that Paul had numerous conversations with people involved in the development, manufacture,

---

1 On February 4, 2013 (the same day TE was to submit its documents for an *in camera review*), TE filed a motion seeking to extend the time for compliance until February 7, 2013 (*see* ECF Doc. 121). The Court granted TE's motion that same day.

2 On February 21, 2012, the Court ordered TE to unredact no less than 149 documents that were previously redacted – many of which were redacted almost in their entirety. *See* ECF Doc. 127. Amphenol anticipates that additional breaches of Paul's contractual and legal obligations will become apparent in the unredacted documents.

3 The exhibits cited in this section come from the productions of documents made by TE in December 2012 through February 2013. These exhibits are *in addition* to the examples of Paul's competitive activity cited in Amphenol's Motion for a Temporary Restraining Order. *See* ECF Doc. 65 *generally*.

and sale of competitive products, that Paul appears to have attended numerous meetings concerning Deutsch and competitive products, and that Paul provided input on highly competitive matters. Paul was even involved in the development of a [redacted] (a product that is directly competitive with Amphenol's [redacted]*ee* Section II.B.3, *infra*) and the [redacted] (another product that directly competes with Amphenol, *see* Section II.B.2, *infra*). Paul's duties and activities clearly violated the contractual obligations owed to Amphenol and, for at least the first eight months of the non-compete period, Paul was in clear breach of such obligations.

**1. Paul Had Involvement and Input in the Deutsch Integration and with Deutsch Products During the Non-Compete Period.**

**(1) Paul and TE misrepresented the level of integration between TE and Deutsch at the October 2012 injunction hearing.**

On July 11, 2012 – several months before the injunction hearing – TE issued a press release in Europe titled "TE Connectivity Announces Expanded Product Range With Deutsch Integration – Addition of Deutsch Circular Connectors for Harsh Environments Allows TE to Deliver Full Range of EWIS Harnessing Solutions." *See* Exhibit 8.[4] The release provided that:

> The acquisition of Deutsch … significantly expanded TE's connector product offering, enabling the company to better serve customers by filling the gap on circular and composite connectors. "With the addition of the Deutsch circular connectors, TE can now provide the complete line of cable harnessing components, including wire, backshells, identification and the accessory materials that make up a modern EWIS dependent electrical harness," said Frank Breslin, Vice President of Global Sales, TE Connectivity. "Customers now have a one-stop shop for highly robust and complete solutions to meet the growing market for harsh environmental connectivity applications."

---

4 Despite receiving a subpoena on May 31, 2012 commanding the production of such information, TE did <u>not</u> produce this release to Amphenol in advance of the October 2012 injunction hearing. TE did not finally disclose this press release until December 10, 2012, and only after the Court compelled such production.

> Integration of Deutsch is well underway within TE. Led by TE's sales channel, the initial focus has been on customer support and service. The addition of Deutsch franchised distributors has been added to the existing TE distribution channel to further support customers. In addition to the channel changes, TE is working towards a unified sales team in order to increase the combined TE and Deutsch presence for all customer accounts.

*Id.* Despite publicly declaring that TE and Deutsch had been integrated, Kevin Rock testified that no such integration had taken place and that TE and Deutsch operated as separate business entities. *See* Hearing Trans. at 237:21-238:12.

**(2) Paul was involved in the various phases of the TE/Deutsch integration.**

Paul and TE repeatedly made sworn statements that Paul had no involvement with Deutsch, Deutsch products, and/or the Deutsch integration. *See* Hearing Trans. at 23:13-17, 202:17-21, 227:20-228:1; *see also* Paul Affidavit (Exh. 2) ¶¶ 36-37; Rock Affidavit (Exh. 3) ¶¶ 10-11. Paul testified that "I have nothing to do with the integration of Deutsch." *See* Hearing Trans. at 150:5-6. According to Paul, "I can't have anything to do with Deutsch, that would be ridiculous." *See* Hearing Trans. at 182:6-8. ***However***, the documents recently produced by TE *after* the injunction hearing show that Paul was in fact involved with Deutsch.

Unbeknownst to Amphenol and this Court at the time of the hearing, TE developed a plan to integrate Deutsch into TE in a series of phases, which apparently started almost immediately after TE acquired Deutsch in April 2012. The TE/Deutsch integration included the incorporation and sale of approximately 10,000 Deutsch products through TE's sales and distribution network. *See* Exhibit 9.

Contrary to his sworn statements, Paul had involvement in the various phases of the TE/Deutsch integration. For example, on July 30, 2012, Paul received an email from Sage Wadke (TE's Director of Sales & Marketing for Deutsch/TE ADM Offshore Business) that sought input

from Paul on matters related to the integration. *See* Exhibit 10. Attached to the email is a meeting agenda which covers the [redacted] *Id.* TE heavily redacted this attachment, so the remainder of its content is not discernible.

On August 16, 2012, Paul received an invite to a series of meetings held on August 27-29, 2012 that focused on the development of [redacted] (a product previously manufactured and distributed by Deutsch). *See* Exhibit 11. Dave Carmen (a Deutsch employee with experience in [redacted]) was also in attendance. *Id.*

On August 27, 2012, Paul received an invitation from Eric Birden to attend recurring weekly meetings on "Phase 3" of the TE/Deutsch integration. *See* Exhibits 12 and 13. The invitation, sent to Paul and others, thanked them for their efforts in completing Phase 2 of the integration. *Id.*

On August 29, 2012, Paul received an email from Mr. Birden advising of the status of Phase 3 of the integration, which required: (1) [redacted]; (2) that such products [redacted] and (3) information related to the Deutsch products [redacted]. *See* Exhibit 9. An earlier thread in the same email chain advises that:

[redacted]



DM1\3723321.3

*Id.* On September 4, 6, and 12, 2012, Paul received additional emails advising of the status of the "ingestion" of Deutsch products into TE. *See* Exhibits 14, 15 and 16. Paul then received an email, on September 7, 2012, discussing the ingestion of Deutsch connectors. *See* Exhibit 17.[5]

On September 12, 2012, Paul again received an invite from Eric Birden to attend recurring weekly meetings on the TE/Deutsch integration. *See* Exhibit 18. The invitation states the following: "Please accept this invite as a valued participant in the [redacted] of Deutsch Products project." *Id.*

On September 17, 2012, Dave Gingerich sent Paul an email discussing a telephone call that was to occur later that afternoon. *See* Exhibit 19. The subject of the call was to cover only the following subject:

> Connectors – suggest [redacted] [redacted] [redacted]; introduction t[redacted]; and depending on depth of [redacted] a possible deeper dive into [redacted].

*Id.*[6] While TE did its best to conceal key portions of this email, the subject of the email is apparent: the integration of Deutsch connector products into TE.

Thus, contrary to the testimony given at the injunction hearing, it appears that Paul participated in numerous TE/Deutsch integration calls and meetings, some occurring on a weekly basis, notwithstanding his contractual and legal obligations to the contrary. In fact, it was not until

---

5 In the September 7, 2012 email, Dale Reeves requested that he "would like to initiate a similar process[redacted]so that we can ge[redacted][redacted]." *Id.* The remainder of the email is redacted so its context is not fully discernible.

6 Thierry Marin-Martinod is the Vice President of Marketing & Engineering for Deutsch, and oversees the manufacture of connectors and other competitive products at Deutsch's Oceanside, California facility. A review of TE's recent production reveals that Paul and Mr. Marin-Martinod were senders and/or recipients of at least 65 of the same emails or email chains. Given Mr. Marin-Martinod's directly competitive role, he and Paul should have not been on the same communications.

September 27, 2012 – two days *after* Amphenol filed its motion for a temporary restraining order – that Paul began declining meetings he previously accepted. *See* Exhibit 20 (September 28, 2012 email from Dale Reeves advising Paul that, "I understand you have tentatively accepted this meeting notice. Just wanted to alert you that this particular meeting is focused on Connectors and there will be several Deutsch folks in attendance."); *see also* Exhibits 21 and 22.

**(3) <u>TE and Deutsch personnel routinely reported to Paul regarding Deutsch, Deutsch products, the Deutsch integration, and competitive opportunities resulting from the TE/Deutsch integration.</u>**

The TE/Deutsch personnel implementing the Deutsch integration and operations routinely updated Paul and copied him on emails that listed many Deutsch people as recipients or senders. For example, on July 3, 2012, Russell Graves sent an email that listed, among other things, the following agenda items:

> 2. [redacted]
>
> a. [redacted]
>
> 3. [redacted]
>
> 4. Create a [redacted].[7]

*See* Exhibit 23. Russell Graves then reported this agenda to Paul and Frank Breslin and advised that "[a]ctions a[redacted] Next call on Monday to assign[redacted]. ." *Id.* (ellipsis in original).

On July 5, 2012, Frank Breslin sent Paul an email (and only to Paul) that attaches a June 2012 Monthly Report. *See* Exhibit 24. While a large portion of the report is redacted, it includes

---

[7] The significance of[redacted]' products and their direct competition to Amphenol products is more fully set forth in Section II.B.2, *infra.*

a portion concerning Deutsch's integration into Amphenol's distribution network: **"Identifying and working** [redacted] **Selected a new** [redacted]**"** *Id.* (bolded in original). The report also contains competitive information on Amphenol: [redacted] *Id.* It was wholly improper for Paul to have any input or be privy to opportunities to directly compete against Amphenol.

Three days later, on July 8, 2012, Paul received an email (that is heavily redacted) that sets forth various TE/Deutsch [redacted] and [redacted] *See* Exhibit 25.

On July 12, 2012, Paul received an email from Clint Medinsky that again detailed the integration of TE and Deutsch and its effects on pricing. *See* Exhibit 26. The underlying emails were generated by Pierre Bottollier-Lemallaz and Jean Chirstian Delamotta, both Deutsch employees working at Deutsch's French facility. At the top of the email chain, Mr. Medinsky sent the following message to Paul (and only to Paul): [redacted]' *Id.*

On July 18, 2012, Paul received an email from Thomas Briere advising that [redacted] *See* Exhibit 27. These are all products that are competitive with Amphenol.[8]

On June 19, 2012, Jill Weir advised Paul that, among other things, '[redacted] [*i.e.*, distributors]." *Id.* Although Paul was

8 The significance of th[redacted] is more fully set forth in Section II.B.3, *infra.*

supposed to have no involvement with competitive products and the TE/Deutsch integration, Paul nonetheless advised Weir to "[k]eep pushing and keep me up to date. If you need help feel free to ask." *Id.*

### 2. Paul Had Involvement and Input Into the [redacted]ine of Connector Adapters.

In addition to connectors, Amphenol manufactures, among other things, connector accessories, adapters, contactors, wire and cable, and fiber optic products. *See* Affidavit of Mark Ross ("Ross Affidavit") (Exhibit 28) ¶ 3. Amphenol manufactures connector adapters referred to as [redacted]. *Id.* ¶ 4. TE also manufactures a similar line of connector adapters referred to as [redacted]. *Id.* ¶ 5 [redacted]dapters are directly competitive with Amphenol's [redacted] *Id.* ¶ 6; *compare also* Exhibit 29 *with* Exhibit 30. In fact, Amphenol's key distributors, such as [redacted], sell both [redacted]. *See* Exhibit 31. Paul worked with the [redacted]while at Amphenol, and had knowledge of their manufacture, development, marketing, and distribution. *See* Ross Affidavit ¶ 7.

Paul's contractual agreements with Amphenol require that Paul "shall not ... directly or indirectly, engage in the development, production, sale or distribution of any product produced, sold, distributed or which is in development [by Amphenol]." *See* Exhibits 32 ¶ 17(a) and 33 ¶ 6 (emphasis added). TE conceded this point and swore that "Mr. Paul is not directly or indirectly engaging in the production, development, sale, or distribution of any product produced, sold, or distributed by Amphenol". *See* Rock Affidavit (Exhibit 3) ¶ 12. Thus, Paul should not have had any involvement or input with Hexashield products.

However, on June 29, 2012, Paul received an email from Doug Jones (TE's Global Senior Product Manager for Connector Accessories) that discusses the technical requirements and needs

for the "[redacted]" *See* Exhibit 34. On July 3, 2012, Russell Graves sent Paul and Frank Breslin an email requesting the assignment of resources and timelines for this project and to "[redacted]." *See* Exhibit 23. Thereafter, Paul sent Breslin an email that discusse[redacted]*ee* Exhibits 35 and 36. While the email is heavily redacted, making it difficult to fully understand its content, the following communication from Doug Jones about the development of a[redacted]oduct is apparent:

> [redacted]

*Id.* Breslin subsequently sent a message to Paul requesting a telephone call to discuss this [redacted] project, and Paul responded affirmatively to have such a call. *Id.* Thereafter, on July 5, 2012, Paul sent Doug Jones an email stating that he "would like to discuss this in person, please propose a time we can chat." *Id*; *see also* Exhibit 37. Paul was cautious enough to have off the record discussions rather than create more email evidence but clearly did have discussions with both Breslin and Jones concerning a product that is competitive to Amphenol.

Two days later, on July 5, 2012, Paul sent Mark Sawyer an email that excerpted portions of a monthly report. *See* Exhibit 38. One of the excerpted portions discusse[redacted]roducts:

> [redacted] *Id.*

On July 16, 2012, Paul received emails from Sofia Shafir and Doug Jones[9] that further discussed the [redacted]. *See* Exhibit 39. At least one portion of the email chain includes a discussion on TE's development of composite hexashield adapter:

[redacted]

*Id.* at TE_R_2016043.[10] On July 16, 2012, Paul was copied on an email from Sofia Shafir that states: "[P]lease contact Deutsch guys and discuss their availability to travel with you. I agree it would be great to brin[redacted]" *See id.* at TE_R_2016041.

Thereafter, on August 3, 2012, Doug Jones sent Paul an email containing the following message: [redacted] *See* Exhibit 40. Paul responds to this email by advising Jones that "[his] plans sound good" and to **"[k]eep pushing these projects, we need the new stuff to kick in."** *See* Exhibit 41 (emphasis added).

---

9 It is not entirely clear who the senders and recipients of this email chain are because the document is heavily redacted; however, TE gathered these emails, per the Court's order, exclusively from Paul's email account, so he must have been a sender or recipient at some point (perhaps "bcc'd").

10 TE went so far as to redact the word "Deutsch" several times in this email chain despite its obvious relevancy to this action. This is yet another example of TE attempting to conceal and obfuscate Paul's competitive activities.

On August 7, 2012, Paul[11] received an email from Martin Pope that requested [redacted][12], [redacted]" *See* Exhibit 42. The remainder of this email is redacted in its entirety.

### 3. Paul Had Input and Involvement with a [redacted] Being Developed by TE that Directly Competes with Amphenol's [redacted]

While employed at Amphenol, Paul was instrumental in the development of Amphenol's [redacted] products, otherwise known as [redacted] *See* Ross Affidavit Exhibit 28) ¶ 8. The [redacted] are designed for harsh industrial and commercial applications, as well as military and aerospace applications. *Id.* ¶ 9. The [redacted] meet or exceed meet military specifications, [redacted] *Id.* The [redacted] can be worn by soldiers to interconnect their technological equipment, such as radio, cameras, and GPS. *Id.* ¶ 10. Prior to April 2012, [redacted] were the largest manufacturer by volume in this niche market. *Id.* ¶ 11.

At Amphenol, Paul was part of the team that identified the need to improve upon Amphenol's [redacted] and, as Director of Marketing, steered that initiative. *Id.* ¶ 12. Paul was in charge of the Product Group responsible for starting the [redacted] and was in daily contact with those responsible for its development. *Id.* ¶ 13. As a result, Paul has intimate knowledge of all aspects of the [redacted] including its engineering, pricing, price margins,

---

11 While the first thread in the email is addressed to "Richard J. Paull" (a different TE employee), given that these emails were gathered exclusively from Defendant Paul's email account, it is believed that the top thread of the email chain forwards this discussion to Paul as the intended recipient. In any event, this discussion – on Deutsch and competitive products – made its way to Paul's email account.

12 It is believed that the acronym "[redacted] refers to a line of competitive [redacted] under development at TE, which is more fully discussed in Section II.B.3, *infra*.

distributor preferences, etc. *Id.* ¶ 14. Paul was also privy to highly-sensitive information concerning the [redacted] For example, on March 6, 2012 (just 3 days before Paul's abrupt resignation), Paul received an email from Robert Watson (Amphenol's Marketing Communication Specialist) that requested Paul's approval for a brochure on Amphenol's [redacted] *See* Exhibit 43. The brochure included, among other things, Amphenol's [redacted] *Id.* at AMPHENOL0012227.

Despite its highly confidential and proprietary nature, Paul misappropriated highly-sensitive information concerning the developmental [redacted] preceding his abrupt departure from Amphenol. On March 2, 2012, Paul forwarded an engineering drawing titled [redacted]' to his personal Yahoo! email account. *See* Exhibit 44. Paul also misappropriated a layout for a developmental product called the [redacted] on his "WD-My Passport" external hard drive. *See* Affidavit of Maria Morgan ("Morgan Affidavit") (Exhibit 1) ¶¶ 4-6, 15; Exhibit 45.

As of April 2012, TE did not manufacture a product line that was competitive with either [redacted] *See* Ross Affidavit ¶ 15. However, when TE merged with Deutsch in April 2012, TE acquired Deutsch's [redacted], which does compete in the [redacted] *Id.* ¶ 16.

Upon Paul's arrival, TE and Deutsch began development of, ***with the involvement of Paul***, [redacted] On July 5, 2012, Paul sent Mark Sawyer an email excerpting portions of a monthly report from Kevin Rock. *See* Exhibit 38. Among the portions Paul chose to excerpt, Paul forwarded the following to Sawyer:

[redacted]



DM1\3723321.3

> [redacted],
> [redacted]

*Id.* Paul should not have been forwarding information on the opportunity to bid on a key defense contract involving a product line he helped develop at Amphenol, let alone be privy to such information. Thereafter, on August 6, 2012, Paul received an email from Frank Breslin attaching "a nice summary of the features of th[redacted] connector." *See* Exhibit 46. The attachment is, however, heavily redacted by TE.

On August 5, 2012, Doug Jones sent Paul an email that analyze[redacted] connectors. *See* Exhibit 47. Specifically, Jones advised that [redacted]" *Id.*

On August 31, 2012, Rich Paul was involved in an email conversation discussing the development of Deutsch's [redacted] or at least th[redacted]or these connectors. *See* Exhibit 48 (several versions of this email are attached). Scott Kenaston, TE's Application Engineer, sent the following email on August 30, 2012:

> [redacted]. . .

*Id.* The developmental product discussed is the[redacted]hat is competitive to Amphenol's[redacted]. *See* Exhibit 49.[13]

Notwithstanding his non-compete obligations and sworn statements to steer clear of such

---

13 [redacted] manufactured to satisf[redacted]*See, e.g.*, Exhibits 50 and 51). Both Amphenol and Deutsch currently distribute[redacted] through Amphenol's key distributors, such as [redacted]*See* Exhibit 52.

information, Paul received an email from Michael Mullen requesting assistance on the problems identified by the application engineer. Paul's response: "Fyi, comments?" *See* Exhibit 48. Dave Gingerich responded directly to Paul response by advising Paul of the following:

[redacted]

*Id* at TE_R_2005582. Paul should have had absolutely no involvement – let alone a form of oversight – over the development of [redacted]roducts directly competitive with Amphenol. Given his misappropriation of proprietary documents and intimate knowledge of Amphenol's [redacted] Paul's contractual obligations should have strictly forbade him from having any involvement with a competing line of products at TE.

**4. Paul Had Involvement or Input Into Other Connector-Related Products.**

At the injunction hearing, Kevin Rock repeatedly asserted that Paul was to have no involvement with connectors of any kind. *See* Hearing Trans. at 225:14-226:1, 252:4-6. Paul and Rock further testified that Dave Engler, the person responsible for TE connectors, did not and would not report to Paul during the non-compete period. *Id.* at 133:20-134:1, 137:5-8. Clint Mendinsky, TE's Global Director of Pricing, reported to Paul but, according to the testimony given, not about connectors. *Id.* at 137:9-11. The Court relied on this testimony, in part, in not imposing a complete prohibition of his TE employment. Upon receipt of TE's most recent production of documents, however, it is clear that the above testimony was false.

For example, on May 8, 2012, Kevin Rock forwarded Paul an email that contained summaries on, among other things, connectors. *See* Exhibit 53. Rock wanted Paul and others to advise as to when [redacted]would be completed and running. *Id.*

On July 3, 2012, Sage Wadke (the Director of Sales and Marketing for Deutsch and TE's Offshore Business) sent Paul (and only Paul), at the request of Kevin Rock, a draft of web data guide designed to enhance the product management of connector products for Paul's review. *See* Exhibit 54. Paul's response: "Thanks Sage, looks and sounds great." *Id.*

On September 5, 2012, Paul sent an email to Dave Gingerich requesting that he "slap a bar chart for ADM connectors[.]" *See* Exhibit 55. Apparently, Ryan Warner (TE's IT professional) understood that Paul was not be involved with connectors, so Paul circumvented Warner's concerns by seeking the prohibited information from Gingerich (a person whom, according to Paul's testimony, was to have no involvement with connectors or connector pricing). Gingerich complied and supplied Paul with the connector information. *See* Exhibit 56. However, TE redacted this report in its entirety, so it is not possible to determine the extent of competitive information Gingerich provided at this time.

On August 6, 2012, Doug Jones sent Paul an email advising him of a large purchase of "Deutsch connectors" by a Deutsch distributor and request fo[redacted]. *See* Exhibit 47.

Paul also attended, accepted invitations to attend, and/or organized numerous meetings focused on connectors. For example, on July 30, 2012, Paul received an invitation to attend a meeting on '[redacted]. *See* Exhibit 57. That same day Paul accepted the meeting request. *See* Exhibit 58. Paul then accepted a meeting on [redacted]' on August 28, 2012. *See* Exhibit 59.

On September 6, 2012, Paul sent an email to Rock, Gingerich, Engler (the person responsible for connectors), and others as part of his efforts to organize a meeting on "Global Project Management", which included, among other things, a presentation by Dave Engler on connectors. *See* Exhibit 60. In the email, Paul (as the meeting's organizer) stated the following:

> We will be holding a global product management review meeting in Harrisburg on Oct 15-17. The goal of this meeting is to review the [redacted]

*See id.* at TE001177 (emphasis added). Paul should not be organizing or attending a meeting covering the project management of connector or competitive products.

Paul also had involvement with connectors as it relates to Amphenol's customers and distributors. On September 2, 2012, Paul received an email from Doug Jones that seeks to displace other "competitors" from the connectors sold by [redacted]

> [redacted]

> [redacted]

*See* Exhibit 61. Paul should have no involvement with Amphenol's customers and distributors, let alone involvement that deals with Deutsch or connector products.

## III. ARGUMENT

Amphenol hereby incorporates and makes part of this Memorandum of Law the legal standards and arguments made in its Motion for a Preliminary Injunction (*see* ECF Doc. 2-14) and Motion for a Temporary Restraining Order (*see* ECF Doc. 65-1).

### A. The Court Should Equitably Extend the Injunctive Period For Eight Months So That Amphenol May Receive the Full Year of Non-Competition It Bargained For.

Under New York law,[14] when a party "unilaterally breaches an agreement not to compete and the time period during which competition was precluded has since expired, such time period may be extended for the length of that time the offending party was in violation of the agreement." *N.Y. Real Estate Inst., Inc. v. Edelman*, 42 A.D.3d 321, 322 (N.Y. App. Div. 1st Dept. 2007); *J.H. Goldberg Co. v. Stern*, 53 A.D.2d 246, 252 (N.Y. App. Div. 4th Dept. 1976) (same). "[I]t is beyond cavil that a district court sitting in equity may devise a remedy that extends or exceeds the terms of a prior agreement between the parties if it is necessary to make the injured parties whole." *Levitt Corp. v. Levitt*, 593 F.2d 463, 469 (2d Cir. 1979). New York law provides that, where the employee's breaches are left unchecked as a result of deception, and the balance of equities favors the employer, the court should exercise its equitable powers and extend the injunctive period. *Edelman*, 42 A.D.3d at 322.

The "equitable extension" doctrine permits a court to extend non-compete periods based on an defendant's willful breaches and concealment of competitive activities:

14 The IPA is governed by, and construed under, the laws of the state in which it is executed. *See* Exhibit 33 ¶ 12. Paul and Amphenol executed the IPA at Amphenol's facility in Sidney, New York; thus, New York applies to the IPA. *See* Ross Affidavit ¶ 17. The Stockholder's Agreement, on the other hand, is governed by the laws of the State of Delaware. *See* Exhibit 32 ¶ 14. At least one Delaware court has recognized the ability to extend a non-compete periods based on a defendant's inequitable conduct, albeit applying the laws of the State of Florida. *See, e.g., Deloitte & Touche USA LLP v. Lamela*, 2007 Del. Ch. LEXIS 44, at *20 (2007).

> [A] reason for an extension of an agreement not to compete beyond its stated expiration date after a party had violated it is that a contrary result would reward the breach of contract.
>
> **An extension of the non-compete agreement protects the integrity of the judicial process; if a court did not extend the non-competition period, defendants would be encouraged to inject delay into their litigation with the purpose of using up as much of the original period as possible.** A time extension protects the usefulness of such restrictive covenants since the effective restraint period of a restrictive covenant can become sharply attenuated by **delays that are either inherent in the judicial process or <u>intended by the defendant</u>**. …
>
> If a party has flouted the terms of a noncompetition agreement, the court should be able to fashion appropriate equitable relief despite the fact that the parties did not expressly provide for such relief in their agreement. Since it is often difficult if not impossible to determine monetary damages with any degree of certainty, the breaching party should not be rewarded because the agreement has already expired.

1-4 Business Torts § 4.07 (2012) (emphasis added; footnotes and citations omitted); *see also Loewen Group Int'l, Inc. v. Haberichter*, 1998 U.S. App. LEXIS 28514, at *21-22 (7th Cir. 1998) ("[C]ourts recognize that where an employee violates a covenant not to compete, the time period may be extended beyond that specified in the contract."); *Overholt Corp. Ins. Serv. Co. v. Travis*, 941 F.2d 1361, 1372 (8th Cir. 1991) (finding that the district court did not err by extending the non-compete period past its expiration as a result of the defendant's inequitable conduct).

Paul and TE have engaged in the precise type of inequitable conduct described above, which merits the extension of injunctive relief. It is clear that Paul and TE engaged in this conduct in order to frustrate Amphenol's claims, thwart the judicial process, and allow Paul to engage in competitive activities notwithstanding his contractual and legal obligations to the contrary. There can be no doubt that TE recruited and hired Paul with the purpose of, among other things, acquiring his knowledge of Amphenol's business and its "processes." *See* Exhibit 62. When TE hired Paul, it had every intention of having Paul work with connectors and in competitive areas,

but reluctantly (and it appears only superficially) removed him from such duties only *after* Amphenol filed suit. *See* Hearing Trans. at 225:14-226:1. Contrary to Paul's assertions, Amphenol did not bring its suit lightly or as means to "harass" Paul or TE. *See* ECF Doc. 20, at 25. Rather, Amphenol discovered that Paul had been negotiating the terms of his employment with TE for several months prior to his abrupt departure and, during that time, misappropriated thousands of highly sensitive and proprietary documents to his personal email account and hard drive. *See* ECF Doc. 2-14, at 11-18. Given these circumstances, Amphenol was compelled to file suit and seek an injunction against Paul to protect its interests.

To dissuade Amphenol from pursuing legal action and to prevent the Court from issuing an injunction, Paul and TE made a series of sworn statements concerning Paul's purported duties and the "precautions" taken to avoid competitive conduct that, in light of TE's most recent production of documents, have been proven false. *See* Section II.A and B, *supra*. However, the competitive activities set forth in Section II.B, *supra*, clearly demonstrate that no meaningful precautions were put in place.[15] Paul was directly competing with Amphenol by having involvement with Deutsch and directly competitive products. *See* Section II.B, *supra*.

To conceal this damaging evidence, TE purposely delayed its production of documents several months with the clear purpose of denying Amphenol proof of Paul's competitive activities. When it finally produced a handful of documents in September 2012, TE employed impermissibly narrow search terms to narrow the scope of what the documents revealed. After being ordered by the Court to conduct another search of Paul's email account, TE produced an additional 1,000 pages of emails, but those emails were heavily redacted and most of the attachments were missing.

---

15 Even on the very limited record presented at the injunction hearing, the Court itself recognized that "TE is not taking adequate measures to insulate Paul from activities that may violate the Agreements." *See* ECF Doc. 101, at 6.

This forced Amphenol to file a second motion to compel, further extend discovery deadlines, and postpone the depositions of Paul and TE personnel.

Only after the Court issued a second order compelling production did TE disclose – for the first time ever – that it had approximately 20,000 pages of documents to produce. The documents produced since the injunction hearing – as set forth above – provide a limited, but compelling, look into the extent of Paul's competitive and unlawful conduct. There is simply no justification for TE to have had 20,000 pages of responsive documents in its possession and have produced less than 10% of these documents over a nine month period (with less than 5% being produced prior to the injunction hearing).

As a result of Paul and TE's campaign of obfuscation, delay, and concealment: (1) Amphenol was forced to proceed through an injunction hearing without receiving full disclosure of Paul's current duties and activities (with Paul conversely arguing that Amphenol failed to meet its burden of proof in order to escape full injunctive relief); (2) Amphenol was forced to delay taking depositions and seek several extensions of the discovery deadline; (3) Amphenol has had to take certain depositions without the benefit of TE's full production; and (4) ***most importantly***, Amphenol is only now, on the eve of crucial injunctive measures expiring, discovering the full extent of Paul's unlawful conduct and is being forced to oppose Paul's motion to modify the order without having TE's complete production of documents or the use of meaningful deposition testimony.

The inequitable conduct of Paul and TE clearly warrants that the non-compete period be extended an additional eight months (the length of Paul's breach). In cases where the defendant willfully breaches his contractual obligations and flouts the judicial process, the "interests of justice" demand an extension of the non-compete period to compensate the non-breaching employer. *See J.H. Goldberg*, 53 A.D.2d at 252 ("[The defendant] should not profit from his

misdeed in violating the covenant as a participant in the operation and management [in the competitor's business]."); *see also Edelman*, 42 A.D.3d at 322; *Levitt*, 593 F.2d at 467.

Far worse than breach the non-compete provisions, as was the case in *J.H. Goldberg* and *Edelman*, Paul and TE abused the judicial process to conceal Paul's unlawful activities and deny Amphenol the period of non-competition it bargained for. The conduct of Paul and TE warrants an extension because they have intentionally "inject[ed] delay into their litigation with the purpose of using up as much of the original period as possible." *See* 1-4 Business Torts § 4.07(4) (footnote and citation omitted).

**B. The Extension of Paul's Non-Competition Beyond One Year Is Contemplated by the Parties and Is Clearly Reasonable In Light of The Actual and Threated Harm Caused By Paul.**

The documents recently produced by TE clearly show that Amphenol was, and likely still is, being irreparably harmed by Paul. Paul has had involvement or input with the Deutsch integration, Deutsch products, and connectors. *See* Section II.B.1, *supra*. Paul has had involvement with a project for [redacted] products, which are directly competitive with Amphenol. *See* Section II.B.2, *supra*. Paul even had involvement with TE's development of [redacted] even though Paul was instrumental in the development, marketing, and distribution of Amphenol's [redacted], which are directly competitive with the [redacted] being developed by TE. *See* Section II.B.3, *supra*.

Given the actual and threatened irreparable harm caused by Paul's breaches, the extension of the non-compete period for eight months is clearly reasonable and, moreover, has been contemplated by the parties. First, both the IPA and Stockholder's Agreements contain provisions that allow Amphenol – at its discretion – to extend the non-compete period for an additional year. *See* Exhibits 32 and 33. Amphenol has elected not to invoke this extension because it has been paying Paul 50% of his salary since he left Amphenol so that he would not compete and yet he has

continued to work and compete, collecting a full salary from TE and additional income from Amphenol. Given that Paul cashed out $545,000 in stock options under the Stockholder's Agreements and has received an additional $77,148 in non-compete pay from Amphenol to date, *in addition to* his salary of $180,000 at TE, *plus* an Annual Incentive Plan at $0-$144,000 and "Sign-on Grant" (a recruitment bonus) of $260,000 in restricted stock units paid by TE upon his hiring **(in sum, at total of between $1,062,148 to $1,206,148),**[16] Amphenol believes it makes absolutely no sense to continue to pay him (in effect, reward him) for engaging in conduct that has been clearly harmful to Amphenol. Rather than invoke a full second year (and trigger its obligation to continue payments for another year), Amphenol seeks to enjoin Paul from competitive activity for an additional eight months without further payment. In return, all Amphenol is seeking that Paul perform the contractual obligations he clearly breached.[17] Moreover, enjoining a defendant from competition for periods of two years or longer has been held reasonable by courts in New York and Delaware. *See, e.g., Leiboff v. Peleaz*, 671 N.Y.S.2d 336, 336-337 (App. Div. 2d Dep't 1998); *Marsh USA Inc. v. Marsh & McLennan Cos.*, 2008 U.S. Dist. LEXIS 90986, at *47-48 (S.D.N.Y. Oct. 31, 2008); *O'Leary v. Telecom Resources Service, LLC*, 2011 Del. Super. LEXIS 36, at *12 (Jan. 14, 2011); *TriState Courier & Carriage, Inc. v. Berryman*, 2004 Del. Ch. LEXIS 43, at *43 (2004).

### C. <u>The Balance of Harms Weighs Decidedly in Amphenol's Favor.</u>

The equities in this case weigh heavily in Amphenol's favor. Paul will not be harmed by the continuance of certain injunctive relief. To date, Paul received no less than $545,000 in stock options (with $238,000 being cashed out in the days prior to his abrupt resignation) from

---

16 *See* Exhibit 63.

17 In effect, Paul did not begin truly honoring his non-compete obligations, if at all, until the Court entered the injunction on November 9, 2012.

Amphenol and an additional $77,148 in post-employment payment, in addition to the $440,000 to $584,000 paid by TE. At this point, Amphenol is not seeking a full prohibition of Paul's employment; rather, Amphenol is only requesting that the non-compete provisions of the injunction order remain in effect for an additional eight months. A serious threat still remains that Paul will participate in the development of products that are directly competitive to Amphenol, with full use and knowledge of Amphenol's trade secret and proprietary information, if left unchecked. Thus, it is reasonable and necessary to have Paul "sit out" from competition for a few months longer.

## IV. CONCLUSION

WHEREFORE, Plaintiff Amphenol Corporation respectfully requests that this Court continue to enjoin and restrain Defendant Richard Paul as follows:

1. Until November 9, 2013, Paul shall have no involvement and/or offer or be asked for any input regarding or relating to the Deutsch acquisition by and/or integration into TE and the post-merger operations of Deutsch;

2. Up to and including until November 9, 2013, Paul shall not have responsibilities for connectors or interconnects of any kind;

3. Amphenol shall cease its payments of non-compete pay on March 9, 2012; and

4. All other aspects of the injunction order (ECF Doc. 101) are unchanged and remain in full effect.

Respectfully submitted,

/s/ James L. Beausoleil, Jr. (phv05434)

James L. Beausoleil, Jr., Esq.
Anthony L. Gallia, Esq.
James J. Halligan, Esq.
**OF COUNSEL:**
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19106-4196
Tel: 215-979-1120/1127/1187
Fax: 215-979-1020
*Attorneys for Plaintiff*
*Amphenol Corporation*

Michael C. Jankovsky, Esq.
QUATRELLA & RIZIO, LLC
One Post Road
Fairfield, CT 06824
Tel: 203-255-9928, ext. 324
Fax: 203-255-6618
E-mail: mjankovsky@qrlaw.com

Dated: February 25, 2013