# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| AMPHENOL CORPORATION,<br>Plaintiff<br>v.<br>MR. RICHARD PAUL,<br>Defendant. | Civil Action No. __________<br><br>(Electronically Filed) |

**AFFIDAVIT OF RICHARD AIKEN**

STATE OF NEW YORK :
: ss
COUNTY OF DELAWARE :

I, Richard Aiken, being duly sworn according to law, do hereby depose and state as follows:

## A. INTRODUCTION

1. I am the General Manager for the Military Aerospace Operations ("Amphenol MAO") of Plaintiff, Amphenol Corporation ("Amphenol").

2. I submit this Affidavit in support of the Motion for Preliminary Injunction and other legal papers being filed contemporaneously herewith against the Defendant, Mr. Richard Paul. This Affidavit, and the legal action it supports, is necessary because we discovered that Richard Paul, a trusted senior executive with Amphenol, entered into negotiations with a major competitor of Amphenol MAO and, before abruptly announcing his resignation on a few minute's notice, methodically accessed, took, copied and printed highly competitively sensitive documents in the weeks, days and hours leading up to his sudden resignation. Under these circumstances, it is reasonable to conclude that Paul intends to use these confidential files and

documents to compete with Amphenol and/or to be successful in his new position. In the months after Richard Paul was recruited and interviewed by Amphenol's direct competitor, Richard Paul secretly accessed highly confidential information that he did not need for his duties at Amphenol, sent confidential documents and emails to his private email account, printed out large quantities of confidential documents, attached mass storage devices to his company issued laptop computer to copy confidential information and then deleted files and emails to cover his tracks. In discussing his abrupt departure, Richard Paul has insisted he is an "ethical person" and that he has returned all of the information to Amphenol. The facts, as outlined below, establish that Richard Paul was not honest about his pre-resignation activities, about his true post-resignation intentions, or about the confidential information he still maintains.

3. I am fully familiar with and have personal knowledge of all facts set forth in this Affidavit and, if called upon to do so, would testify to the same under oath.

## B. AMPHENOL CORPORATION

4. Amphenol is one of the largest manufacturers of interconnect products in the world. Amphenol designs, manufactures, and markets electrical, electronic, and fiber optic connectors, coaxial, and flat-ribbon cable, and interconnect systems.

5. The primary end markets for Amphenol's products are communications and information processing markets, including cable television, cellular telephone, and data communication and information processing systems; aerospace and military electronics; and automotive, rail, and other transportation and industrial applications.

6. More specifically, and as it relates directly to the Defendant in this case, Amphenol's MAO is the world leader in the design, manufacture, and supply of high-performance interconnect systems for military and commercial aerospace harsh environment applications. Amphenol MAO provides an unparalleled product breadth, from military

specification connectors to customized high-speed board level interconnects; from flexible to rigid printed circuit boards; from backplane systems to completely integrated assemblies. An example of an Amphenol "connector" is below.



7. The above product is an Amphenol 38999-III connector. This connector features a unique "inner clutch" design which provides enhanced anti-vibration and anti-decoupling capability – in other words, the connector actually tightens itself under vibration providing obvious advantages why flying fighter jets at more than 700 miles per hour in contact.

8. Amphenol MAO supports key markets including avionics, radar, communications, ordnance, missiles, engines, ground vehicles and tanks, space, and all levels of aviation.

9. Amphenol is a technology innovator that designs to meet customers' needs from program inception.

10. In the year 2011, Amphenol's military and aerospace total product sales to the military aerospace market were approximately $788 million.

## C. DEFENDANT RICHARD PAUL

11. Defendant, Richard Paul ("Defendant" or "Paul"), in the year prior to his sudden and surprise resignation from Amphenol in March 2012, was the Business Unit Director of Amphenol's High Speed Interconnect unit. This unit was created specifically for Mr. Paul. As

the Director of the unit, Mr. Paul had ultimate responsibility for all aspects of the business including, among other things, sales, operations, marketing, engineering, and profit and loss.

12. The High-Speed Interconnect unit was one of Amphenol's fastest growing business units. As the Director, Mr. Paul was responsible for this profit and loss center, managed all activities including the development and marketing of new and existing products, and its personnel and resources. As Director, Mr. Paul had intimate knowledge of current and future customer needs, market potential and trends, unmet needs of the market that Amphenol MAO was targeting, sales efforts and targets, strategic goals of the unit, and market pricing strategy.

13. In the two years prior to the time the High Speed Interconnect unit was created specifically for him, Mr. Paul was the Director of Marketing for Amphenol's entire MAO. In the capacity of Director of Marketing for Amphenol MAO, Mr. Paul had ultimate responsibility for all aspects of marketing, including budgeting, yearly strategic planning, new product development, pricing (including costs, margins, etc.), and responsibility for sales and distribution channels. A copy of the job description for the Director of Marketing is attached hereto as Exhibit "G".

14. Mr. Paul was one of the top level key management employees in Amphenol MAO and had full access to strategic confidential company information.

15. And for his efforts, Mr. Paul was compensated handsomely. Specifically, Mr. Paul was being paid an annual base salary of $164,328 plus benefits at the time of his termination with Amphenol. In addition, Mr. Paul was eligible for and compensated under Amphenol's "MIP" or management incentive program, which financially rewarded him based, among other things, on the performance of Amphenol MAO. Lastly, and perhaps the biggest piece of his overall compensation package, Mr. Paul was eligible for and received generous stock

options from Amphenol. Only top level executives, like Mr. Paul, were eligible for and received stock options. In fact, during the week of his sudden resignation, Mr. Paul cashed in approximately $238,000 in stock options and left a significant number of unvested options "on the table" when he resigned. Over the course of his employment with Amphenol, Rich Paul cashed in almost $545,000 of vested options.

**D. AMPHENOL'S DISTRIBUTOR NETWORK**

16. Amphenol MAO does a significant amount of its business through its distributor network. Amphenol MAO distributes its products mainly through separate and independent distributors, the names of which I have omitted from this Affidavit for confidentiality purposes. Among those distributors, the majority of Amphenol MAO's products are sold through certain "primary" distributors.

17. Various Amphenol competitors also sell products through the same set of distributors that Amphenol uses, but, Amphenol historically has been the largest seller of military and aerospace connectors through those distributors.

**E. TE CONNECTIVITY LTD. AND DEUTSCH GROUP SAS**

18. Two such competitors of Amphenol MAO are TE Connectivity Ltd. ("TE Connectivity") and Deutsch Group SAS ("Deutsch"). Up until April 3, 2012, TE Connectivity, a self-described "$12.1 billion" global behemoth, sold products through the same distributors as Amphenol. However, the products that TE Connectivity sold through the distributors were not the same products as those sold by Amphenol.

19. For its part, Deutsch also sold products through the same set of distributors as Amphenol, but Deutsch had a very small share of the market in military and aerospace connectors being sold through these distributors. These two facts became subject to change on April 3, 2012.

20. Specifically, on April 3, 2012, TE Connectivity announced the completion of an acquisition of Deutsch. The specifics of the announcement and the transaction are located at http://newsroom.te.com/index.php?s=28396&item=126471. A copy of the New Release is attached hereto as Exhibit "H". TE paid a significant premium to acquire Deutsch.

21. In its New Release, TE Connectivity boasts that

> The acquisition of Deutsch, a leading provider of high-performance connectivity solutions for harsh environment applications, will significantly expand TE's product portfolio and enable the Company to better serve customers in the Industrial and Commercial Transportation, Aerospace and Defense, and Rail markets.
>
> 'We are excited to bring together TE and Deutsch, two of the most trusted names in our industry. Deutsch has a long history of leadership and innovation and its complementary product line will enable TE to offer the most complete range of connectivity solutions to our customers,' said Tom Lynch, Chief Executive Officer of TE Connectivity. 'Together, our broad product range, global presence and shared commitment to innovation will create an even greater opportunity to serve the growing market for harsh environment connectivity applications.'

*Id.*

22. Following the initial announcement of the TE Connectivity/Deutsch transaction in November 2011, Amphenol formed a team to consider the impact of the announced merger. The team brainstormed, created, and exchanged information and documents, among other things, specifically dealing with Amphenol's immediate and long-term strategy in responding to the TE Connectivity/Deutsch expansion in the military and aerospace connector markets. The team's information and documents are highly secretive and confidential and are not available to the general public and/or Amphenol's competitors.

23. Mr. Paul accessed, retained, and/or received highly confidential and proprietary information and documents the team created, including a recently updated report before he announced his resignation.

24. Under normal circumstances, the acquisition of Deutsch by TE Connectivity would not necessarily cause significant concern to Amphenol or rise to the level that Amphenol would be required to take legal action. However, for the reasons more fully discussed below, this situation is anything but normal and has necessitated this emergent response.

**F. DEFENDANT PAUL'S SUDDEN AND SURPRISE RESIGNATION**

25. In the evening of March 8, 2012, Mr. Paul, who was my direct report at the time, contacted me and asked that I meet him at his office the following morning. I responded by asking Mr. Paul to meet me at my office the next morning.

26. The following morning, March 9, 2012, I received an early morning email from Mr. Paul requesting that I meet him in a coffee shop stating that "it is important that we meet." A copy of Mr. Paul's March 9, 2012 email is attached hereto as Exhibit 'I". Unbeknownst to me at the time, Mr. Paul also requested that the Manager of Human Resources, Ms. Sheri Youngs, meet us in the coffee shop as well.

27. When I arrived at the coffee shop, Mr. Paul and Ms. Youngs were already there. Mr. Paul had a laptop with him as well as a manila envelope. Once I arrived, Mr. Paul simultaneously handed both Ms. Youngs and I a letter and, without allowing us time to read the letter, stated "I am resigning."

28. The news of Mr. Paul's sudden resignation came as quite a shock to me, especially considering that I had worked with Mr. Paul for more than 20 years and, at no time prior to that morning, had Mr. Paul ever indicated to me that he was thinking of leaving

Amphenol. Mr. Paul then handed Ms. Youngs his laptop, cell phone, and the manila envelope which contained his employee badge and keys to the MAO facilities.

29. I asked Mr. Paul what was going on and why he was resigning. He stated to us that he "loved his job," that I was "like a father" to him, but that "someone made me an offer that you would not believe" and that we "should not try to change his mind." Mr. Paul further stated that it is "not often that an opportunity like this comes along" and that "with only 13 years left to work, an opportunity like this is too good to pass up." Mr. Paul described the new job opportunity as "shockingly good."

30. I asked Mr. Paul why he was resigning so abruptly and with no notice to Amphenol, to which he responded, "if you knew what I know, you would not want me here." The statement struck me as unusual, to say the least, so, concerned that Mr. Paul might be going to work for an Amphenol competitor, I asked Mr. Paul some additional questions.

31. I specifically asked Mr. Paul where he was going to work, but he was noticeably evasive and would not tell us. What he did say was that his new employer was "somebody in our industry, but not a direct competitor." He claimed that he was a "very ethical person" and that he "was not going to compete with Amphenol." These statements, like most of the statements made by Mr. Paul during that short meeting on the morning of March 9, 2012, have proven to be false.

**G. AMPHENOL'S INVESTIGATION**

32. A subsequent investigation into Mr. Paul's activities prior to his abrupt resignation revealed that Mr. Paul had been secretly planning his resignation and the start-up of a competitive business division for TE Connectivity for many months. Specifically, although deleted from his Amphenol computer, on December 21, 2011, Mr. Paul received the following email message from Kevin Rock, the President of TE Connectivity's Global Aerospace, Defense & Marine Division:



DM1\3240634.2

> I'm sure you heard about TE and Deutsch coming together. The next several months will be quite interesting as we integrate them into TE. We'll eventually need some highly talented executive leadership to help grow this enterprise. Anyone come to mind???? Hope you are well. Have a nice holiday. Kevin

A copy of the December 21, 2011 email from Mr. Rock is attached hereto as Exhibit "E." Mr. Paul responded to this request by expressing interest in the offer to take a "leadership" position in a new division of TE Connectivity that competes directly with Amphenol.

33. This email certainly suggests some prior familiarity between Mr. Paul and Mr. Rock and at least one prior discussion. In light of Mr. Paul's prior interest in Deutsch, as discussed immediately below, and the fact he was monitoring the acquisition of Deutsch by TE Connectivity, it is clear that he had a keen interest in helping TE Connectivity position Deutsch for a successful integration and therefore to successfully compete with Amphenol.

34. Amphenol also discovered that, even prior to that exchange, on December 1, 2012, Mr. Paul sent an email to a lower-level Amphenol employee attaching a PowerPoint presentation – created by TE Connectivity – which discusses TE Connectivity's acquisition of Deutsch. A copy of the Email and PowerPoint are attached hereto as Exhibit "F." In this email, Mr. Paul emailed the Director of Marketing of Amphenol Industrial Operations and said, "Good thing we did not take the job, or is it … " Attached to the email was a PDF of the November 29, 2011 announcement by TE Connectivity of its planned acquisition of Deutsch. This email suggests Mr. Paul had previously declined a job working for Deutsch but was now interested in the prospect of employment with TE Connectivity with the upcoming acquisition of Deutsch.

35. Moreover, the PowerPoint states that TE Connectivity's acquisition of Deutsch will "[e]xpand [TE Connectivity's] capability to offer a complete range of connectivity solutions across all major industries, applications and regions." The PowerPoint presentation specifically had a section that dealt with connector products in the defense and aerospace markets – the very

same marketplace served by Amphenol and under the direct control of Mr. Paul. For reasons that are now obvious, Mr. Paul did not disclose this email or PowerPoint presentation to Amphenol.

36. And the evidence does not end there. In Mr. Paul's résumé, which he furnished to TE Connectivity while he was the Director of the High Speed Interconnect unit at Amphenol, Mr. Paul brags that, from 1999 through 2012, he:

(a) was responsible for the sales growth through original equipment manufacturers (OEM) direct, international, and distribution channels;

(b) is very knowledgeable with military and aerospace markets as well as Department of Defense programs, budgets, and program funding;

(c) developed strong relationships with Amphenol's key customers; and,

(d) was directly responsible for Amphenol's distribution, sales, marketing, product marketing, and customer service.

37. Mr. Paul's résumé makes clear that his value to TE Connectivity is that of a person with direct and specific knowledge of Amphenol's highly confidential and proprietary information and/or trade secrets, in an area that is highly valuable and useful to competitors such as TE Connectivity and Deutsch.

38. Mr. Paul's résumé expressly conveys his knowledge of Amphenol's new product initiatives. This information is highly secretive and proprietary and is not available to the general public and/or Amphenol's competitors. The résumé states that, in his position as Business Unit Director, "a major focus is on new product introduction and product line expansion, especially into emerging markets such as unmanned vehicles, advanced avionics, commercial airframe and advanced communications." This description of his recent responsibilities mirrors the language found in the TE Connectivity PowerPoint presentation which claimed that TE Connectivity's acquisition of Deutsch would allow it to introduce new

complimentary products into the market and expand "penetration in emerging markets." *Compare* Exhibits F and J.

39. At the same time that he was communicating with TE Connectivity, on January 3, 2012, Mr. Paul attended a meeting with TE Connectivity's senior management in Harrisburg, Pennsylvania to discuss, *inter alia*, the position of Vice President of Product Management for TE Connectivity. TE Connectivity reimbursed Mr. Paul for the travel and lodging expenses to attend the meeting.

40. On January 5, 2012, Mr. Paul received an email message from a TE Connectivity administrative assistant requesting that Mr. Paul call Mr. Rock, and he was also requested to provide Mr. Rock with his cellphone number – a cellular telephone and service paid for by Amphenol. Mr. Paul likewise did not disclose this email message to Amphenol's.

41. On January 30, 2012, Mr. Paul received the following message from Mr. Rock:

> I was requested to ask if you could send me your complete non-compete agreement. Fortunately, legal is very comfortable with the information you provided us as well as the way the position would be structured. They would like be be [sic] fully prepared if we agree to move forward.

42. A copy of the January 30, 2012 email is attached hereto as Exhibit "K" Despite the evidence of his clear intention to seek employment with a competitor, Mr. Paul did not disclose any of this information to Amphenol.

43. In other words, while he was employed as a high-ranking Amphenol employee, Mr. Paul was meeting with TE Connectivity's senior management regarding competitive employment opportunities with TE Connectivity.

44. The disclosure or threat of disclosure of, among other things, the strategy team's information and/or documents to TE Connectivity by Mr. Paul will severely harm and

compromise Amphenol's competitive advantages against TE Connectivity in the military and aerospace markets, thereby allowing TE Connectivity to impermissibly gain knowledge of Amphenol's internal operations and strategies. If the team's information and/or documents fell into the hands of TE Connectivity, it would be able to, among other things, anticipate Amphenol's actions and responses, directly and specifically know of Amphenol's pricing and margin structure, quickly reach decision makers in the military and aerospace markets, and learn of Amphenol's new product development.

45. The depth and breadth of knowledge that Mr. Paul has is alone sufficient to pose a significant threat to Amphenol should Mr. Paul be permitted to work for TE Connectivity in any capacity. There is simply no way that Mr. Paul can perform his purported job duties with TE Connectivity without utilizing and/or disclosing Amphenol's trade secret and/or confidential and proprietary information. Mr. Paul cannot simply erase or ignore the detailed information he obtained as Amphenol's Director of High Speed Interconnect unit and Director of Marketing of the MAO, including his intimate involvement with the team formed to respond to the Deutsch acquisition. Nor can Mr. Paul simply erase or ignore the information he possesses regarding, among others, Amphenol's pricing structure, its product level margins, its cost structuring, detailed customer and distributor information, and sales and marketing strategies.

46. Mr. Paul will instantaneously bring with him to TE Connectivity the following knowledge of Amphenol's confidential and trade secretive information: (i) which potential customers Amphenol will target in the coming year; (ii) which areas of the market present growth opportunities, and which may be in decline; (iii) Amphenol's strengths and weaknesses with its customers, which TE Connectivity will now be in a position to counteract and/or exploit; (iv) what specific products, vendors, and arrangements with third parties should be targeted to

increase TE Connectivity's profitability and thereby cut into Amphenol's market share; (v) how Amphenol's pricing structure and methodology can be used against it to divert or solicit customers; (vi) which customers present specific opportunities; (vii) and other information which, collectively, will result in TE Connectivity being able to shortcut what it took Amphenol many years, labor, and great expense to build.

47. All of the above highly suspicious activities, coupled with the fact that Mr. Paul has taken a job with Amphenol's direct competitor, TE Connectivity, the fact that Mr. Paul negotiated with TE Connectivity's senior management concerning employment while still employed as a high-level management employee with Amphenol, and the fact that Mr. Paul repeatedly accessed, printed, copied, or otherwise retained, Amphenol's highly confidential and proprietary information (as discussed below), all lead to the unavoidable and inevitable conclusion that Mr. Paul accessed and retained this information to educate himself and to arm himself with information necessary to unfairly compete with Amphenol and to succeed in his new position. His covert actions and misrepresentations, while at Amphenol and during the two weeks after his departure, suggest he intends to share this information with TE Connectivity. Mr. Paul's employment as a Vice President of Product Management with TE Connectivity, which employment start date of April 3, 2012 – not coincidently – the same date that TE Connectivity closed the Deutsch acquisition transaction (*see* Exhibit H), will surely involve the disclosure of Amphenol's trade secrets and other confidential and proprietary information, and poses a grave risk to Amphenol's position and competitive advantage in the military and aerospace markets.

## H. DEFENDANT PAUL'S CONTRACTUAL OBLIGATIONS TO AMPHENOL

48. Because of the key executive positions that Mr. Paul held with Amphenol, Amphenol required, as a condition of his employment and otherwise, that Mr. Paul sign certain

agreements with Amphenol containing various confidentiality and post-employment obligations. For example, Mr. Paul signed an Intellectual Property Agreement with Amphenol, which requires, among other things, that Mr. Paul not disclose any of Amphenol's confidential information or trade secrets, and not divert any of Amphenol's customers, suppliers, and/or distributors. The specifics of the Intellectual Property Agreement are detailed in the Complaint filed contemporaneously herewith at paragraphs 29 through 33 and 36 through 37..

49. In addition, as a precondition to receipt of his annual stock option award, Mr. Paul and other option awardees were required to accept the terms of various Management Stockholder's Agreements with Amphenol which, like the Intellectual Property Agreement, require that Mr. Paul maintain the confidentiality of Amphenol's information and, in addition, contain the post-employment restriction that, for a period of at least one year, Mr. Paul "shall not … engage in the development, production, sale or distribution of any product produced, sold, distributed" by Amphenol. Accepting employment with a major direct competitor like TE Connectivity is in and of itself a violation of the Management Stockholder's Agreements. The specific details of the Management Stockholder's Agreements are detailed in the Complaint at paragraphs 33 through 41.

50. Mr. Paul was certainly familiar with and understood the agreements that he had signed with Amphenol. Indeed, three days following his sudden resignation, Mr. Paul sent Amphenol an email stating that he would "fully honor" his agreements and the post-employment restrictions set forth in the Intellectual Property Agreement and Management Shareholder's Agreements. A copy of Mr. Paul's email is attached hereto as Exhibit "A".

51. Despite the assurances that he would "fully honor" his employment agreements with Amphenol, as set forth above, Amphenol has uncovered information that proves that Mr.

Paul repeatedly accessed Amphenol's most highly confidential and proprietary information and trade secrets, while, at the same time, holding secret negotiations with TE Connectivity's senior management months before his precipitous resignation. Amphenol also has proof that Mr. Paul copied, printed, retained, downloaded to portable storage devices, and/or forwarded to his personal Yahoo account – rpaulaao@yahoo.com – this same information and is now in a position to use this information for his personal advantage and the advantage of his new employer, TE Connectivity.

52. Mr. Paul accessed information, downloaded, and retained important confidential company information and trade secrets without the permission or knowledge of Amphenol.

**I. DEFENDANT PAUL'S MISAPPROPRIATION OF TRADE SECRETS**

53. Although Mr. Paul's knowledge of Amphenol's confidential proprietary information and trade secrets is enough of a reason for Amphenol to seek to enforce its contracts and to prevent Mr. Paul from working for TE Connectivity, there is even more disturbing evidence to support Amphenol's request to this Court.

54. Amphenol's operations in Sidney, New York sustained major damage as a result of a major flood not long ago. While employees were relocated, they were given temporary Yahoo email accounts. Mr. Paul's was rpaulaao@yahoo.com. When systems were restored, Mr. Paul continued to use his Yahoo email. The Yahoo email does not go through the Amphenol servers and so emails and attachments sent to and from Mr. Paul's Yahoo account can be saved and retrieved by Mr. Paul. Amphenol does not have the ability to access those emails or to delete them.

55. Amphenol was, however, able to recover some emails from back-up tapes that show that Mr. Paul knew this and used it to take and keep Amphenol confidential information.

56. Specifically, shortly before he abruptly terminated his employment with Amphenol, Mr. Paul began accessing, copying, printing, downloading, forwarding, and otherwise retaining Amphenol's highly confidential and proprietary information and/or trade secrets without the authorization, knowledge, and/or permission of Amphenol. Mr. Paul's access and retention of this information provided no benefit to Amphenol and was not in furtherance of any Amphenol legitimate business purposes. It seems obvious that, based on the information Amphenol has uncovered to date, Mr. Paul accessed and retained this information for the sole purpose of disclosing this information to TE Connectivity and/or using this information in a manner that competes with, or otherwise undermines, Amphenol's business.

57. For example, an analysis of Mr. Paul's computer subsequent to his resignation of employment from Amphenol has revealed that Mr. Paul printed, from January 23, 2012 through March 8, 2012, *no less than 154 Amphenol documents from Amphenol's network printer without Amphenol's knowledge or permission.* Many, if not all, of these documents were confidential and proprietary and/or contained a "CONFIDENTIAL" or similar marking clearly evidencing the fact that Amphenol considers the information highly confidential and, in all events, information that should not, under any circumstances, be shared with an Amphenol competitor. Just by way of example only, Mr. Paul printed and retained the following documents on the following days:

(a) On March 1, 2012, Mr. Paul printed confidential and proprietary documents containing Amphenol MAO sales and pricing information related to Amphenol's distributors and customers.

(b) On March 2, 2012, Mr. Paul printed documents containing information, including pricing and rebate information, on connector products designed, manufactured, and sold for the new Boeing 737 platform.

(c) On March 7, 2012, Mr. Paul printed confidential and proprietary documents containing information on newly-designed connector products, including pricing information, that were sold to Amphenol's distributors.

(d) On March 8, 2012 -- the day before his resignation -- Mr. Paul printed a highly confidential and proprietary one page report of MAO business vitals.

(e) On March 8, 2012 -- again, the day before his resignation -- Mr. Paul printed a highly secretive and confidential document titled "Zeus," which relates to a new product line planned to be developed by Amphenol as a part of the High Speed business unit strategy.

58. None of the above-listed information is available to the general public and/or to Amphenol's competitors, like TE Connectivity. Disclosure of this information to Amphenol's competitors, including TE Connectivity, would severely harm and/or compromise Amphenol's competitive advantages in the military and aerospace markets.

59. In addition to the information that Mr. Paul secretly printed and removed from Amphenol in the days just prior to his surprise resignation, he also forwarded, among others, the following confidential and proprietary emails and documents, without Amphenol's knowledge or permission, to his Yahoo email account on the following days:

(a) On February 28, 2012, Mr. Paul forwarded an email chain to his Yahoo email account that contained customer needs for a quote on specific products along with an attachment. The ten page attachment contained proprietary drawings and specifications. The level of detail in these drawings is never shared with Amphenol's customers, distributors, or competitors. The attachment has a conspicuous disclaimer on every page stating "[t]his document contains proprietary information and such information may not be disclosed to others for any purpose . . . ."

(b) On February 29, 2012, Mr. Paul forwarded an email to his Yahoo email account attaching an Amphenol sales form and "Guide" to assist in the selection of high frequency connectors, which is supplied to Amphenol's distributors.

(c) On February 29, 2012, Paul forwarded an email chain to his Yahoo email account concerning a "Virtual Backplane Discussion." Attached to this email was "VITA 75 Slides."

60. All of this information is likewise highly confidential, and is not available to the general public and/or to Amphenol's competitors, like TE Connectivity.

61. Amphenol has also discovered that Paul extracted and printed all of his contacts, took hundreds of customer business cards and a current worldwide phone directly of Amphenol employees.

62. In addition and perhaps most damaging, Amphenol has recently discovered that Mr. Paul accessed a highly confidential document known as Amphenol's POS Pivot Table report ("POS Pivot") in February 2012 and copied it to a portable storage device and/or external hard drive, which Mr. Paul has admitted to having in his possession.

63. The POS Pivot is a highly confidential internal database that may only be accessed by top-ranking Amphenol MAO employees, like Mr. Paul. Indeed, even Mr. Paul needed an employee-specific code to access the database.. Among other things, POS Pivot contains: (i) the contractual obligations of Amphenol's distributors to Amphenol, including the obligation of the distributors to provide Amphenol with information about where its products are sold, in what quantities, and for how much; (ii) details on all Amphenol products sold to end customers, such as part numbers, pricing, quantities; and (iii) customer-specific information, such as contact information and historical purchasing data. The information on the POS Pivot is used by Amphenol to, among other things, understand sales and market trends. The information is so highly confidential that Amphenol is contractually prohibited from sharing this information even among its various distributors.

## J. AMPHENOL'S CONFIDENTIAL AND TRADE SECRET INFORMATION

64. The information that Mr. Paul became aware of, acquired, or gained access to at Amphenol has been collected by Amphenol over the years (and can only be acquired) through a extremely labor intensive process that takes a great deal of time, experience, and money to collect, compile, and cultivate. Moreover, it is confidential information and is not readily available to Amphenol competitors, like TE Connectivity. Instead, Amphenol's confidential and

trade secret information has been acquired as the result of thousands of interactions, transactions, and observations, and is made possible by and acquired through substantial expenditures made by Amphenol over this same period of many years. Amphenol obtained this information through creating and developing products and sales materials, research and development, preparing business and marketing plans and sales proposals, conducting business, developing computer and information systems, engaging in continuous data collection and retrieval, compiling, maintaining, and integrating into the sales process key transaction histories and record data reflecting the sales, products, technical support, technology and systems, workflow and other specifications and needs, and developing many other products at great expense to Amphenol in the development and maintenance of its customers and acquiring valuable account-related information.

65. For a competing company like TE Connectivity, especially where it lacks prior experience and relationships specific to military and aerospace, creating a successful business unit – virtually overnight, as it apparently has – would be a very difficult and unlikely proposition and time-consuming process. Because the business of these distributors has been under Amphenol's microscope for so long, and Amphenol has developed valuable information, substantial relationships, and goodwill with these specific distributors (handled by Amphenol's marketing and sales representatives, like Mr. Paul), Amphenol MAO had a significant advantage that its competitors simply could not begin to duplicate, if ever, without investing years of very substantial time, effort, and expense.

66. If Defendant Paul, or any other third party like TE Connectivity, were able to selectively utilize any information from within this constellation of knowledge acquired by and

through Amphenol, it would unfairly allow them to gain a competitive advantage or to put Amphenol at a competitive disadvantage.

67. Unless Defendant Paul is temporarily and preliminarily enjoined from the foregoing conduct, Amphenol will be irreparably harmed by:

(a) Disclosure of trade secrets, business methods and strategies, and other confidential information which are solely the property of Amphenol;

(b) Loss of confidentiality of Amphenol's highly confidential and trade secret information, loss of confidentiality of customers' business and financial dealings, loss of confidence and trust of customers, loss of customers' goodwill, loss of the customer relationship, and loss of business reputation; and

(c) Present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

68. Accordingly, Amphenol has brought this action to protect its legitimate business interests and to protect its client relationships, client goodwill, and confidential and trade secret information from being compromised and Amphenol irreparably harmed as a result.

69. I have carefully reviewed Amphenol's business records and e-mail communications. I have personal knowledge and I have interviewed Amphenol employees having personal knowledge of the events described in this Affidavit. All of the descriptions and the representations I have made in this Affidavit I believe are true, accurate and correct to the

best of my knowledge and information. I stand ready to testify concerning these matters if and when called upon by the Court to do so.

Richard Aiken

SWORN TO AND SUBSCRIBED BEFORE ME, the undersigned authority, by Richard Aiken, who is personally known to me, who executed the foregoing in my presence and who did take an oath this 10 day of April, 2012.

Notary Public

My commission expires: 11-13-13

MARILYN J HOWE
Notary Public - State of New York
NO. 01HO5051720
Qualified in Chenango County
My Commission Expires 11-13-13



DM1\3240634.2