UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

AMPHENOL CORPORATION,

Plaintiff,

v.

RICHARD PAUL,

Defendant.

Civil Action No. 3:12-cv-00543-AVC

(Electronically Filed)

REDACTED

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**[FILED UNDER SEAL IN ACCORDANCE WITH LOCAL RULE 5(E)]**

**OF COUNSEL:**
James L. Beausoleil, Jr., Esq.
Anthony L. Gallia, Esq.
James J. Halligan, Esq.
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19106-4196
Tel: 215-979-1120/1127/1187
Fax: 215-979-1020
Email: jlbeausoleil@duanemorris.com
Email: algallia@duanemorris.com
Email: jjhalligan@duanemorris.com

Michael C. Jankovsky, Esq.
QUATRELLA & RIZIO, LLC
One Post Road
Fairfield, CT 06824
Tel: 203-255-9928, ext. 324
Fax: 203-255-6618
E-mail: mjankovsky@qrlaw.com

*Attorneys for Plaintiff*
*Amphenol Corporation*

# TABLE OF CONTENTS

Page


I. INTRODUCTION ........ 1

II. FACTUAL BACKGROUND ........ 2

A. Paul's Crucial Role in Amphenol's Business and His Access to Confidential Information and Trade Secrets. ........ 2

B. The Intellectual Property Agreement and the 2000 and 2009 Management Stockholder's Agreements. ........ 3

C. The Merger of TE Connectivity, Ltd. and Deutsch Group SAS. ........ 5

D. In the Weeks Prior to His Abrupt Resignation, Paul Repeatedly Accessed, Downloaded, Printed, and Otherwise Retained Amphenol's Confidential Information and Trade Secrets. ........ 6

E. Paul Also Stole Confidential Information on Amphenol's Efforts to Develop a Competitive Response To TE/Deutsch's Expansion in the Military and Aerospace Connector Markets ........ 8

F. Upon Learning of Paul's Theft of Confidential Information and Intention to Pursue Employment with a Competitor, Amphenol Promptly Acted to Protect its Legal and Equitable Rights. ........ 9

G. Contrary to Paul and TE's Sworn Assertions, the Documents Recently Produced by TE Clearly Show that Paul *Has* Engaged in Competitive and Harmful Conduct. ........ 10

1. Paul Had Involvement and Input in the Deutsch Integration and with Deutsch Products During the Non-Compete Period. ........ 10

(1) Paul was involved in the [redacted] ........ 10

(2) TE and Deutsch personnel routinely reported to Paul regarding Deutsch, Deutsch products, the [redacted] and competitive opportunities resulting from the [redacted]. ........ 12

2. Paul Had Involvement and Input Into the [redacted] ........ 14

3. Paul Had Input and Involvement with a [redacted] Being Developed by TE that Directly Competes with Amphenol's [redacted] ........ 18

4. Paul Had Involvement or Input Into Other Connector-Related Products. 21

III. LEGAL STANDARD 23

IV. ARGUMENT 24

A. The Evidence Obtained Through Discovery Establishes That Paul Breached His Contractual Obligations And Amphenol Has Been Damaged As A Result. 24

1. Paul's Contractual Obligations Are Reasonable In Scope. 24

2. The Evidence Shows That Paul Clearly Breached His Obligations Under the Stockholder's Agreements and IPA. 26

3. Amphenol Is Entitled To Receive Equitable Relief And Recover Nominal, Compensatory, and Punitive Damages As A Result Of Paul's Breaches Of His Contractual Obligations. 28

B. The Record Establishes That Paul Violated the Computer Fraud and Abuse Act by Accessing and Removing Documents in Excess of His Authorized Access. 32

C. The Factual Record Establishes that Paul Misappropriated Trade Secrets and Engaged in Unfair Competition That Damaged Amphenol as a Result. 36

D. The Factual Record Reveals That Paul Breached The Fiduciary Duties He Owed Amphenol. 38

V. CONCLUSION 40

## TABLE OF AUTHORITIES

**Federal Cases**

*24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 566 F. Supp. 2d 305 (S.D.N.Y. 2008) ................ 38

*Advanced Aerofoil Techs., AG v. Todaro*, 2013 U.S. Dist. LEXIS 25711 (S.D.N.Y. Jan. 30, 2013) ................ 35

*Advanced Analytics, Inc. v. Citigroup Global Mkts., Inc.*, 2009 U.S. Dist. LEXIS 130133 (S.D.N.Y. Aug. 5, 2009) ................ 37-38

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................ 24

*Caro v. Weintraub*, 2010 U.S. Dist. LEXIS 116492 (D. Conn. Nov. 2, 2010) ................ 33

*Caylon v. Mizuho Secs. USA, Inc.*, 2007 U.S. Dist. LEXIS 66051 (S.D.N.Y. Apr. 27, 2007) ..... 35

*Computer Associates Int'l v. Bryan*, 784 F. Supp. 982 (E.D.N.Y. 1992) ................ 37-38

*Cramer v. Devon Group, Inc.*, 774 F.Supp. 176 (S.D.N.Y. 1991) ................ 39

*Demel v. Am. Airlines, Inc.*, 2011 U.S. Dist. LEXIS 13776 (S.D.N.Y. Feb. 10, 2011) ................ 24

*Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322 (N.D. Ga. 2007) ................ 35

*Friedman v. Wahrsager*, 2012 U.S. Dist. LEXIS 10994 (E.D.N.Y. Jan. 20, 2012) ................ 37

*Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173 (2d Cir. 1993) ................ 37

*IBM v. Papermaster*, 2008 U.S. Dist. LEXIS 95516 (S.D.N.Y. Nov. 21, 2008) ................ 27-28

*Int'l Airport Centers, LLC v. Citrin*, 440 F.3d 418 (7th Cir. 2006) ................ 33

*Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171 (2d Cir. 1990) ................ 38

*Intermetro Indus. Corp v. Kent*, 2007 U.S. Dist. LEXIS 28239 (M.D. Pa. Apr. 17, 2007) .......... 26

*JBC Holdings NY, LLC v. Pakter* 2013 U.S. Dist. LEXIS 39157 (S.D.N.Y. Mar. 20, 2013) ................ 34, 36

*Julie Research Lab. v. Select Photographic Eng'g.*, 810 F. Supp. 513 (S.D.N.Y. 1992) ........ 37-38

*Juniper Entm't, Inc. v. Calderhead*, 2013 U.S. Dist. LEXIS 3690 (E.D.N.Y. Jan. 9, 2013) ........ 40

*LNC Invs. V. First Fid. Bank, N.A.*, 173 F.3d 454 (2d Cir. 1999) ................ 29

*Lovely Peoples Fashion v. Magna Fabrics*, 1998 U.S. Dist. LEXIS 11197 (S.D.N.Y. July 22, 1998) ................ 29

*LVRC Holdings LLC v. Brekka*, 581 F.3d 1127 (9th Cir. 2009) .......... 32-34

*Nationwide Life Ins. Co. v. Bankers Leasing Co.*, 182 F.3d 157 (2d Cir. 1999) .......... 24

*Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 2002 U.S. Dist. LEXIS 3747 (S.D.N.Y. Mar. 6, 2002) .......... 39

*On-Line Techs., Inc. v. Perkin-Elmer Corp.*, 253 F. Supp.2d 313 (D. Conn. 2003) .......... 37

*Orbit One Communic'ns, Inc. v. Numerex Corp.*, 692 F. Supp. 2d 373 (S.D.N.Y. 2010) .......... 34

*Payment Alliance Int'l, Inc. v. Ferreira*, 530 F. Supp. 2d 477 (S.D.N.Y. 2007) .......... 27

*Paz Systems, Inc. v. Dakota Group Corp.*, 2012 U.S. Dist. LEXIS 45654 (E.D.N.Y. Mar. 30, 2012) .......... 37

*Powlus v. Chelsey Direct, LLC*, 2012 U.S. Dist. LEXIS 81480 (S.D.N.Y. June 12, 2012) .......... 24

*Sadowski v. Dell Computer Corp.*, 268 F. Supp. 2d 129 (D. Conn. 2003) .......... 24

*Schaeffer v. Schaeffer Holding LLC*, 2013 U.S. Dist. LEXIS 38781 (S.D.N.Y. Mar. 20, 2013) .......... 34

*Starwood Hotels & Resorts Worldwide, Inc. v. Hilton Hotels Corp.*, 2010 U.S. Dist. LEXIS 71436 (S.D.N.Y. Jun. 16, 2010) .......... 35

*Ticor Title Ins. Co. v. Cohen*, 1998 WL 355420 (S.D.N.Y. Jul. 2, 1998) .......... 26

*United States v. John*, 597 F.3d at 272 .......... 33

*United States v. Rodriguez*, 628 F.3d 1258 (11th Cir. 2010) .......... 33

*Univ. Sports Publ'ns Co. v. Playmakers Media Co.*, 725 F. Supp. 2d 378 (S.D.N.Y. 2010) .......... 34

*Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241 (2d Cir. 2004) .......... 24

*Westbrook Techs., Inc. v. Wesler*, 2010 U.S. Dist. LEXIS 70901 (D. Conn. Jul. 15, 2010) .......... 34

**State Cases**

*Aon Risk Servs., N.E. v. Cusack*, 34 Misc. 3d 1205(A) (N.Y. Sup. Ct. 2011) .......... 39

*Borne Chemical Co., Inc. v. Dictrow* 85 A.D.2d 646 (N.Y. App. Div. 2d Dep't 1981) .......... 29, 31-32

*Brian E. Weiss, P.C. v. Miller*, 166 A.D.2d 283 (N.Y. App. Div. 1st Dep't 1990) .......... 40

*Chernoff Diamond & Co. v. Fitzmaurice, Inc.*, 651 N.Y.S.2d 504 (App. Div. 1st Dep't 1996) .......... 26

*Cramer v. Spada*, 203 A.2d 739 (N.Y. App. Div. 3d Dep't 1994) ............................................. 29

*Furia v. Furia*, 116 A.D.2d 694 (N.Y. App. Div. 2d Dep't 1986)............................................. 29

*Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90 (N.Y. 1993) ........................................................... 29

*Research & Trading Corp. v. Pfuhl*, 1992 Del. Ch. LEXIS 36 (Nov. 19, 1992).....................26-27

*SinoMab Bioscience Ltd. v. Immunomedics, Inc.*, 2009 Del. Ch. LEXIS 106 (Del. Ch. June 16, 2009)......................................................................................................................... 29

*Tristate Courier and Carriage, Inc. v. Berryman*, 2004 Del. Ch. LEXIS 43 (Apr. 15, 2004)...... 26

*VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606 (Del. 2003)....................................... 29

*Wiener v. Lazard Freres & Co.*, 241 A.D.2d 114,122 (N.Y. App. Div. 1st Dep't 1998)............ 39

*World Auto Parts, Inc. v. Labenski*, 261 A.D.2d 850 (N.Y. App. Div. 4th Dep't 1999)............. 29

**Federal Statutes and Rules of Court**

18 U.S.C. § 1030 ......................................................................................................................... 32

18 U.S.C. § 1030(a)(2)(C)..................................................................................................... 33, 35

18 U.S.C. § 1030(e)(6) ..............................................................................................................32-33

Fed. R. Civ. P. 56 ........................................................................................................................ 23

Fed. R. Civ. P. 56(c)...................................................................................................................... 2

Fed. R. Civ. P. 56(d)....................................................................................................... 31, 38, 40

**Other Authorities**

12-61 Corbin on Contracts § 61.5 ................................................................................................ 30

36 N.Y. Jur. 2d Damages § 6 (West 2013) ................................................................................... 29

Employee Noncompetition Law § 8:15, 8:16 (West 2012)........................................................... 29

# I. INTRODUCTION

In his Motion for Summary Judgment (ECF Doc. 169), Defendant Richard Paul ("Paul") advances a wholly improper standard that relies almost entirely upon his "say so" and ignores the facts, law, and inferences that are contrary to his arguments. For example, Paul attempts to unilaterally limit his non-compete obligations to "connector products", even though the contracts at issue strictly forbid Paul from "directly or indirectly, engag[ing] in the development, production, sale, or distribution of **any product** produced, sold, distributed or which is in development [by Amphenol]." There is no basis in fact or law to support the "re-write" advanced by Paul, and, given his involvement at TE with competitive connector accessories, such as [redacted] it is not surprising that Paul would attempt to limit his post-employment obligations in this manner.

Paul also argues that Amphenol cannot prove any damages as a result of any breach. This purported "fact" ignores reality in that Amphenol is seeking a permanent injunction against Paul and compensatory damages in the form of a return of all monies and stock options paid under the agreements at issue. Moreover, this argument is contrary to New York law in that nominal and punitive damages are always available even if damages such as lost profits are difficult to prove.

Further, Paul wrongly claims that he has not used any of Amphenol's confidential or proprietary information. On the contrary, Paul was involved with, and had responsibility over, competitive products at TE. Given the nearly two decades Paul spent working with Amphenol's products – for example, [redacted] – his knowledge of Amphenol's confidential information coupled with his involvement with similar, competing products at TE gives rise to the obvious inference that he has or inevitably will disclose and use Amphenol's confidential information and trade secrets by applying the "know how" he obtained at Amphenol.

It is clear that summary judgment is only proper when there are no genuine issues as to any material facts. Fed. R. Civ. P. 56(c). At a minimum, Paul's motion for summary judgment should be denied because his moving papers are replete with genuine issues of disputed material facts, self-serving inferences, and misstatements of fact and law.

## II. FACTUAL BACKGROUND

### A. Paul's Crucial Role in Amphenol's Business and His Access to Confidential Information and Trade Secrets.

In the year prior to his sudden resignation from Plaintiff Amphenol Corporation ("Amphenol") in March 2012, Paul was the Business Unit Director of Amphenol's High Speed Interconnect unit. *See* Deposition of Richard Paul ("Paul Dep."), Exhibit 4 at 26:5-6. This unit was created specifically for Paul to manage and grow and, as the Director of the unit, Paul had ultimate responsibility for all aspects of the business including, among other things, sales, operations, marketing, engineering, and profit and loss. *See* Affidavit of Richard Aiken ("Aiken Aff."), Exhibit 1 ¶ 11.[1]

The High Speed Interconnect unit, one of Amphenol's fastest growing business units, was responsible for tens of millions of dollars in sales in the year that Paul was its Director. *Id.* ¶ 12. In the two years prior to the time the High Speed Interconnect unit was created specifically for him, Paul was the Director of Marketing for Amphenol's entire Military Aerospace Operation ("MAO"). *Id.* ¶ 13; *see also* Paul Dep., Exhibit 4, at 22:2-3. In the capacity of Director of Marketing for Amphenol's MAO, Paul had the broader responsibility for all aspects of marketing,

1 Paul holds a bachelor's degree in mechanical engineering. *See* Paul Dep., Exhibit 4, at 15:1-2. After earning his degree, Paul was employed as an engineering manager in the aviation accessory and connector industries for a combined period of 14 years. *See id.* at 15:4-19:7. While at TE, Paul has had involvement with engineering for the product lines he has responsibility over. *See* Deposition of David Gingerich ("Gingerich Dep."), Exhibit 5, at 45:22-46:23. Given Paul's education and experience, it is clear that he understands the engineering and technical side of connector products and accessories.

including budgeting, yearly strategic planning, new product development, pricing (including costs, margins, etc.), and responsibility for sales and distribution channels. *See* Aiken Aff., Exhibit 1 ¶ 13; Paul Dep., Exhibit 4, at 22:6-19.

Paul was compensated handsomely for his efforts. *See* Aiken Aff., Exhibit 1 ¶ 15. Specifically, Paul was paid an annual base salary of $164,328 plus benefits in his last year of employment with Amphenol. *Id.* In addition, Paul was eligible for and compensated under Amphenol's "MIP" or management incentive program, which financially rewarded him based on, among other things, the performance of the MAO. *Id.* Lastly, and perhaps the biggest piece of his overall compensation package, Paul was eligible for and received significant annual stock option awards from Amphenol. *Id.* Only top level management employees, like Paul, were eligible for and received stock options. *Id.* On March 7, 2012 and on March 9, 2012 (the day he resigned), Paul cashed in approximately $238,000 in stock options. *Id.*; *see also* Paul Dep., Exhibit 4, at 57:21-24. Over the course of his employment with Amphenol, Paul cashed in almost $545,000 of stock options. *See* Aiken Aff., Exhibit 1 ¶ 15.

**B. The Intellectual Property Agreement and the 2000 and 2009 Management Stockholder's Agreements.**

On November 2, 2006, Paul signed his Amphenol IPA. *See* Aiken Aff., Exhibit 1 ¶ 48; Exhibit 3.[2] As part of the IPA, Paul specifically acknowledged the value and importance of Amphenol's confidential information and trade secrets. *See* Exhibit 3 ¶ 6.[3] Paul acknowledged

---

2 Paul acknowledged and agreed that the version of the IPA signed in 2006 was a memorialization of an IPA he signed from the outset of his employment in 1996. *See* Paul Dep., Exhibit 4, at 36:15-37:10. Paul signed the 2006 version of the IPA because the 1996 version was destroyed in a flood. *Id.* at 37:23-38:3. Paul acknowledged that the 2006 IPA contained terms similar to the 1996 IPA and was binding upon him. *Id.* at 36:15-37:10, 40:17-24.

3 The IPA broadly defined the term "Confidential Information" to mean "any information used in Amphenol's business which gives Amphenol an advantage over our competitors who do not know or use such information (for example, a formula, manufacturing process,

and agreed that, for a period of one year following the termination of his employment, he would not "divert … any Amphenol business by soliciting, contacting or communicating with any customers of Amphenol's products with whom [he] had contact during the year preceding termination of [his] employment." *See* Exhibit 3 ¶ 6. Paul also acknowledged and agreed that "all documents and tangible things embodying or containing Amphenol's Confidential Information are and shall remain Amphenol's exclusive property." *Id.*; *see also* Exhibit 6 ¶ 17(d). Paul further understood, acknowledged, and agreed that "[he] shall have access to such Confidential Information solely for performing the duties of [his] employment by Amphenol." *See* Exhibit 3 ¶ 6 (emphasis added).

In addition, as a precondition to each of the numerous stock option awards that he received, Paul entered into a 2000 Management Stockholder's Agreement and a 2009 Management Stockholder's Agreement (collectively the "Stockholder's Agreements"). *See* Aiken Aff., Exhibit 6 and 7. As part of the Stockholder's Agreements, and in exchange for the valuable consideration of various stock options provided under these agreements, Paul agreed to be bound by the "Covenant Not to Compete; Protection of Confidential Information; Nonsolicitation of Customers and Suppliers and Nonsolicitation of Employees" provisions of the Stockholder's Agreements. *See* Exhibit 6 ¶ 17(a). Paul acknowledged and agreed that, for a period of at least one year, he "shall not … directly or indirectly, engage in the development, production, sale or distribution of any product produced, sold, distributed" by Amphenol. *Id.* The IPA contains a nearly identical non-compete covenant. *See* Exhibit 3 ¶ 6.[4] In some circumstances, such as the

manufacturing equipment, propriety compound, customer list, supplier list, employee information, marketing plans, financial data, business data, etc.)." *See* Exhibit 3 ¶ 13(c); *see also* Exhibit 6 ¶ 17(d).

4 The Stockholder's Agreements define the term "directly or indirectly" to mean that Paul shall not "direct[ly] or indirect[ly] participat[e] in such [competitive] enterprise as an employee[.]" *See* Exhibit 6, at ¶ 17(c). The IPA similarly limits Paul's employment with

present case, Amphenol may pay as additional consideration for the employee's non-compete undertaking, a salary continuation in an amount equal to 50% of his or her base salary during the enforcement period. *See* Exhibits 6 ¶ 17(b) and 3 ¶ 6. Amphenol took the extraordinary step in this case of paying Paul 50% of his base salary during the first year of his employment (approximately $82,000). *See, e.g.,* Exhibit 8.

### C. <u>The Merger of TE Connectivity, Ltd. and Deutsch Group SAS.</u>

Until April 3, 2012, TE Connectivity, Ltd. ("TE"), a self-described "$12.1 billion" global behemoth, sold connector products and accessories through the same distributors as Amphenol. *See* Aiken Aff., Exhibit 1 ¶ 18. On April 3, 2012, TE announced the completion of an acquisition of Deutsch. *Id.* ¶ 21. Contrary to the assertions in Paul's summary judgment motion, Amphenol and TE competed against each other in the sale and distribution of connectors and connector accessories, among others products, prior to TE's acquisition of Deutsch, at least at the design level. *See* Ross Dep., Exhibit 2, at 229:7-230:9; First Deposition of Kevin Rock ("Rock Dep. I"), Exhibit 9, at 70:6-20; Second Deposition of Kevin Rock ("Rock Dep. II"), Exhibit 10, at 55:12-15. To the extent that there was any doubt that TE and Amphenol directly competed prior to April 3, 2012, TE's acquisition of Deutsch unequivocally made TE and Amphenol direct competitors.

For all practical purposes, [redacted]

---

competing companies. *See* Exhibit 3 ¶ 6. Under the plain language of these agreements, Paul's employment with TE should have been prohibited in its entirety during the Non-Compete period.

5 *See* Deposition of Francis Breslin ("Breslin Dep."), Exhibit 11, at 45:25-46:2, 69:20-24, 71:11-15; Rock Dep. I, Exhibit 9, at 28:17-22; Gingerich Dep., Exhibit 5, at 37:15-19.

[redacted][9]. In fact, TE's Vice President of Global Sales and Marketing, Francis Breslin, has [redacted] *See* Breslin Dep., Exhibit 11, at 9:6-8.

**D. In the Weeks Prior to His Abrupt Resignation, Paul Repeatedly Accessed, Downloaded, Printed, and Otherwise Retained Amphenol's Confidential Information and Trade Secrets.**

In the days and weeks before he abruptly terminated his employment with Amphenol, Paul began reviewing, accessing, copying, printing, downloading, forwarding, and otherwise retaining Amphenol's confidential information and trade secrets without the authorization, knowledge, or permission of Amphenol. *See* Aiken Aff., Exhibit 1 ¶ 53, 56-58. Paul's access and retention of this information provided no benefit to Amphenol and furthered none of Amphenol's legitimate business needs. *Id.* Paul accessed this information without the permission or knowledge of Amphenol's management, and such access – done to benefit Paul and/or his new employer, TE – exceeded any authorization Paul had to access this information. *Id.*

For example, Paul printed and retained, from January 23, 2012 through March 8, 2012 (the day immediately prior to his resignation), no less than 154 Amphenol documents from Amphenol's network printer without Amphenol's knowledge. *See id.* ¶ 57. Many, if not all of these documents were confidential and proprietary, and contained a "CONFIDENTIAL" or similar

---

6 *See* Breslin Dep., Exhibit 11, at 69:25-70:3; Rock Dep. I, Exhibit 9, at 25:21-23; Gingerich Dep., Exhibit 5, at 38:12-15.

7 *See* Breslin Dep., Exhibit 11, at 70:21-23; Gingerich Dep., Exhibit 5, at 39:6-8.

8 *See* Breslin Dep., Exhibit 11, at 71:22-72:1; Rock Dep. I, Exhibit 9, at 23:23-24:3; Gingerich Dep., Exhibit 5, at 39:12-15.

9 *See* Rock Dep. I, Exhibit 9, at 24:15-23, 25:11-16.

marking. *See id.* ¶ 57(a)-(d). None of this information is available to the general public and/or Amphenol's competitors, including TE. *Id.* ¶ 58.

Paul also forwarded to his Yahoo! email account confidential and proprietary emails and documents, without Amphenol's knowledge or permission. *See, e.g.,* Aiken Aff., Exhibit 1 ¶ 59(a)-(c); *see also* ECF Doc. 101, at 5.[10]

Amphenol also discovered that Paul accessed the [redacted] databases in February 2012 and copied them to a portable storage device. *See* Aiken Aff., Exhibit 1 ¶ 62.[11] Specifically, on Sunday, February 26, 2012, Paul entered Amphenol's office during non-business hours to download thousands of documents – including several historical versions of th[redacted] containing Amphenol's confidential information and trade secrets. *See* Report of Garry Pate ("Pate Report"), Exhibit at 13. Paul stated that he accessed information directly from Amphenol's mainframe while inside of its offices because, given the high volume of data he was taking, it would have been very hard to download this amount of information remotely. *See* Paul Dep., Exhibit 4, at 101-24:102:12. Paul admitted that "[he] had grabbed pieces [of data] at a time[.]" *See id.* at 105:9-13. Paul does not deny that he was, in fact, the person that downloaded this information. *See id.* at 105:19-106:4. Paul claims to have "not knowingly" taken files containing

---

10 When the September, 2011 flood occurred, Amphenol provided its employees with permission to create and use email accounts through third-party email providers given the interruption caused to Amphenol's servers as a result of the flood. *See* Ross Dep., Exhibit 2, at 55:24-56:8. This permission, however, was rescinded when Amphenol's servers were restored after the flood. *Id.* The AOL account used by Gary Anderson (as referenced in Paul's motion) is <u>not</u> a personal email account because emails sent to that email address are redirected from Amphenol's servers, thereby causing those emails to operate within Amphenol's business network. *Id.* at 27:4-29:3. In any event, Paul's personal Yahoo! email address has nothing to do with the limited permission given by Amphenol as a result of the September, 2011 flood, because Paul created this email account for reasons other than Amphenol's business in July, 2011. *See* Exhibit 12.

11 The [redacted] is a highly confidential Amphenol internal database that may only be accessed by top-ranking Amphenol MAO employees, including Paul. *Id.* ¶ 63. The information on the [redacted] used by Amphenol MAO to, among other things, understand sales and market trends. *Id.*; *see also* Paul Dep., Exhibit 4, at 126:1-127:2.

Amphenol's confidential business information, *see id.* at 110:15-19, but the forensic analysis of Paul's activities reveals quite another story.

A summarized version of Exhibit "H" of the Pate Report shows the exact files Paul targeted on February 26, 2012, as well as the time it took to begin and end the download of each file. *See* Exhibit 14. Paul admitted that he downloaded work-related folders titled "ops review", "customers", "HSI", "meetings", "presentations", and "products", among others, even though these files do not contain his personal information. *See* Paul Dep., Exhibit 4, at 106:22-107:5, 108:3-24. "Paul secretly accessed highly confidential information that he did not need for his duties at Amphenol." *See* Aiken Aff., Exhibit 1 ¶ 2. I At the time Paul downloaded this vast quantum of Amphenol's confidential information, he admits that he intended to leave Amphenol for a new opportunity with TE or some other company. *Id.* ¶ 56; *see also* Paul Dep., Exhibit 4, at 122:7-123:1. Paul quite literally left "no stones unturned" when he targeted thousands of electronic documents containing Amphenol's confidential information. *See* Paul Dep., Exhibit 4, at 115:20-116:18.

**E. Paul Also Stole Confidential Information on [redacted]**

Upon learning that TE planned to acquire Deutsch, Amphenol formed [redacted] *See* Ross Dep., Exhibit 2, at 92:8-14. [redacted] *Id.*; *see also* Paul Dep., Exhibit 4 at 91:7-18. Before Paul resigned, he was given access to the highly confidential documents created by [redacted] was asked for input, and reviewed the most recent version of their work product. *See* Aiken Aff., Exhibit 1 ¶ 23. Amphenol did not know that at the time Paul was secretly negotiating



DM1\4214817.2

and meeting with TE's senior management regarding his employment opportunities with TE. *Id.* ¶ 43.

**F. Upon Learning of Paul's Theft of Confidential Information and Intention to Pursue Employment with a Competitor, Amphenol Promptly Acted to Protect its Legal and Equitable Rights.**

After the initial forensic investigation revealed the extent of Paul's theft of confidential information and trade secrets, Amphenol immediately sent Paul and TE cease and desist letters advising them of the threat Paul's employment posed and warning that Amphenol would take the steps necessary to protect its legal and equitable rights. *See* Exhibits 15 and 16. When Paul and TE responded that they intended to proceed with Paul's immediate employment at TE, Amphenol was left with no other choice but to file a claim against Paul and move for emergency injunctive relief on April 10, 2012. *See* ECF Docs. 1 and 2.

In response to Amphenol's motion, Paul and TE's President, Kevin Rock, submitted affidavits in which they swore that Paul: (1) would not have any "role" or "input" with Deutsch; (2) would not have any "responsibility" over connector products; and (3) would not "directly or indirectly engage" in the production, development, sale or distribution of products that compete with Amphenol. *See* Affidavit of Richard Paul ("Paul Aff."), Exhibit 17 ¶¶ 18, 36-38; Affidavit of Kevin Rock ("Rock Aff."), Exhibit 18 ¶¶ 7, 10-12.

Contrary to Paul's assertions, "extensive precautions" were not taken prior to the issuance of the Injunction Order on November 9, 2012. Following the October 17-18 hearing on Amphenol's motion for injunctive relief (the "Injunction Hearing"), the Court held that "TE is not taking adequate measures to insulate Paul from activities that may violate the Agreements[.]" *See* ECF Doc. 101, at 6. That is because the only precautions put in place prior to the Court's Injunction Order was a verbal instruction to Paul and a few others that he was not to have involvement with connectors or Deutsch. *See* Gingerich Dep., Exhibit 5, at 64:21-65:2, 66:2-9;

Rock Dep. II, at Exhibit 10, at 16:24-18:4. Prior to the Injunction Order being issued on November 9, 2012, TE did not implement any of the following precautions: (1) word-based filters that would prevented Paul from receiving emails on competitive matters; (2) requirement for Paul to work in secure locations; (3) issuance of a memorandum and reminders advising TE personnel of Paul's contractual restrictions; and (4) retention of an IT professional to confirm whether Paul uploaded any Amphenol information into TE's systems. *See* ECF Doc. 101.

### G. Contrary to Paul and TE's Sworn Assertions, the Documents Recently Produced by TE Clearly Show that Paul *Has* Engaged in Competitive and Harmful Conduct.

#### 1. Paul Had Involvement and Input in the Deutsch Integration and with Deutsch Products During the Non-Compete Period.

##### (1) Paul was involved in the various phases of th[redacted]

Paul had involvement in the various phases of the [redacted]. For example, on July 30, 2012, Paul received an email from Sage Wadke (TE's Director of Sales & Marketing for Deutsch/TE ADM Offshore Business) that sought input from Paul on matters related to [redacted]. *See* Exhibit 21. Attached to the email is a meeting agenda which covers the [redacted] *Id.*

On August 16, 2012, Paul received an invite to a series of meetings held on August 27-29, 2012 that focused on the development of [redacted] a product previously manufactured and distributed by Deutsch). *See* Exhibit 22. Dave Carmen (a Deutsch employee with experience [redacted]s also in attendance. *Id.*

On August 27, 2012, Paul received an invitation from Eric Birden to attend recurring weekly meetings on [redacted]*See* Exhibits 23 and 24. The



DM1\4214817.2

invitation, sent to Paul and others, thanked them for their efforts in completing [redacted]. *Id.*

On August 29, 2012, Paul received an email from Mr. Birden advising of the status of [redacted]which required: (1)[redacted] *See* Exhibit 20. An earlier thread in the same email chain advises that:

[redacted]

*Id.* On September 4, 6, and 12, 2012, Paul received additional emails advising of the status of the [redacted]E. *See* Exhibits 25, 26, and 27. Paul then received an email, on September 7, 2012, discussing the[redacted] *See* Exhibit 28.[12]

On September 12, 2012, Paul again received an invite from Eric Birden to attend [redacted] *See* Exhibit 29. The invitation states the following: [redacted] *Id.*

On September 17, 2012, Dave Gingerich sent Paul an email discussing a telephone call that was to occur later that afternoon. *See* Exhibit 30. The subject of the call was to cover only the following subject:

---

12 In the September 7, 2012 email, Dale Reeves requested that he "[redacted]" *Id.* The remainder of the email is redacted so its context is not fully discernible.

[redacted]

*Id.* While TE did its best to conceal key portions of this email, the subject of the email is apparent: the integration of Deutsch connector products into TE.

**(2) TE and Deutsch personnel routinely reported to Paul regarding Deutsch, Deutsch products, the [redacted], and competitive opportunities resulting from the [redacted]**

The TE/Deutsch personnel implementing the [redacted] on and operations routinely updated Paul and copied him on emails that listed many Deutsch people as recipients or senders. For example, on July 3, 2012, Russell Graves sent an email that listed, among other things, the following agenda items:

[redacted]

*See* Exhibit 34. Mr. Graves then reported this agenda to Paul and Frank Breslin and advised that [redacted] *Id.* (ellipsis in original).

On July 5, 2012, Frank Breslin sent Paul an email (and only to Paul) that attaches a June 2012 Monthly Report. *See* Exhibit 35. While a large portion of the report is redacted, it includes a portion concerning Deutsch's integration into Amphenol's distribution network: [redacted] *Id.* (bolded in original). The

report also contains competitive information on Amphenol: [redacted]." *Id.*

Three days later, on July 8, 2012, Paul received an email (that is heavily redacted) that sets forth various TE/Deutsch [redacted] Exhibit 36.

On July 12, 2012, Paul received an email from Clint Mendinsky, TE's Global Director of Pricing, that again detailed the integration of TE and Deutsch and its effects on pricing. *See* Exhibit 37. The underlying emails were generated by Pierre Bottollier-Lemallaz and Jean Chirstian Delamotta, both Deutsch employees working at Deutsch's French facility. At the top of the email chain, Mr. Medinsky sent the following message to Paul (and only to Paul): [redacted] *Id.*

On July 18, 2012, Paul received an email from Thomas Briere (TE's Business Development Manager) advising that "[redacted] *See* Exhibit 38. These are all products that are competitive with Amphenol.[13]

On June 19, 2012, Jill Weir (TE's Global Product Manager for Specialty Products) advised Paul that, among other things, [redacted]" *Id.* Although Paul was supposed to have no involvement with competitive products and the [redacted] Paul nonetheless advised Weir to [redacted]" *Id.*

---

13 The significance of the [redacted] is more fully set forth in Section II.B.3, *infra.*



DM1\4214817.2

All of the information sent to Paul contravenes even TE's understanding of the contractual obligations Paul owed to Amphenol. TE understood that Paul was to send or receive "[n]o communications, [and have] no interactions with Deutsch at all." *See* Deposition of Janet Russell ("Russell Dep."), Exhibit 39, at 34:7-9. Paul and TE's nonchalant adherence to this directive and failure to implement meaningful precautions allowed Paul to routinely send and receive information related to Deutsch, Deutsch products, and Deutsch technology during at least the first eight months of his employment at TE.

**2. Paul Had Involvement and Input Into the [redacted]**

In addition to connectors, Amphenol manufactures, among other things, connector accessories, adapters, contactors, wire and cable, and fiber optic products. *See* Affidavit of Mark Ross ("Ross Affidavit"), Exhibit 40 ¶ 3. Amphenol manufactures c[redacted]rs referred to as [redacted] *Id.* ¶ 4. TE also manufactures a similar line of [redacted] referred to a[redacted]*d.* ¶ 5.[14] [redacted]are competitive with Amphenol's [redacted]. *See* Ross Aff., Exhibit 40 ¶ 6; *compare also* Exhibit 41 *with* Exhibit 42; *see also* Breslin Dep. Exh. 11, at 28:2-8 ([redacted], 48:12-20 [redacted]).[15]

Amphenol's key distributors, such as[redacted]sell both[redacted]. *See* Exhibit 31. Paul worked with the [redacted]while at Amphenol, and had knowledge of their manufacture, plating, development, marketing, and distribution. *See* Ross Aff.,

---

14 TE's [redacted]enerates between[redacted]*See* Breslin Dep., Exhibit 11, at 35:14-36:6.

15 TE also manufactures [redacted] that competes with Amphenol under its [redacted]*ee* Breslin Dep., Exhibit 11, at 39:8-14.

Exhibit 40 ¶ 7; *see also* Exhibit 44 (email showing that Paul received confidential drawings and information on [redacted]) and 45 (agenda meeting showing that Paul attended and participated in an Amphenol meeting covering, among other things [redacted] Paul has admitted that he is directly responsible for the development and marketing [redacted] *See* Paul Dep., Exhibit 4, at 31:7-9, 31:21-32:8.

On June 29, 2012, Paul – now TE's Global Vice President of Vice President of Product Management and Development – received an email from Doug Jones (TE's Global Senior Product Manager for Connector Accessories) that discusses the technical requirements and needs for the [redacted]" *See* Exhibit 46. On July 3, 2012, Russell Graves sent Paul and Frank Breslin an email requesting the assignment of resources and timelines for this project and to [redacted] *See* Exhibit 34. Thereafter, Paul sent Breslin an email that discusses [redacted] *See* Exhibits 47 and 48. While the email is heavily redacted, making it difficult to fully understand its content, the following communication from Doug Jones about the development of [redacted]:

[redacted]

[redacted]

*Id.* Breslin subsequently sent a message to Paul requesting a telephone call to discuss this [redacted] and Paul responded affirmatively to have such a call. *Id.* According to Breslin, "[redacted]



DM1\4214817.2

[redacted] *See* Breslin Dep., Exhibit 11, at 53:13-25. Graves did this to [redacted] *Id.* at 55:15-18. Paul has admitted that he was involved with marketing [redacted] while at Amphenol, *see* Paul Dep., Exhibit 4, at 21:7-14, and that the people reporting to him at TE are involved in the process of applying [redacted] *see* Paul Dep., Exhibit 4, at 286:12-22; *see also* Rock Dep. I, Exhibit 9, at 235:10-14.

Thereafter, on July 5, 2012, Paul sent Doug Jones an email stating that he [redacted] *See also* Exhibits 49. Breslin admitted that he solicited Paul, among others, for input for the strategy of the [redacted] *See* Breslin Dep., Exhibit 11, at 32:17-33:1. Paul was cautious enough to have off the record discussions rather than create more email evidence but clearly did have discussions with both Breslin and Jones concerning a product that is competitive to Amphenol.

Two days later, on July 5, 2012, Paul sent Mark Sawyer (TE's Global Director of Wire and Cable or "W&C") an email that excerpted portions of a monthly report. *See* Exhibit 50. One of the excerpted portions discuss[redacted] *Id.*

On July 16, 2012, Paul received emails from Sofia Shafir and Doug Jones that further discussed th[redacted]. *See* Exhibit 51. At least one portion of the email chain includes a discussion on TE's development of [redacted]

16 [redacted] are key customers and purchasers of Amphenol and TE products.

[redacted]

*Id.* at TE_R_2016043. On July 16, 2012, Paul was copied on an email from Sofia Shafir (TE's Global Director of Engineered Polymer Solutions or "EPS") that states [redacted] *See id.* at TE_R_2016041. TE has admitted that it is developing [redacted]ts connectors and connector accessories in collaboration with Deutsch. *See* Gingerich Dep., Exhibit 5, at 35:8-14. Paul is directly responsible for the above-discussed connector accessories and other products that are in the process of having Deutsch's [redacted] applied to TE products. *Id.* at 35:15-36:2.

On August 3, 2012, Doug Jones sent Paul an email containing the following message: [redacted] *See* Exhibit 52. Paul responds to this email by advising Jones that [redacted] *See* Exhibit 53 (emphasis added). On August 7, 2012, Paul received an email from Martin Pope that requested [redacted] *See* Exhibit 54.

---

17 The acronym [redacted] refers to a line of competitiv[redacted]



DM1\4214817.2

### 3. Paul Had Input and Involvement with a [redacted] Being Developed by TE that Directly Competes with Amphenol's [redacted]

While employed at Amphenol, Paul was instrumental in the development of Amphenol's [redacted] otherwise known as [redacted] *See* Ross Aff., Exhibit 40 ¶ 8; Paul Dep. Exhibit 4, at 22:4-23:6, 28:12-20. The [redacted] are designed for harsh industrial and commercial applications, as well as military and aerospace applications. *See* Ross Aff., Exhibit 40 ¶ 9. The [redacted] or exceed military specifications, including mil-spec 38999. *Id.* The [redacted] can be worn by soldiers to interconnect their technological equipment, such as radio, cameras, and GPS. *Id.* ¶ 10. Prior to April 2012, [redacted] the largest manufacturer by volume in this niche market. *Id.* ¶ 11. According to TE, [redacted] *See* Breslin Dep., Exhibit 11, at 84:16-85:2.

At Amphenol, Paul was part of the team that identified the need to improve upon Amphenol's [redacted], as Director of Marketing, steered that initiative. *See* Ross Aff., Exhibit 40 ¶ 12. Paul was in charge of the Product Group responsible for starting the [redacted] and was in daily contact with those responsible for its development. *Id.* ¶ 13. Paul admitted that, as Amphenol's Director of Marketing, he had responsibility over [redacted] *See* Paul Dep., Exhibit 4, ¶ 22:24-23:6. As a result, Paul has intimate knowledge of all aspects of the [redacted] including its engineering, pricing, price margins, distributor preferences, etc. *See* Ross Aff., Exhibit 40 ¶ 14. Paul was also privy to highly-sensitive information concerning the [redacted] For example, on March 6, 2012 (just 3 days before Paul's abrupt resignation), Paul received an email from Robert Watson (Amphenol's Marketing Communication Specialist) that requested Paul's approval for a brochure on Amphenol's [redacted] *See* Exhibit 55.

The brochure included, among other things, [redacted] *See id.* at AMPHENOL0012227.[18]

Despite its highly confidential and proprietary nature, Paul misappropriated highly-sensitive information concerning the developmental [redacted]om Amphenol. On March 2, 2012, Paul forwarded an engineering drawing titled [redacted]o his personal Yahoo! email account. *See* Exhibit 56. Paul also misappropriated a layout for a developmental product called th[redacted]n his "[redacted]xternal hard drive. *See* Affidavit of Maria Morgan ("Morgan Affidavit") (Exhibit 1) ¶¶ 4-6, 15.

As of April 2012, TE did not manufacture a product line that was competitive with either [redacted] *See* Ross Aff. Exhibit 40, ¶ 15. However, when TE acquired Deutsch in April 2012, TE obtained Deutsch's [redacted]s, which <u>does</u> compete in th[redacted] ¶ 16; *see also* Paul Dep., Exhibit 4, at 298:1-18. TE also acquired Deutsch's manufacturing capabilities and technologies fo[redacted] *See* Breslin Dep., Exhibit 11, at 82:2-6. TE's Vice President of Global Sales and Marketing admitted that TE, through its acquisition of Deutsch's [redacted]now competes in the same market as Amphenol. *See id.* at 82:21-84:1, 86:1-6.

Upon Paul's arrival, TE and Deutsch began development of, ***with the involvement of Paul***, a competitive line of [redacted]s. On July 5, 2012, Paul sent Mark Sawyer an email excerpting portions of a monthly report from Kevin Rock. *See* Exhibit 27. Among the portions Paul chose to excerpt, Paul forwarded the following to Sawyer:

---

18 As Director of Marketing, Paul was responsible for the development and marketing of [redacted]which is a product line within th[redacted]ee Paul Dep. Exhibit 4, at 24:3-6.



DM1\4214817.2

[redacted]

*Id.* Paul should not have been forwarding information on the opportunity to bid on a key defense contract involving a product line he helped develop at Amphenol, let alone be privy to such information. Thereafter, on August 6, 2012, Paul received an email from Frank Breslin attaching [redacted] *See* Exhibit 58.

On August 5, 2012, Doug Jones sent Paul an email that analyze[redacted] *See* Exhibit 59. Specifically, Jones advised that [redacted] *Id.*

On August 31, 2012, Rich Paul was involved in an email conversation discussing the development of Deutsch's [redacted]r at least the [redacted]or these connectors. *See* Exhibit 60 (several versions of this email are attached). Scott Kenaston, TE's Application Engineer, sent the following email on August 30, 2012:

[redacted]. . .

*Id.* The developmental product discussed is the [redacted]at is competitive to Amphenol's [redacted]*See* Exhibit 61.[19] Notwithstanding his non-compete obligations and sworn statements to steer clear of such information, Paul received an email from Michael Mullen requesting assistance on the problems identified by the application engineer. Paul's response: "Fyi, comments?" *See* Exhibit 60. Dave Gingerich responded directly to Paul response by advising Paul of the following:

> [redacted]

*Id* at TE_R_2005582. Paul should have had absolutely <u>no</u> involvement – let alone oversight – over the development of [redacted]products directly competitive with Amphenol. Kevin Rock has stated that Paul's involvement with such connectors violates his legal obligations and the instruction given by Rock to avoid Deutsch and Deutsch-related matters. *See* Rock Dep. I, Exhibit 9, at 38:23-40:16.

### 4. Paul Had Involvement or Input Into Other Connector-Related Products.

Contrary to Paul's sworn assertions, Paul did have involvement and input into connector products at TE during, at least, the first eight months of his employment. For example, on May 8, 2012, Kevin Rock forwarded Paul an email that contained summaries on, among other things, connectors. *See* Exhibit 65. Rock wanted Paul and others to advise as to when [redacted] would be completed and running. *Id.*

---

19 [redacted] (*see, e.g.*, Exhibits 62 and 63). Both Amphenol and Deutsch currently distribut[redacted]hrough Amphenol's key distributors, such as [redacted]*See* Exhibit 64.

On July 3, 2012, Sage Wadke (the Director of Sales and Marketing for Deutsch and TE's Offshore Business) sent Paul (and only Paul), at the request of Kevin Rock, a [redacted] *See* Exhibit 66. Paul's response: "Thanks Sage, looks and sounds great." *Id.*

On September 5, 2012, Paul sent an email to Dave Gingerich requesting that he add [redacted][.]" *See* Exhibit 67. Apparently, Ryan Warner (TE's IT professional) understood that Paul was not be involved with connectors, so Paul circumvented Warner's concerns by seeking the prohibited information from Gingerich. Gingerich complied and supplied Paul with the connector information. *See* Exhibit 68; Gingerich Dep., Exhibit 4, at 123:1-124:2.

On August 6, 2012, Doug Jones sent Paul an email advising him of a large purchase of "Deutsch connectors" by a Deutsch distributor and request for additional connectors, adapters, and heat shrink boots. *See* Exhibit 59.

Paul also attended, accepted invitations to attend, and/or organized numerous meetings focused on connectors. For example, on July 30, 2012, Paul received an invitation to attend a meeting on [redacted] *See* Exhibit 69. That same day Paul accepted the meeting request. *See* Exhibit 70. Paul then accepted a meeting o[redacted]ugust 28, 2012. *See* Exhibit 71.

On September 6, 2012, Paul sent an email to Rock, Gingerich, Engler (the person responsible for connectors), and others as part of his efforts to organize a meeting on "Global Project Management", which included, among other things, a presentation by Dave Engler on connectors. *See* Exhibit 72. In the email, Paul (as the meeting's organizer) stated the following:

> [redacted]



DM1\4214817.2

[redacted]

*See id.* at TE001177 (emphasis added). Paul violated his contractual obligations by organizing and/or attending a meeting covering the project management of connector or competitive products. Kevin Rock admitted that Paul's involvement with such connector products, even if they are under the [redacted] an compete with Amphenol, at least at the design level. *See* Rock Dep. I, Exhibit 9, at 70:10-20.

Paul also had involvement with connectors as it relates to Amphenol's customers and distributors. On September 2, 2012, Paul received an email from Doug Jones who sought to displace other "competitors" from the connectors sold by [redacted]

[redacted]

*See* Exhibit 73. Paul should have no involvement with Amphenol's customers and distributors, let alone involvement that deals with Deutsch or connector products.[20] In addition, Paul "likely" had numerous discussions regarding Amphenol distributors – such a [redacted] – with Mr. Gingerich. *See* Gingerich Dep., Exhibit 5, at 53:13-23, 54:20-55:12.

## III. LEGAL STANDARD

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. The

---

20 Paul has admitted tha [redacted] was a distributor of Amphenol and that, while at Amphenol, Paul developed several contacts wit [redacted] *See* Paul Dep., Exhibit 4 at 216:15-22, 253:12-18.

moving party "bears a heavy burden of demonstrating the absence of any material issues of fact." *Nationwide Life Ins. Co. v. Bankers Leasing Co.*, 182 F.3d 157, 160 (2d Cir. 1999). To carry its "initial burden," Paul must "come forward with evidence on each material element of [his] claim or defense, thus demonstrating that [he] is entitled to relief." *Powlus v. Chelsey Direct, LLC,* 2012 U.S. Dist. LEXIS 81480, at * 4, (S.D.N.Y. June 12, 2012); *Sadowski v. Dell Computer Corp.*, 268 F. Supp. 2d 129, 132 (D. Conn. 2003).

To determine whether Paul met his burden of showing the absence a genuine issue for trial, the district court may not only rely solely on the statement of undisputed facts. *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). It must be satisfied that the citation to evidence in the record supports the assertion. *Id.*

Only admissible evidence can be considered. *SEC v. Lyon*, 605 F. Supp. 2d 531, 542, (S.D.N.Y. 2009). A court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Demel v. Am. Airlines, Inc.*, 2011 U.S. Dist. LEXIS 13776, at *10 (S.D.N.Y. Feb. 10, 2011). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are not the functions of the court when ruling on summary judgment motions. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## IV. ARGUMENT

### A. The Evidence Obtained Through Discovery Establishes That Paul Breached His Contractual Obligations And Amphenol Has Been Damaged As A Result.

#### 1. Paul's Contractual Obligations Are Reasonable In Scope.

Paul turns the scope of his contractual obligations with Amphenol on its head when he attempts to unilaterally limit those obligations solely to "connector products". *See* ECF Doc. 169-

1, at 14 (emphasis in original). The Stockholder's Agreements and IPA strictly forbade Paul from "directly or indirectly, engag[ing] in the development, production, sale, or distribution of **any product** produced, sold, distributed or which is in development [by Amphenol]." *See* Exhibits 6 ¶ 17(a) and 3 ¶ 6. This language was necessary because Paul had wide responsibilities, particularly as Director of Marketing, and had access to confidential information at Amphenol. The restriction preventing Paul from competing against "any product" made by Amphenol is what the parties freely bargained for, and is why Paul received several hundred thousand dollars in stock options and non-compete pay. *See* Section II.A, *supra*. The plain and unambiguous language of these agreements in no way limits themselves to "connector products".

Paul argues that enforcing the contracts as written does not protect Amphenol's legitimate business interests because "[t]he undisputed facts show that Mr. Paul does not work with connectors and interconnect products at TE." *See* ECF 169-1, at 14. This flawed argument fails for several reasons. First, Paul had involvement with competing products, such as [redacted]uring at least the first eight months of his employment at TE. *See* Sections II.G.2-3, *supra*. While at Amphenol, Paul worked with the [redacted]nd had knowledge of their manufacture, development, marketing, and distribution. *See* Ross Aff., Exhibit 40 ¶ 7; *see also* Exhibits 44 and 45. Paul was also responsible for starting the [redacted] at Amphenol and was in daily contact with those responsible for its development. *See* Ross Aff., Exhibit 40 ¶ 13; *see also* Paul Dep., Exhibit 4, at 22:24-23:6. These products compete with TE directly and/or at the design level. *See* Breslin Dep., Exh. 11, at 28:2-8, 48:12-20, 82:21-84:1, 86:1-6. Paul admitted that he was directly responsible for the development o[redacted]because TE placed [redacted] under its Engineered Polymer Solutions or "EPS" group – a group directly under Paul's management. *See* Paul Dep., Exhibit 4, at 76:24-77:17. The factual record clearly shows that Paul was involved in



DM1\4214817.2

all facets of the development, production, and distribution o[redacted], *see* Section II.G.2, *supra*, in clear violation of his contractual obligations. The evidence also establishes that Paul had involvement with TE's push into th[redacted]even though he was instrumental in launching Amphenol's[redacted] this very same market. *See* Section II.G.3, *supra.* Paul received information on competitive opportunities in this market, *see* Exhibits 50 and 59, and was involved in the development and engineering o[redacted] *see* Exhibit 60. Not only does this evidence raise genuine disputes of material facts contrary to Paul's motion, Paul's involvement with[redacted]onstitutes a clear breach of his contractual obligations.

The law provides that an employer's interest in protecting its confidential information and trade secrets is "weighty and worthy of the court's protection." *Research & Trading Corp. v. Pfuhl*, 1992 Del. Ch. LEXIS 36 (Nov. 19, 1992); *Chernoff Diamond & Co. v. Fitzmaurice, Inc.*, 651 N.Y.S.2d 504, 506 (App. Div. 1st Dep't 1996). An employer has a protectable interest in, among other things, confidential information and trade secrets related to competitive products, strategic plans, pricing practices, product margins, and product development. *See, e.g., Intermetro Indus. Corp v. Kent*, 2007 U.S. Dist. LEXIS 28239, at *16 (M.D. Pa. Apr. 17, 2007); *Tristate Courier and Carriage, Inc. v. Berryman*, 2004 Del. Ch. LEXIS 43, at *42 (Apr. 15, 2004); *Ticor Title Ins. Co. v. Cohen*, 1998 WL 355420, at *4 (S.D.N.Y. Jul. 2, 1998); *Pfuhl*, 1992 Del. Ch. LEXIS, at *32.

### 2. The Evidence Shows That Paul Clearly Breached His Obligations Under the Stockholder's Agreements and IPA.

Paul argues that he has not breached his non-compete obligations under the Stockholder's Agreements and IPA because he submitted an affidavit stating that he has had no involvement with competing products at TE. Unfortunately for Paul, the standard for a motion for summary

judgment is not Paul's "say so", but rather whether any genuine disputes of material fact exist. As discussed in Section II.G, *supra*, Paul had involvement with competing products such as [redacted] and other connector products, as well as involvement with Deutsch and its technologies, including [redacted]

Paul also argues that there is no evidence that he breached the confidentiality provisions of these agreements because there is no proof that he uploaded any Amphenol documents into TE's computer systems and did not "use" Amphenol's confidential information. *See* ECF Doc. 169-1, at 18-21. The law, however, is not so restricted. Amphenol employed Paul for nearly two decades where he served as an engineering manager, Director of Marketing (with global responsibility for Amphenol's MAO products), and as the Business Unit Director of Amphenol's High Speed Interconnect unit. *See* Section II.A, *supra*. Paul had extensive involvement and responsibility for the development, production, and distribution of a broad range of Amphenol products. *Id.* When Paul began working on products at TE ([redacted]that compete with products he developed, produced, and distributed at Amphenol – it is reasonable to conclude that he worked with the TE versions while using the knowledge he obtained through his many years of employment at Amphenol. In fact, "what other base of technical know-how could [an employee] draw upon to perform his new and important job?" *See IBM v. Papermaster*, 2008 U.S. Dist. LEXIS 95516, at *34 (S.D.N.Y. Nov. 21, 2008) (finding it likely that former employee who helped develop microprocessors for his former employer would likely disclose confidential information to a new employer developing a similar microprocessor); *see also Payment Alliance Int'l, Inc. v. Ferreira*, 530 F. Supp. 2d 477, 482-483 (S.D.N.Y. 2007) (finding that employee's "detailed knowledge" of former employer's business processes creates the risk that employee will disclose the information to competitor). "It is inconceivable that the [former employee] will not

draw upon his [former employer's] experiences in making those decisions. *Papermaster*, 2008 U.S. Dist. LEXIS 95516, at *32.

Finally, under the IPA, Paul acknowledged and agreed "that all documents and tangible things embodying or containing Amphenol's Confidential Information are and shall remain Amphenol's exclusive property[.]" *See* Exhibit 3 ¶ 6. Paul further agreed that "[he] will return all copies, facsimiles and specimens of such documentation (including excerpts or portion thereof) and any other forms of Amphenol's Confidential Information in my possession, custody or control before leaving the employment of Amphenol." *Id.* In clear breach of these obligations, Paul stole thousands of Amphenol's confidential documents in the days and weeks leading up to his abrupt resignation. *See* Sections II.D-E, *supra*; *see also* Injunction Order (ECF Doc. 101), at 5. The forensic investigation revealed that Paul specifically targeted files containing only Amphenol's confidential information when downloading thousands of documents from Amphenol's hard drives to his personal storage device. *See* Section II.D, *supra.*

### 3. Amphenol Is Entitled To Receive Equitable Relief And Recover Nominal, Compensatory, and Punitive Damages As A Result Of Paul's Breaches Of His Contractual Obligations.

Paul's argument that Amphenol has failed to establish proof of its monetary damages resulting from a loss of business is incorrect because: (1) there is no requirement that a plaintiff establish monetary damages resulting from a loss of business in the context of non-compete and non-solicitation covenants; (2) Amphenol is entitled to nominal damages, equitable relief, punitive damages, and other forms of monetary damages; and (3) the determination of whether Amphenol has suffered a loss in revenues and/or profits is not yet calculable given that the products Paul had involvement with – *e.g.*, Hexashield and miniature connectors – are under development and additional time is needed to assess their impact in the market.

First, the cases cited by Paul stating that monetary damages are a required element for a breach of contract claim are not applicable because none of those cases involve the breach of restrictive covenants in the employment context.[21] As with all contracts – but specifically in the context of employment covenants – there are two distinct categories of monetary damages: compensatory and nominal damages. *See* Employee Noncompetition Law § 8:15, 8:16 (West 2012). Nominal damages serve to acknowledge a party's rights to other forms of relief – such as equitable and declaratory relief and punitive damages – absent injury or sufficient proof of monetary damages. *Id.* § 8:17; *see also SinoMab Bioscience Ltd. v. Immunomedics, Inc.*, 2009 Del. Ch. LEXIS 106, *59 (Del. Ch. June 16, 2009) ("Unlike compensatory damages, nominal damages do not purport to put the offended party back in the place that it was before it suffered harm, rather they are in recognition of a technical injury and by way of declaring the rights of the plaintiff."); *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 95 (N.Y. 1993) ("Nominal damages are always available in breach of contract actions."); *Borne Chemical Co., Inc. v. Dictrow*, 85 A.D.2d 646, 651 (N.Y. App. Div. 2d Dep't 1981) (citations omitted) ("In the event that wrongful competition is proven but the proportion of lost profits due to that competition cannot be established, then plaintiff will be entitled to an award of nominal damages only."); 36 N.Y. Jur. 2d Damages § 6 (West 2013) ("Even if a breach of contract caused no loss, or if the amount of the

---

21 *See LNC Invs. V. First Fid. Bank, N.A.*, 173 F.3d 454 (2d Cir. 1999) (involving breach of contract suit by bondholders against trustees); *Lovely Peoples Fashion v. Magna Fabrics*, 1998 U.S. Dist. LEXIS 11197 (S.D.N.Y. July 22, 1998) (involving breach of a contract for the sale of fabric); *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606 (Del. 2003) (involving breach of a licensing agreement); *Cramer v. Spada*, 203 A.2d 739 (N.Y. App. Div. 3d Dep't 1994) (involving breach of contract and legal malpractice claims against attorneys); *Furia v. Furia*, 116 A.D.2d 694, 695 (N.Y. App. Div. 2d Dep't 1986) (involving breach of contract to provide services and materials for a certain bicycle device).[21] The other case cited by Paul, *World Auto Parts, Inc. v. Labenski*, 261 A.D.2d 850 (N.Y. App. Div. 4th Dep't 1999), concerns the method used to measure damages resulting breach of a non-compete agreement, but does not state that monetary damages are a required element for breach of such an agreement.



DM1\4214817.2

loss cannot be proven with sufficient certainty, the injured party is entitled to recover a small sum as nominal damages without regard to the amount of loss."). For this reason alone, the Court should deny Paul's motion on this issue because Amphenol is entitled to receive nominal damages.

Second, Amphenol – in addition to compensatory damages resulting from any loss of business – has sought the following forms of equitable and monetary relief: (1) a permanent injunction prohibiting Paul from using or disclosing Amphenol's trade secrets or proprietary and confidential information; (2) the return of the cash value of the vested stock options that Paul sold; and (3) punitive damages. *See* Am. Compl. (ECF Doc. 36), at 28-29. These categories of damages and equitable relief were not addressed by Paul in his summary judgment motion and, accordingly, should survive his motion as unchallenged. Given the fact that Paul breached the Stockholder's Agreements and IPA by, among other things, stealing thousands of confidential documents and assisting in the development, production, and distribution of competing products, Amphenol is further seeking to recover the $82,164 paid to Paul as non-compete pay.[22]

Finally, Paul is incorrect when he suggests that "that there is no dispute that the plaintiff has not and cannot prove any damages as a result of any alleged breach[.]" *See* ECF Doc. 169-1, at 21. On the contrary, as far as Amphenol is aware, the competitive products that Paul is known to have involvement with at TE during the Non-Compete Period [redacted]re products that are still under development by TE and their impact on the market

22 Paul feebly argues against – without a shred of authority - Amphenol's right to recover the non-compete pay paid to Paul. *See* ECF Doc. 169-1, at 25. Pursuant to the Stockholder's Agreements and IPA, Amphenol paid Paul 50% of his base salary to not work during the Non-Competition Period. *See* Section II.B, *supra*. Paul refused and continued his employment at TE. It is axiomatic that a party may seek, as a restitutionary remedy for a breach of contract, the return of all monies paid due to non-performance. *See* 12-61 Corbin on Contracts § 61.5 ("[R]estitution requires that the defendant shall give something back to the plaintiff.").

and on Amphenol cannot be properly addressed at this time. Mark Ross, Amphenol's Director of Distribution, informed Paul's counsel during his deposition that Amphenol has [redacted] *See* Ross Dep., Exhibit 2, at 128:1-20. Thus, Amphenol has experienced [redacted] – including [redacted]

Once the competitive products at issue are on the market, Amphenol will be in a position to study them and determine whether any of its technologies have been incorporated into them. Given Paul's known involvement with the development, production, and engineering of the composite version of [redacted], *see* Section II.G, *supra*, coupled with Paul's intimate knowledge of Amphenol's versions, *see id.*, there could be a reasonable basis for a jury to conclude that Amphenol's technologies were incorporated into these products through Paul's involvement. Amphenol can only make this assessment, however, when TE's products are placed into the market for a period of four to six months. If Amphenol can establish that its technologies have been copied, that Paul was involved with the competing products, and a loss of revenue has resulted, "the trier of the facts, on the best evidence of which the case is susceptible, may apply experience and common sense to the fact proved so as to determine and award such damages as may be reasonably calculated as a result of the defendant's breach." *Dictrow*, 85 A.D.2d at 646.

Therefore, pursuant to the Court's inherent discretion under Federal Rule of Civil Procedure 56(d), Amphenol respectfully requests that this Court defer deciding the issue of compensatory damages related to lost or diverted business until the time of trial. Deciding Paul's motion now on an incomplete record allows Paul to develop competitive products in violation of

his contractual obligations and escape the consequences his unlawful conduct simply because the harm caused has not yet fully manifested before the close of discovery. Under such a result, Amphenol would be severely prejudiced. On the other hand, if Amphenol cannot establish lost or diverted business due to Paul's unlawful competition by the time of trial, Amphenol will nonetheless be able to proceed and recover an award of nominal and other forms of compensatory damages. *Dictrow*, 85 A.D.2d at 651. Thus, the Court's deferment of this issue until trial results in no prejudice to Paul and is justified by the developmental nature of the competitive products at issue.

### B. The Record Establishes That Paul Violated the Computer Fraud and Abuse Act by Accessing and Removing Documents in Excess of His Authorized Access.

As in his motion to dismiss (*see* ECF Doc. 45), Paul once again argues against Amphenol's claim under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, by construing the statute in such a restricted manner that he gives the terms "without authorization" and "exceeds authorization" the exact same meaning. CFAA provides a private federal cause of action against a person who:

> [1] intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains … information from any protected computer [18 U.S.C. § 1030(a)(2)(C)]; or
>
> [2] knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds access, and by means of such conduct further the intended fraud and obtains anything of value. [18 U.S.C. § 1030(a)(4)][23]

23 CFAA defines the term "exceeds authorized access" as "access[ing] a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled to obtain or alter." 18 U.S.C. § 1030(e)(6). As this definition makes clear, an individual who is authorized to use a computer for certain purposes but goes beyond those limitations is someone who has "exceeded authorized access" under CFAA. *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1133 (9th Cir. 2009).

Under Paul's tortured view of CFAA, once an employer provides any level of authorization to an employee, that employee can use that authorization to access information for any purpose the employee chooses – even if that access is for purpose of misappropriating valuable trade secrets and/or engaging in corporate espionage – without violating CFAA.[24] But that is simply not the case. In *United States v. John*, the Fifth Circuit Court of Appeals aptly observed that:

> [T]he concept of "exceeds authorized access" may include the purposes for which access is "authorized." Access to a computer and data that can be obtained from the access may be exceeded if the purposes for which access has been given are exceeded. In other words, [the defendant's] access to [the employer's] data was confined. She was not authorized to access that information for any and all purposes but for limited purposes.

597 F.3d at 272 (citing *EF Cultural Travel BV*, 274 F.3d 577, 578-579 (1st Cir. 2001)); *see also United States v. Rodriguez*, 628 F.3d 1258, 1263-1264 (11th Cir. 2010) (finding that employee "exceed[ed] authorized access" when he accessed information for a non-business reason in violation of employer's policy); *Int'l Airport Centers, LLC v. Citrin*, 440 F.3d 418, 420 (7th Cir. 2006) (finding employee's authorization ended when he violated duty of loyalty to employer); *Brekka*, 581 F.3d at 1133 ("[Section 1030(e)(6)] makes clear, an individual who is authorized to use a computer for certain purposes but goes beyond those limitations is considered by the CFAA as someone who has "exceed[ed] authorized access.'"); *Caro v. Weintraub*, 2010 U.S. Dist. LEXIS 116492, at *30-31 (D. Conn. Nov. 2, 2010) (same). While Paul's narrow interpretation would read "exceeds authorized access" out of the statute, courts have held that this term "implies that an employee can violate employer-placed limits on accessing information stored on the

---

24 Paul actually takes this argument a step further by suggesting – without authority – that although he "copied" (read, accessed and stole) documents from Amphenol's computers, he purportedly has not opened them following his resignation. *See* ECF Doc. 169-1, at 34. However, CFAA specifically deals "access[ing] a computer without authorization or exceed[ing] authorized access," 18 U.S.C. § 1030(a)(2)(C), not the after fact usage of the data unlawfully obtained from the computer, making this argument entirely irrelevant under CFAA.

computer and still have authorization to access that computer." *Brekka*, 581 F.3d at 1135. In the March 28, 2013 Ruling on Defendant's Motion to Dismiss, this Court agreed and held that "[u]ntil the second circuit determines that CFAA does not encompass this alleged misconduct," Amphenol has stated a cognizable claim under CFAA. *See* ECF Doc. 143, at 14. Since the Court issued this Ruling, the Second Circuit has issued no opinion contrary to the above interpretation and the recent district court cases cited by Paul are no more supportive of his argument than the earlier cases he cited in his motion to dismiss.[25]

There has not been any "clear movement" by the district courts in the Second Circuit since the March 28, 2013 Ruling to support Paul's unduly narrow interpretation of CFAA.[26] The case of *JBC Holdings NY, LLC v. Pakter*, 2013 U.S. Dist. LEXIS 39157 (S.D.N.Y. Mar. 20, 2013), is entirely distinguishable to the theft of confidential information committed by Paul. In *Pakter*, there was no specific contractual language cited by the court which limited the employee's access, as is the case with Paul under the IPA. Thus, the question in *Pakter* was not whether the employee exceeded the level of access authorized by the employer, but whether CFAA is violated when "a faithless employee has allegedly misused an employer's information." *Id.* at *12. More importantly, the evidence supporting Amphenol's CFAA claim are not premised on "misuse", but

25 To avoid duplication of the arguments made in prior briefings, Amphenol hereby incorporates the portions of its opposition to Paul's motion to dismiss (*see* ECF Doc. 51, at 9-17) and sur-reply (ECF Doc. 58, at 3-7) which address and respond to the following cases, among others, relied upon by Paul in his motion for summary judgment: *Orbit One Communic'ns, Inc. v. Numerex Corp.*, 692 F. Supp. 2d 373, 385 (S.D.N.Y. 2010); *Univ. Sports Publ'ns Co. v. Playmakers Media Co.*, 725 F. Supp. 2d 378, 383-384 (S.D.N.Y. 2010); *Westbrook Techs., Inc. v. Wesler*, 2010 U.S. Dist. LEXIS 70901 (D. Conn. Jul. 15, 2010).

26 Of course, in attempting to persuade this Court that there is "clear movement" towards the "narrow approach" in this circuit, Paul entirely omits the recently decided decision of *Schaeffer v. Schaeffer Holding LLC*, 2013 U.S. Dist. LEXIS 38781 (S.D.N.Y. Mar. 20, 2013), in which the court rejects the defendants' argument that "CFAA does not apply where an employee uses his authorized access to a computer to misappropriate his employer's information." *Id.* at *16. Thus, the District Court for the Southern District of New York has rejected Paul's restrictive interpretation as recently as March, 2013.

whether Paul "exceed[ed his] authorized access, and thereby obtain[ed] information from any [Amphenol] protected computer." *See* 18 U.S.C. § 1030(a)(2)(C); Exhibit 3 ¶ 6. The facts clearly show that Paul exceeded his authorized access under the IPA when he repeatedly accessed and downloaded electronic files that did not pertain to his specific job duties in order to "obtain" them from Amphenol's computers and place them on his personal hard drive. *See* Sections II.D-E, *supra*; *compare also* Aiken Aff., Exhibit 1 ¶ 2 (**"Paul secretly accessed highly confidential information that he did <u>not</u> need for his duties at Amphenol."** (emphasis added)) *with* Exhibit 3 ¶ 6 (**"[Paul] shall have access to such Confidential Information <u>solely</u> for performing the duties of [his] employment by Amphenol.**" (emphasis added)). Paul's violation of CFAA occurred the moment he accessed information in a manner that exceeded the authorization provided by Amphenol under the IPA. *See, e.g., Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1343 (N.D. Ga. 2007) ("[A] violation for 'exceeding authorized access' occurs where initial access is permitted but the access of certain information is not permitted."); *see also Starwood Hotels & Resorts Worldwide, Inc. v. Hilton Hotels Corp.*, 2010 U.S. Dist. LEXIS 71436, at *15 (S.D.N.Y. Jun. 16, 2010); *Caylon v. Mizuho Secs. USA, Inc.*, 2007 U.S. Dist. LEXIS 66051, at *4 (S.D.N.Y. Apr. 27, 2007).[27]

---

27 The case of *Advanced Aerofoil Techs., AG v. Todaro*, 2013 U.S. Dist. LEXIS 25711 (S.D.N.Y. Jan. 30, 2013), is likewise distinguishable. The Court in *Todaro* offers no analysis of whether the employee "exceeded authorized access" because "there are no allegations that [the employer] gave any of the Defendants something short of unlimited and unfettered access to its systems." *Id.* at *15. Unlike *Todaro*, the IPA limited Paul's access to only the confidential information required for performing his specific employment duties. Paul next asserts that "[t]here is no evidence that [he] accessed any of the plaintiff's documents for any reason other than for performing his duties [] the plaintiff's employee." *See* ECF Doc. 169-1, at 34. Again, the record reveals that Paul targeted files containing Amphenol's confidential information and trade secrets – information that did not relate to his job duties – at a time he was secretly negotiating the terms of his new employment with TE. *See* Section II.D, *supra*. The obvious inference from this conduct is that Paul was stealing this information with the intention of taking and

Moreover, Paul's entire argument on whether this Court should adopt the purported "narrow approach" under CFAA versus the "broad approach" is a red herring. These "approaches" differ only in whether an employee's after the fact misuse and misappropriation of information obtained through a computer system can "exceed authorized access" if the later use violates an employer's policy or common law duties of loyalty. *See Pakter*, 2013 U.S. Dist. LEXIS 39157, at *12. The CFAA claim asserted by Amphenol is not premised on Paul's later misuse of the information he stole, but whether Paul intentionally accessed confidential information that did not pertain to his specific job duties in order to remove these files and place them onto his personal storage device, all in violation of the limitations on access placed on him under the IPA.[28]

**C. The Factual Record Establishes that Paul Misappropriated Trade Secrets and Engaged in Unfair Competition That Damaged Amphenol as a Result.**

The factual record demonstrates that Paul stole and had intimate knowledge of, among other things, trade secrets related to the development, manufacturing, design, pricing, marketing, and distribution of Amphenol [redacted] when he left Amphenol and inevitably used that information to help in the development, manufacturing, and distribution of similar, competing products at TE.

To recover under New York law for the misappropriation of a trade secret, the plaintiff must demonstrate: "(i) that it possessed a trade secret and (ii) that the defendant used that trade secret in breach of an agreement, a confidential relationship, or duty, or as a result of discovery by

---

using it at TE in order to succeed as a new TE employee and/or to benefit his new employer, TE.

28 Paul's motion under CFAA must also fail because there are genuine disputes of material fact. Paul contends that Amphenol "freely" provided him access to its computers, *see* ECF Doc. 169-1, at 27, but that is not the case. Under the IPA, Paul agreed that "[he] shall have access to such Confidential Information solely for performing the duties of [his] employment by Amphenol." *See* Exhibit 3 ¶ 6.

improper means." *Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173, 1176 (2d Cir. 1993). A claim for misappropriation can be established by showing access to trade secrets and substantial similarity of the competing products. *Julie Research Lab. v. Select Photographic Eng'g.*, 810 F. Supp. 513, 518 (S.D.N.Y. 1992); *see also Advanced Analytics, Inc. v. Citigroup Global Mkts., Inc.*, 2009 U.S. Dist. LEXIS 130133, 72-73 (S.D.N.Y. Aug. 5, 2009) (applying Connecticut law); *see also Computer Associates Int'l v. Bryan*, 784 F. Supp. 982, 1008-1009 (E.D.N.Y. 1992) (finding trade secret misappropriation where plaintiff's former employee developed for a competitor a computer program based upon plaintiff's original technology that the competitor subsequently modified).[29] "Misappropriation can be proved by evidence of an advantage gained by building upon another's successful secrets." *On-Line Techs., Inc. v. Perkin-Elmer Corp.*, 253 F. Supp.2d 313, 332-333 (D. Conn. 2003).

Paul had intimate knowledge of all aspects of the [redacted] including its engineering, pricing, price margins, distributor preferences, etc. *See* Ross. Aff., Exhibit 40 ¶ 8, 12-14. Paul also worked with [redacted] while at Amphenol and had knowledge of their manufacture, development, marketing, and distribution. *See id.* ¶ 7; *see also* Exhibit 44 and 45.

Upon Paul's arrival at TE, TE began development of, with the involvement of Paul, a competitive line of [redacted] *See* Section II.G.3, *supra*. Paul had direct responsibility of the development, production and distribution of TE's [redacted] and was directly

---

29 New York law provides that "the same acts that support a claim for misappropriation of trade secrets may also support a claim for unfair competition." *See Paz Systems, Inc. v. Dakota Group Corp.*, 2012 U.S. Dist. LEXIS 45654, at *10 (E.D.N.Y. Mar. 30, 2012)); *see also Geo Group, Inc. v. Comm. First Servs., Inc.*, 2012 U.S. Dist. LEXIS 45654, at *9 (E.D.N.Y. Mar. 30, 2012); *Friedman v. Wahrsager*, 2012 U.S. Dist. LEXIS 10994, at *55 (E.D.N.Y. Jan. 20, 2012). Thus, to the extent Amphenol establishes that Paul has misappropriated trade secrets, it will also establish a claim for unfair competition under New York law.

involved in a project to leverage Deutsch's [redacted] and apply it to [redacted] *See* Section II.G.2, *supra*.

Thus, the record provides, at a minimum, a basis for a jury to reasonably conclude that Paul used the knowledge of the trade secrets he acquired at Amphenol while being involved in the development, production, and distribution of competing products at TE. *See Julie Research Lab.*, 810 F. Supp. at 518; *See Advanced Analytics*, 2009 U.S. Dist. LEXIS 130133, at *72-73; *Computer Associates Int'l*, 784 F. Supp. at 1008-1009. This is particularly true if Amphenol is able to establish any incorporation of its technologies once these products are introduced into the market and an analysis can be made.

New York law provides an award of nominal damages for unfair competition claims in the event that monetary damages resulting from a loss of business are not calculable or available. *See 24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 566 F. Supp. 2d 305, 320 (S.D.N.Y. 2008) ("Where, as here, plaintiff is unable to prove damages for unfair competition without speculation, it may seek nominal damages." (citations omitted)). Plaintiffs may also seek permanent injunctive relief in claims involving the actual or threatened misappropriation of trade secrets. *See Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171 (2d Cir. 1990). As to the issue of compensatory damages resulting from a loss or diversion of business, Amphenol incorporates its request for a deferment of this issue under Rule 56(d), for the same reasons stated in Section III.A.3, *supra*.

### D. **The Factual Record Reveals That Paul Breached The Fiduciary Duties He Owed Amphenol.**

Under New York law, the two primary elements of a breach of fiduciary duty claim are (1) the existence of a fiduciary relationship between the parties and (2) a breach of the duty flowing

from that relationship. *Cramer v. Devon Group, Inc.*, 774 F.Supp. 176, 184 (S.D.N.Y. 1991).[30] Both the existence of a fiduciary relationship and the breach of obligations arising from such relationship tend to be "fact-specific inquir[ies] reserved for a jury." *Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 2002 U.S. Dist. LEXIS 3747, at *28 (S.D.N.Y. Mar. 6, 2002); *Wiener v. Lazard Freres & Co.*, 241 A.D.2d 114,122 (N.Y. App. Div. 1st Dep't 1998).

High-level corporate employees, such as Paul, owe fiduciary duties to their employer "not to (1) actively exploit their positions within the corporation for their own personal benefit, or (2) hinder the ability of a corporation to continue the business for which it was developed." *Aon Risk Servs., N.E. v. Cusack*, 34 Misc. 3d 1205(A) (N.Y. Sup. Ct. 2011). Where an agent has a conflict of interest with his principal and fails to disclose the conflict, the agent is liable for a breach of fiduciary duty. *Id.* (citing *Sokoloff v Harriman Estates Dev. Co.*, 96 N.Y.2d 409, 416-417 (2001)). A senior employee "privy to [former employer's] most confidential strategic, financial and client information, once [] enter[ing] into employment negotiations with [a competitor], ... ha[s] a duty to disclose such negotiations." *Id.*

In violation of these strict fiduciary duties, Paul, among other things: (1) secretly met with Amphenol's direct competitor, TE, in the months leading up to his abrupt resignation; (2) in the process, stole thousands of confidential documents while secretly negotiating the terms of employment with TE; (3) retained this confidential information following his departure from Amphenol; (4) withheld the name of his new employer upon his resignation; (5) misrepresented the job responsibilities he was to undertake at TE with full knowledge that he would work with products that competed with Amphenol. *See* Sections II.D-F, *supra*. Paul's deceptive and bad-

---

30 Paul does not challenge the fact that a fiduciary relationship existed between he and Amphenol in his motion for summary judgment. *See* ECF Doc. 169-1, at 36.

faith conduct breached the fiduciary duties he owed Amphenol as a high-level management employee, particularly his duties of loyalty and confidence. *Aon Risk Servs.*, 34 Misc. 3d at 1205(A).

Like the breach of contract claim, New York law permits an award of nominal damages in the event that monetary damages resulting from a loss of business are not calculable or available. *See Juniper Entm't, Inc. v. Calderhead*, 2013 U.S. Dist. LEXIS 3690, at *13-15 (E.D.N.Y. Jan. 9, 2013); *Brian E. Weiss, P.C. v. Miller*, 166 A.D.2d 283 (N.Y. App. Div. 1st Dep't 1990). Further, as to the issue of compensatory damages resulting from a loss or diversion of business, Amphenol again incorporates its request for a deferment of this issue under Rule 56(d), as made in Section II.A.3, *supra*.

## V. CONCLUSION

WHEREFORE, Plaintiff Amphenol Corporation respectfully requests that this Court deny Paul's motion for summary judgment.

Respectfully submitted,

/s/ James L. Beausoleil, Jr. (phv05434)
James L. Beausoleil, Jr., Esq.
Anthony L. Gallia, Esq.
James J. Halligan, Esq.
**OF COUNSEL:**
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19106-4196
Tel: 215-979-1120/1127/1187
Fax: 215-979-1020
*Attorneys for Plaintiff*
*Amphenol Corporation*

Michael C. Jankovsky, Esq.
QUATRELLA & RIZIO, LLC
One Post Road
Fairfield, CT 06824
Tel: 203-255-9928, ext. 324
Fax: 203-255-6618
E-mail: mjankovsky@qrlaw.com

Dated: October 1, 2013

**CERTIFICATE OF SERVICE**

I, James J. Halligan, Esquire, do hereby certify that a true and correct copy of Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment was electronically filed with the Court on the below listed date and is available for viewing and downloading from the ECF System. Counsel of record were served via electronic notification.

/s/ James Halligan
James J. Halligan, Esq.

Dated: October 1, 2013