## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| AMPHENOL CORPORATION, | : | |
|    Plaintiff, | : | |
| | : | |
|    v. | : | Civil No. 3:12cv00543(AVC) |
| | : | |
| RICHARD PAUL and | : | |
| TE CONNECTIVITY, | : | |
|    Defendant. | : | |

### RULING ON THE DEFENDANT, PAUL'S, MOTION FOR SUMMARY JUDGMENT

This is an action for damages and equitable relief in which the plaintiff, Amphenol Corporation (hereinafter "Amphenol"), claims that the defendant, Richard Paul, breached a non-competition agreement. It is brought pursuant to 18 U.S.C. §§ 1030 et seq., along with tenets concerning breach of contract, misappropriation of trade secrets, breach of fiduciary duties, and unfair competition. Paul has moved for summary judgment on all counts, arguing that he is entitled to judgment on all the plaintiff's causes of action. For the reasons set forth below, the defendant's motion for summary judgment is GRANTED.

### FACTS

Examination of the complaint, pleadings, local rule 56 statements, the exhibits accompanying the motion for summary judgment, and the responses thereto, discloses the following, undisputed, material facts:

Amphenol is a leader in the design, manufacture, and supply

of high-performance interconnect systems for the military and aerospace markets. Amphenol designs, manufactures, and markets electrical, electronic, and fiber optic connectors, coaxial and flat-ribbon cable, and interconnect systems.

From 1996 until March 9, 2012, Paul was employed by the plaintiff, Amphenol. When he resigned on March 9, 2012, Paul held the title of Business Unit Director of the High Speed Interconnect Unit at Amphenol's military aerospace operations. Amphenol gave Paul access to its confidential, proprietary, and trade secret information. Pursuant to the Intellectual Property Agreement (hereinafter the "IPA"), this access was to be "solely for performing the duties of [his] employment by Amphenol."

As an employee of Amphenol, Paul was required to enter into the IPA.[1] Paul also entered into two Management Stockholder's Agreements through the receipt of Amphenol's stock option awards.[2] As alleged in the complaint, the IPA required all employees to "agree, *inter alia*, not to disclose any of Amphenol's confidential information or trade secrets, and not to divert any of Amphenol's customers, suppliers, and/or distributors." Further, the IPA stated "that in the event of any such breach, Amphenol shall be entitled, in addition to any other remedies and damages, to an injunction restraining further

---

[1] The IPA is dated November 2, 2006.

[2] The Stockholder Agreements are from the years 2000 and 2009.

violations of such restrictions by [Paul] and by any other person for whom [he] may be acting or who is acting for [him] or in concert with [him]." Also of relevance, the IPA stated, and Paul agreed that, "[i]f [his] employment with Amphenol is involuntarily terminated for Cause or is voluntarily terminated without Good Reason, [he] will not, without the prior written consent of Amphenol, for a period of one year following said termination, directly or indirectly, engage in the production, development, sale or distribution of any product produced, sold or distributed by Amphenol or which was in development by Amphenol at the time of [his] termination."[3]

On February 26, 2013, Paul downloaded personal files along with his work files. The personal information Paul downloaded included tax return information, personal financial data, family pictures, personal emails, and private account passwords. Paul stated he "had stuff strung all over the place" and "wanted to grab it all" to be on the safe-side and delete what he did not need at a later time. Amphenol, however, states that "[t]he manner in which Paul targeted Amphenol's specific work-related files clearly and irrefutably demonstrate that Paul

---

[3] Similarly, the Management Stockholder agreements state: "If my employment with Amphenol is involuntarily terminated for Cause or is voluntarily terminated without Good Reason, [Paul] will not, without the prior written consent of Amphenol, for a period of one year following said termination, directly or indirectly, engage in the production, development, sale or distribution of any product produced, sold or distributed by Amphenol or which was in development by Amphenol at the time of my termination."

intentionally copied and removed Amphenol's confidential information and trade secrets in violation of his legal and contractual obligations."[4]

On March 9, 2012, Paul left Amphenol to begin employment with TE Connectivity, Ltd. (hereinafter "TE"). That day, during his resignation meeting, Paul returned to Amphenol his laptop, cell phone, employee badge, corporate American Express card, and keys to the Amphenol facility. On April 30, 2012, Paul returned a second laptop computer to Amphenol. On August 3, 2012, Paul provided Amphenol with a second Seagate external hard drive. Paul testified that he has returned all of Amphenol's documents, electronic or hardcopy, which were in his possession following his resignation and has not disclosed any of these documents to anyone.

In April of 2012, shortly after Paul began his new employment, TE acquired Deutsch, a leading manufacturer of high-performance solutions for harsh environment application. Paul stated that prior to the Deutsch acquisition, TE "was never really considered in a big way a major competitor of our division." Amphenol, however, states that it "and TE competed against each other in the sale and distribution of connectors and accessories, among others, prior to TE's acquisition of Deutsch, at least at a design level."

---

[4] As an example, Amphenol states Paul targeted several versions of the POS Pivot database (both current and historical).

Paul states that "Deutsch's locations are separate from the TE business unit that Mr. Paul works for, TE's Aerospace, Defense & Marine business unit." Amphenol, however, states that "[f]or all practical purposes, TE and Deutsch have been integrated as a single operating company since the April, 2012 acquisition."

In regards to his duties at TE, Paul states that he "is responsible for managing the products and pricing for the following TE products: relays, wire/cable and engineered products (primarily cable accessories)." Amphenol, however, contends that "Paul had far wider responsibilities at TE. Paul had direct responsibility and involvement with products, such as connector adapters and specifically TE's version of the 'Hexashield' adapter. . ."

In an affidavit, and reaffirmed in a deposition, Paul swore that "[a]t TE, [he is] not, directly or indirectly, engaging in the production, development, sale or distribution of any product produced, sold or distributed by Amphenol or which, to the best of [his] knowledge, was in development at the time [he] left Amphenol." Amphenol, however, asserts that "Paul routinely sent and/or received information related to connectors while at TE and had involvement in the development, production, and

distribution of connector products."[5] Likewise, while Paul states he "had no responsibility or input on Deutsch," Amphenol states that "Paul routinely sen[t] and/or received information on Deutsch, Deutsch products, and the Deutsch integration."

Paul testified that he has not diverted any of Amphenol's customers or distributors. Several of Amphenol's employees testified that Amphenol has no evidence of Mr. Paul diverting any customers since his resignation from the company. These employees include Maria Morgan, Amphenol's human resources director,[6] Mark Ross, Amphenol's director of distribution sales, and Richard Aiken, the general manager for Amphenol's military Aerospace operations. Amphenol, however, states that Paul has had discussions with key TE personnel, such as David Gingerich, concerning Amphenol's distributors while at TE, which may have directly or indirectly led to the diversion of such business from Amphenol.

Paul testified that he has not solicited any of Amphenol's employees to join TE. Maria Morgan testified that Amphenol is not aware of any employees that Mr. Paul has caused to leave Amphenol. Mark Ross and Richard Aiken testified that Amphenol

---

[5] For example, Amphenol states that "[o]n August 16, 2012, Paul received an invite to a series of meetings held on August 27-29, 2012 that focused on the development of fiber optic cables at TE (a product previously manufactured and distributed by Deutsch)."

[6] Morgan is also the corporate designee under Fed. R. Civ. P. 306(b)(6), with regard to this dispute.

has no evidence of Mr. Paul soliciting or diverting any of the company's employees since resigning. Amphenol is still currently unaware of whether Paul has induced or has attempted to induce any Amphenol employees to leave their employment.

Paul swore under oath that he has not and will not disclose Amphenol's confidential, proprietary, or trade secret information. TE's Senior Information Security Analyst, Arden Wickenheiser, certified that he did not find any copies of Amphenol's confidential or trade secret information on Paul's TE work computer. Richard Aiken and Maria Morgan testified that they were not aware of evidence that Mr. Paul has given any of Amphenol's confidential, proprietary, or trade secret information to TE. Amphenol, however, states that "Paul worked with products at TE that are competitive to products he worked and became familiar with at Amphenol, thereby creating the reasonable inference that . . . Paul must have used his knowledge of Amphenol's confidential and proprietary information and trade secrets, in part, to develop, produce, and distribute TE's competitive versions or at least to help TE more effectively compete against Amphenol." TE assured Amphenol in writing that it has taken precautions to protect Amphenol's confidential information, avoid the diversion of its customers and suppliers, prevent the solicitation of its employees with respect to Paul, and will continue to do so for at least a year.

Amphenol has not designated an expert witness to testify on the issue of damages, instead relying on the "admissible, non-speculative evidence" of Mark Ross, Amphenol's Director of Distribution, to testify as to the proof and amount of damage caused by the defendant.  Ross stated that Amphenol generally observed a "lost market share" as a result of TE's acquisition of Deutsch. Amphenol states that it has thus experienced a decline in sales resulting from the TE/Deutsch merger – including a decline in competitive products Paul is known to have had involvement in since joining TE.

**STANDARD**

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'"  Am. Int'l Group, Inc. v. London Am. Int'l Corp., 644

8

F.2d 348, 351 (2d Cir. 1981) (quoting <u>Heyman v. Commerce and</u>
<u>Indus. Ins. Co.</u>, 524 F.2d 1317, 1319-20 (2d Cir. 1975)).

A dispute concerning material fact is genuine "if evidence
is such that a reasonable jury could return a verdict for the
nonmoving party." <u>Aldrich v. Randolph Cent. Sch. Dist.</u>, 963
F.2d 520, 523 (2d Cir. 1992) (quoting <u>Anderson v. Liberty Lobby,</u>
<u>Inc.</u>, 477 U.S. 242, 248 (1986)).  The court must view all
inferences and ambiguities in a light most favorable to the
nonmoving party.  <u>See</u> <u>Bryant v. Maffucci</u>, 923 F.2d 979, 982 (2d
Cir. 1991), <u>cert.</u> <u>denied</u>, 502 U.S. 849 (1991).  "Only when
reasonable minds could not differ as to the import of the
evidence is summary judgment proper."  <u>Id.</u>

A dispute concerning material fact is not created by a mere
allegation in the pleadings, or by surmise or conjecture. <u>Stuart</u>
<u>& Sons, L.P. v. Curtis Pub. Co., Inc.</u>, 456 F. Supp.2d 336, 342
(D. Conn. 2006)(citing <u>Applegate v. Top Assoc., Inc.</u>, 425 F.2d
92, 96 (2d Cir. 1970); <u>Quinn v. Syracuse Model Neighborhood</u>
<u>Corp.</u>, 613 F.2d 438, 445 (2d Cir. 1980). "Conclusory assertions
also do not create a genuine factual issue." <u>Id.</u> (citing
<u>Delaware & Hudson Ry. Co. v. Conrail</u>, 902 F.2d 174, 178 (2d Cir.
1990).

## ANALYSIS

### I.    Breach of Contract Claim

Paul first argues that the undisputed facts show that he has not breached the provisions of the IPA or the Shareholder's Agreement and, even if he had, Amphenol cannot prove damages of the alleged breach. Specifically, the defendant argues that he has not competed with Amphenol in violation of the restrictive covenants of the agreement, which he argues are overly broad and do not protect legitimate business interests. The defendant also argues that he has not competed with Amphenol, that he has not disclosed any of its confidential information, and that he has not solicited any of its employees. Paul states that even if a material dispute existed with respect to the aforementioned arguments, the absence of damages is fatal to Amphenol's breach of contract cause of action.

Amphenol responds that the contractual obligations are reasonable in scope, the evidence shows that Paul clearly breached his obligations under the stockholder's agreement and IPA, and it is entitled to receive equitable relief and recover nominal, compensatory, and punitive damages as a result of Paul's breaches of his contractual obligations. Specifically, Amphenol argues that the stockholder's agreement and the IPA are in no way limited to "connector products," and that the law shields these contracts which protect Amphenol's confidential

information and trade secrets.[7] With respect to contractual damages, Amphenol argues that (1) "there is no requirement that a plaintiff establish monetary damages resulting from a loss of business in the context of non-compete and non-solicitation covenants," (2) that they are "entitled to nominal damages, equitable relief, punitive damages, and other forms of monetary damages," and (3) "that the determination of whether Amphenol has suffered a loss in revenues and/or profits is not yet calculable . . . and additional time is needed to assess their impact in the market."

In a reply brief, Paul admits that the plaintiff "has an interest in protecting its proprietary information and has attested on multiple occasions that he will assist in keeping such information confidential." Specifically, Paul responds that there is no evidence that Paul works with competing products at TE, such as Deutsch's Wildcat connector, as Amphenol claims, and that this conclusory assertion does not create a genuine factual issue. Finally, Paul replies that "[a]ssuming, arguendo, that Paul could conceivably be deemed to have violated a legally enforceable obligation to the plaintiff, the plaintiff has failed to provide any disputed issue of material fact that Mr.

---

[7] Amphenol argues that Paul had "extensive involvement and responsibility for the development, production, and distribution of a broad range of products" and "it is reasonable to conclude that he worked with TE versions while using the knowledge he obtained through his many years at Amphenol." Amphenol states "Paul stole thousands of Amphenol's confidential documents" when downloading them from Amphenol's hard drive."

Paul has caused it any damages . . . but goes on to argue it may in the future . . . [H]owever if this were a viable argument to defeat motions for summary judgment then any plaintiff could argue in perpetuity that it might in the future suffer damages."

Under New York law, applicable in this case, "[t]o establish a *prima facie* case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." National Market Share, Inc. v. Sterling Nat. Bank*,* 392 F.3d 520, 525 (2d Cir. 2004); RIJ Pharm. Corp. v. Ivax Pharms., Inc*.,* 322 F. Supp.2d 406, 412 (S.D.N.Y. 2004).

In a similar case to this one, Shred-It USA, Inc. v. Bartscher, involving*, inter alia*, a breach of contract claim and misappropriating trade secrets, the court concluded that "[b]ecause there is no other evidence in the record of actual damages, [the court] must conclude that Shred-It has failed to prove the element of damages, and therefore cannot sustain its burden of proof on the cause of action [for breach of contract]." Shred-It USA, Inc. v. Bartscher, 2005 WL 2367613 at *12 (E.D.N.Y. Sept. 27, 2005)

"While breach of contract damages are intended to place a party in the same position as he or she would have been in if the contract had not been breached, the damages may not be

merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes" Wenger v. Alidad, 265 A.D.2d 322, 323, (1999) (internal quotations omitted); see also Lovely Peoples Fashion, Inc. v. Magna Fabrics, Inc., WL 422482 at *4 (S.D.N.Y. July 22, 1998).

Here, after extensive discovery, Amphenol has failed to present sufficient evidence to support its breach of contract cause of action.

First, Amphenol offers evidence of general emails referencing connectors, miniature connectors, TE's Hexashield, or Deutsch. Assuming that all of these products are also produced by Amphenol, these emails show Paul may not have been abundantly cautious, but fail to demonstrate that he directly, or even indirectly, engaged in the production, development, sale or distribution of the products.

Second, while Paul downloaded confidential information prior to his termination, Paul returned the information and all other Amphenol property, and there is no evidence that he retained any confidential information, let alone used it. While Paul should not have downloaded the confidential information, the undisputed facts show that he returned all of it and has not

used it. As such, the court concludes that there was no breach
of the provisions of the stockholder agreement and IPA.

Even if the court was to conclude otherwise, Amphenol's
assertions of damages are speculative, at best. Amphenol states
that a jury can determine its claim if it "can establish that
its technologies have been copied, that Paul was involved with
the competing products, *and a loss of revenue has resulted*."
Amphenol states that "the competitive products that Paul is
known to have involvement with at TE during the Non-Compete
period are (e.g., Hexashield and miniature connectors) products
that are still under development by TE and their impact on the
market and on Amphenol cannot be properly addressed at this
time." On the issue of damages, Amphenol relies on the assertion
of its Director of Distribution, Mark Ross, stating that
Amphenol generally observed "lost market share" as a result of
TE's acquisition of Deutsch that is not yet quantifiable.
Amphenol thus concludes it "has experienced a decline in sales
resulting from the TE/Deutsh merger," and, continuing to paint
with a broad brush, Ross concludes that the decline in sales
"includ[ed] a decline in the competitive products Paul is known
to have had involvement with since joining TE."  This is nothing
more than speculative.

The court concludes Amphenol's breach of contract claim
fails on two fronts: the undisputed facts show that, as a matter

14

of law, Amphenol cannot succeed on the elements of breach or damages.

## II.  **Computer Fraud and Abuse Act Claim**

Paul next argues that he had "authorized access" to each and every document and database that he is alleged to have accessed which defeats a Computer Fraud and Abuse Act (hereinafter "CFAA") cause of action. According to Paul, such a claim requires that a defendant accessed a computer without authorization or that he has exceeded the authorized access. Specifically, the defendant argues that misuse or misappropriation of information is irrelevant to the CFAA, only unauthorized or exceeded access is relevant. Paul argues that there is no evidence that he accessed any of Amphenol's documents for any reason other than performing his duties as an employee.

Amphenol responds that Paul has a "tortured view of the CFAA," and argues it is not the case that, as Mr. Paul asserts, once an employer provides any level of authorization to an employee, that employee can use that authorization to access information for any purpose the employee chooses without violating the CFAA. Specifically, Amphenol cites <u>LVRC Holdings LLC v. Brekka</u>, 581 F.3d 1127 (9th Cir. 2009), and argues that "[w]hile Paul's narrow interpretation would read exceeds authorized access out of the statute, courts have held that this

term implies that an employee can violate employer-placed limits on accessing information stored on the computer and still have authorization to access that computer" (internal quotations omitted). Amphenol states that there has been no clear movement by district courts in the second circuit to support Mr. Paul's interpretation of the CFAA. According to Amphenol, Paul's "violation of the CFAA occurred the moment he accessed information in a manner that exceeded the authorization provided by Amphenol under the IPA."

In his reply memorandum, Paul argues that "[t]here is no dispute that Mr. Paul had access [to] the plaintiff's database, the dispute is over the application of the CFAA – whether it applies to allegedly disloyal employees and allegations of misappropriation." Paul states that movement in the second circuit is towards the application of the narrow approach, i.e., that the CFAA does not apply to disloyal employees, citing the recent Poller v. BioScrip, Inc., 2013 WL 5354753 at *20, *22 (S.D.N.Y. Sept. 25, 2013).

The CFAA provides in relevant part: "[w]hoever intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer . . ." or "knowingly and with intent to defraud, accesses a protected computer without authorization, or

exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value . . . shall be punished as provided in subsection (c) of this section."  18 U.S.C. §§ 1030(a)(2)(c) and (a)(4).  The statute permits a person to maintain a civil action if he or she suffered damage or loss by reason of a violation of the criminal statute.  18 U.S.C. § 1030(g).

The CFAA does not define "without authorization," but courts have construed this phrase to mean "without any permission."  LVRC Holdings LLC, 581 F. 3d 1127, 1130-31 (9th Cir. 2009); see also Westbrook Tech., Inc. v. Wesler, 2010 WL 2826280, at *3 (D. Conn. July 15, 2010).  The ninth circuit specifically held that "a person uses a computer 'without authorization' . . . when the person has not received permission to use the computer for any purpose . . . or when the employer has rescinded permission to access the computer and the defendant uses the computer anyway."  LVRC Holdings LLC, 581 F.2d at 1130.  The CFAA defines "exceeds authorized access" as "access[ing] a computer with authorization and to use such access to obtain or alter information in the computer that the accessor is not entitled to so obtain or alter."  18 U.S.C. § 1030(e)(6).  A violation occurs when an employee permissibly accesses a computer, but uses such authorization to access information to which he is not entitled.  See LVRC Holdings LLC,

17

F.3d at 1133 (recognizing that "a person who 'exceeds authorized access' has permission to access the computer, but accesses information on the computer that the person is not entitled to access.").

The second circuit has not squarely addressed the issue of whether access and misuse or misappropriation of data in which an employee has authorized access constitutes "access without authorization" and "exceed[ing] authorized access" under the CFAA. Orbit One Commc'ns, Inc. v. Numerex Corp., 692 F. Supp.2d 373, 385 (S.D.N.Y. 2010).[8]  The court in Orbit found that a review of the statute as a whole confirms a narrow interpretation. The court concluded that improper access does not include an authorized user's misuse or misappropriation of information. Id.

The CFAA defines "loss" as "a reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential

---

[8] Finding that "[a]t least two Circuits and one district court in our Circuit have applied agency law principles to the CFAA and held that an employee who misappropriates data residing on his employer's computer system or accesses it for an improper purpose violates the statute.[65] But other courts, including at least one district court in our Circuit, have disagreed, holding that the CFAA's prohibition of improper 'access' does not encompass an employee's misuse or misappropriation of information that the employee lawfully accessed." Orbit One Commc'ns, Inc., 692 F. Supp.2d at 385.

damages incurred because of interruption of service." 18 U.S.C.
§ 1030. The second circuit concluded that 18 U.S.C. §
1030(e)(11) of the CFAA "exclude[s] losses incurred as a result
of [the] plaintiff's misappropriation of proprietary
information. . . . implicitly show[ing] that the statute as a
whole does not reach misappropriation of lawfully accessed
information: It would be illogical for the statute to prohibit
misappropriation of employer information, but not to define loss
to include the losses resulting from that misappropriation."
JBCHoldings NY, LLC v. Pakter, 931 F. Supp.2d 514, 524 (S.D.N.Y.
2013) (citing Jet One Grp., Inc. v. Halcyon Jet Holdings, Inc.,
2009 WL 2524864, at *6 (E.D.N.Y. Aug. 14, 2009) (internal
citations omitted). Thus, "the statute as a whole indicates
Congress's intent to prohibit access of a computer without
authorization, not an employee's misuse of information that he
or she was entitled to access or obtain." Id.; see also Univ.
Sports Pub. Co. v. Playmakers Media Co., 725 F. Supp.2d 378, 384
(S.D.N.Y. 2010) (concluding that the CFAA's language and
legislative history show that Congress intended it to proscribe
hacking, not misappropriation of lawfully accessed information).

The recent JBCHoldings NY "[found] the narrow approach to
be considerably more persuasive: When an employee who has been
granted access to an employer's computer misuses that access,

either by violating the terms of use or by breaching a duty of loyalty to the employer, the employee does not 'exceed authorized access' or act 'without authorization.'" JBCHoldings 931 F. Supp.2d 514, 522-23 (S.D.N.Y. 2013).

In another recent case from the southern district of New York, the court found "exploitative or disloyal access to an employer's computer will not render otherwise permissible access unauthorized within the CFAA's meaning." The court stated "where an employee has certain access to a computer or system associated with her job, that access will be construed as unauthorized within the CFAA only where it occurs after the employee is terminated or resigns." Poller 2013 WL 5354753 at *20, *22 (S.D.N.Y. 2013).

Movement within the second circuit has been towards the narrow approach to the CFAA, that is, an employee's misuse of access that has been granted to him or her by an employer, does "exceed authorized access" or amount to an act "without authorization," within the meaning of the CFAA.

Here, Amphenol gave Paul access to confidential, proprietary, and trade secret information. Paul was a high-level employee and, as such, his job required that he have access to anything and everything. While Paul agreed that, under the IPA, he would have access to such confidential information solely for

performing the duties of his employment, the provision highlighted the fact that Paul was not to abuse his access. It did not, however, act as a talismanic limit or revocation of access.

The court concludes that Paul was authorized to access to the confidential information, but misused that access by downloading the confidential information. However, Paul did not exceed authorized access or act without authorization within the meaning of the CFAA.  Furthermore, when, on February 26, 2013, Paul downloaded personal files along with his work files, he did so well before his resignation on March 9, 2012. Therefore, the court concludes that Paul did not violate the CFAA.

### III. <u>Misappropriation of Trade Secrets and Unfair Competition Claims</u>

Paul argues that Amphenol cannot prove that he has, or is, using its trade secrets. Specifically, Paul argues that there is no dispute that he has returned all of Amphenol's materials, attested to the fact that he would not disclose Amphenol's information, signed an agreement with his current employer prohibiting any such disclosure, and TE's electronic certifications prove that the defendant is not disclosing any such information. Furthermore, as discussed above, Paul argues

that Amphenol cannot prove any damages as a result of its misappropriation claim.

Amphenol responds that a claim of misappropriation can be established by showing access to trade secrets and substantial similarity of the competing products. Specifically, Amphenol argues that "the record provides, at a minimum, a basis for a jury to reasonably conclude that Paul used the knowledge of the trade secrets he acquired at Amphenol while being involved in the development, production, and distribution of competing products at TE. Amphenol asserts that "[t]he factual record demonstrates that Paul stole and had intimate knowledge of, among other things, trade secrets related to the development, manufacturing, design, pricing, marketing, and distribution of Amphenol's backshell adapters and 2M miniature connectors when he left Amphenol and inevitably used that information to help in the development, manufacturing, and distribution of similar, competing products at TE." With respect to damages, Amphenol argues that New York law provides an award of nominal damages for unfair competition claims in the event monetary damages resulting from a loss of business are not calculable or available. "As to the issue of compensatory damages resulting from a loss or diversion of business, Amphenol incorporates its request for a deferment of the issue under Rule 56(d)," for the same reasons stated in section I.

Unfair competition is a "broad and flexible doctrine" that recognizes an "incalculable variety of illegal practices." <u>Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Co.</u>, 672 F.2d 1095, 1105 (2d Cir. 1982) (internal quotation marks and citations omitted). It includes "any form of commercial immorality or simply as endeavoring to reap where one has not sown; it is taking the skill, expenditures and labors of a competitor, and misappropriating for the commercial advantage of one person . . . a benefit or property right belonging to another." <u>Id.</u> In other words, "the essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship." <u>Telecom Int'l Am., Ltd. v. AT & T Corp.</u>, 280 F.3d 175, 197 (2d Cir. 2001). Importantly, "some element of bad faith" is central to a viable claim for unfair competition. <u>Saratoga v. Vichy Springs</u>, 625 F.2d 1037, 1044 (2d Cir. 1980).

The New York Court of Appeals identified "two theories of common-law unfair competition that have been "long recognized": (1) "palming off" - selling the goods of one manufacturer as those of another; and (2) "misappropriation" – misappropriating

the results of the skill, expenditures, and labors of a competitor.  ITC Ltd. v. Punchgini, Inc., 9 N.Y.3d 467, 476-77 (2007).  "Although unfair competition often alleges misappropriation of trade secrets or ideas, a claim may be based on misappropriation of client lists, internal company documents, and business strategies if wrongful or fraudulent tactics are employed."  Friedman v. Wahrsager, 848 F. Supp.2d 278, 303 (E.D.N.Y. 2012) (citing Barbagallo v. Marcum LLP, 820 F. Supp.2d 429 (E.D.N.Y. 2011)).

A plaintiff claiming misappropriation of a trade secret must prove: "(1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc., 920 F.2d 171, 173 (2d Cir. 1990); Rapco Foam, Inc. v. Scientific Applications, Inc., 479 F. Supp. 1027, 1029 (S.D.N.Y. 1979)[9]

Where the information sought "would not otherwise qualify as a trade secret, the unauthorized physical taking and exploitation of internal company documents, including detailed customer information by an employee for use in his future

---

[9] "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Restatement (First) of Torts § 757 (1939).

24

business or employment is to be enjoined as unfair competition." Ecolab Inc. v. Paolo, 753 F. Supp. 1100, 1111 (E.D.N.Y. 1991). Advanced Magnification Instruments of Oneonta, N.Y., Ltd. v. Minuteman Optical Corp., 135 A.D.2d 889, 522 (3d Dep't 1987).

Here, as the court concluded in section I, the undisputed facts show that Paul, even if he possessed a trade secret, is not using, or unfairly competing with, that information. Additionally, Amphenol has failed to prove that it incurred damages. Therefore, Amphenol has failed to provide sufficient facts to support its cause of action for misappropriation of trade secrets and unfair competition.

## IV.  Breach of Fiduciary Duties Claim

The defendant finally argues that Amphenol cannot satisfy its burden of establishing that he breached any fiduciary duty owed to Amphenol or that it sustained any damages from any alleged breach. Specifically, the defendant states that he resigned for a better job at TE which does not amount to a breach of fiduciary duties, and that Amphenol has no evidence to the contrary.

Amphenol responds that "[h]igh-level corporate employees, such as Paul, owe fiduciary duties to their employer not to (1) actively exploit their positions within the corporation for

25

their own personal benefit, or (2) hinder the ability of a corporation to continue the business for which it was developed." Specifically, Amphenol argues that "[i]n violation of these strict fiduciary duties, Paul, among other things: (1) secretly met with Amphenol's direct competitor, TE, in the months leading up to his abrupt resignation; (2) in the process, stole thousands of confidential documents while secretly negotiating the terms of employment with TE;(1) retained this confidential information following his departure from Amphenol;(4) withheld the name of his new employer upon his resignation; and (5) misrepresented the job responsibilities he was to undertake at TE with full knowledge that he would work with products that competed with Amphenol." With respect to damages, Amphenol argues that, as with the breach of contract claim, "New York law permits an award of nominal damages in the event that monetary damages resulting from a loss of business are not calculable or available." Again, Amphenol incorporates its argument in Section I for a deferment under Rule 56(d) on the issue of compensatory damages resulting from a loss or diversion of business.

"In Whitney v. Citibank, N.A., 782 F.2d 1106, 1115 (2d Cir.1986), [the second circuit] set out the well settled elements of a New York claim for inducing or participating in a breach of fiduciary duty: The claimant must prove (1) a breach

by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that the plaintiff suffered damages as a result of the breach." S & K Sales Co. v. Nike, Inc., 816 F.2d 843, 847-48 (2d Cir. 1987) (internal quotations omitted).

"New York law establishes that an employee-employer relationship is fiduciary." New York v. Joseph L. Balkan, Inc., 656 F. Supp. 536, 548 (E.D.N.Y. 1987) Fairfield Fin. Mortgage Grp., Inc. v. Luca, 584 F. Supp.2d 479, 485 (E.D.N.Y. 2008). Furthermore, "damages are an essential element of a cause of action for breach of fiduciary duty." Donovan v. Ficus Investments, Inc., 872 N.Y.S.2d 690 (Sup. Ct. 2008) (citing People of the State of New York v. H & R Block, Inc., 2007 WL 2330924, at *7 (N.Y. Sup.Ct. July 9, 2007); Kurtzman v. Bergstol, 40 AD3d 588, 590 (2d Dep't 2007) (stating that "[i]n order to establish a breach of fiduciary duty, a plaintiff must prove . . . damages that were directly caused by the defendant's misconduct"); R.M. Newell Co., Inc. v. Rice, 236 A.D.2d 843, 844 (4th Dep't 1997) (noting that in a breach of fiduciary duty claim damages are "an essential element").

"An employee owes a fiduciary duty to his employer as a matter of law and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound

to exercise the utmost good faith and loyalty in the performance of his duties." Louis Capital Markets, L.P. v. REFCO Grp. Ltd., LLC, 801 N.Y.S.2d 490, 496 (Sup. Ct. 2005) (quoting Lamdin v. Broadway Surface Advertising Corp., 272 N.Y. 133, 138 (1936) (internal quotation marks omitted)). "New York courts have consistently held that an employee is not restricted from accepting employment with his former employee's competitor, as long as he does not violate the terms of his employment agreement and does not breach any fiduciary duties owed to his former employer." Id. (citing Kaumagraph Co. v. Stampagraph Co., 235 N.Y. 1, 9 (1923)).

First, while Paul owed Amphenol a fiduciary duty in an employee-employer relationship, there is no evidence that he violated that duty, only that he met with TE for the obvious discussion of future employment. There is also no evidence that Paul was acting in bad faith in these discussions.  Secondly, as explained in Section I, there is no evidence Paul violated the terms of his employment agreement or that Amphenol sustained any damages. Thus, the court concludes that Paul did not breach a fiduciary duty by accepting employment with his former employee's competitor.

## CONCLUSION

For the reasons stated above, Paul's motion for summary judgment is GRANTED

It is so ordered this 24th day of January 2014, at Hartford, Connecticut.

_____/s/_____
Alfred V. Covello,
United States District Judge